UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| PEAK FISHING SERVICES, LLC, | § | |
|     Plaintiff, | § | CIVIL ACTION NO. 7:20-cv-00211 |
| | § | |
| v. | § | |
| | § | |
| ASSURED BENEFIT ADMINISTRATORS, | § | |
| INC., AND EMPLOYEE BENEFITS | § | |
| CONSULTING, | § | |
|     Defendants. | § | |

## ORIGINAL COMPLAINT

Plaintiff, Peak Fishing Services, LLC (hereinafter "Peak Fishing" or "Plaintiff"), on behalf of itself and as fiduciary of the Peak Fishing Services, LLC Employee Health Plan (the "Plan"), files this Original Complaint through its counsel against Defendants Assured Benefit Administrators, Inc. ("ABA"), and Employee Benefits Consulting, ("EBC"), (collectively "Defendants"), and for cause of action respectfully states and alleges as follows:

## PARTIES

1.     Peak Fishing is a limited liability company organized under the laws of the State of Texas, doing business in the State of Texas with its headquarters in Midland, Texas. Peak Fishing supplies tools and services in the oil and gas industry. Peak Fishing is the Plan Sponsor and Plan Administrator of the Peak Fishing Services, LLC Employee Health Plan (the "Plan"). As Plan Sponsor and Plan Administrator, Peak Fishing is a fiduciary of the Plan and has standing to bring claims under 29 U.S.C. 1132(a) and (e).

2.     Assured Benefit Administrators, Inc., is a corporation organized and existing under the laws of Texas with an office at 221 N Kansas St., Suite 1610, El Paso,

1

TX 79901.  ABA may be served through David A Rendall, its agent for service of process, at 8150 N. Central Expressway, Ste. 1700, Dallas TX 75006.  ABA served as third party administrator of the Plan and was a fiduciary of the Plan beginning no later than the Plan start date on June 1, 2019.

3.     Employee Benefits Consulting is the assumed name of a limited liability company doing business in Texas with an office at 2367 Oak Aly, Tyler, TX 75701.  EBC may be served through James B Gillen, Jr., at 613 Shelley Park Plaza, Tyler, TX 75701.  Mr. Gillen is the agent for service of process of Employee Benefits Consulting, LLC, which is either EBC's Manager or is EBC itself.  Throughout calendar year 2019, EBC served as Broker of Record for Plaintiff with respect to Plaintiff's employee benefit program, including the Plan.  As further described below, EBC was a fiduciary of the Plan with respect to specific actions taken by EBC during the Plan's term.

## JURISDICTION/VENUE

4.     This Court has jurisdiction pursuant to 29 U.S.C. § 1132 (a) and (e) over Plaintiff's claims arising under ERISA, Title 29, Chapter 18 of the U.S. Code.  This Court has supplemental jurisdiction over claims not arising under Title 29 of the U.S. Code pursuant to 28 U.S.C. § 1367(a) as those claims involve the same Defendants and the conduct giving rise to the ERISA claims are intertwined with the conduct giving rise to the non-ERISA claims.

5.     Venue is proper in this District for each Defendant pursuant to 29 U.S.C. § 1132(e) because the Plan was administered, at least in part, in the Western District of Texas, Defendant ABA may be found in the Western District of Texas, and one or more of the breaches complained of below occurred in the Western District of Texas.

## STATEMENT OF FACTS

6.      Plaintiff incorporates paragraphs 1-5 as if fully restated here.

7.      This case arises from damages caused to the Plan and to Peak Fishing related to an employee health product (the "Health Product") promoted to Peak Fishing by ABA and EBC and from breaches of duties by Defendants as Plan fiduciaries under ERISA.  Both ABA and EBC failed to properly advise Peak Fishing as to the features and risks of the Health Product.  ABA and EBC also made material misrepresentations on which Peak Fishing relied in adopting the Health Product offered by ABA and endorsed by EBC.

8.      During the first quarter of 2019, Peak Fishing began looking for opportunities to improve benefits provided to its employees and to cultivate employee goodwill.  Peak Fishing's general liability insurance broker recommended that Peak Fishing engage EBC to help with this effort.

9.      Peak Fishing met with EBC which held itself out as specially qualified to assist and advise employers such as Peak Fishing with their employee health benefit plans.  Based on the representations of Peak Fishing's liability broker and of EBC, Peak Fishing engaged EBC as broker of record for its employee health plan and related coverages.

10.     EBC, as Peak Fishing's broker of record, recommended ABA to Peak Fishing for consideration as third party administrator of Peak Fishing's employee health plan.

11.     ABA and EBC provided Peak Fishing with summaries of different health plan options.  One such option was the ABA "RBC" plan, which ABA and EBC both

characterized as including a "PPO". ABA's written proposal to Peak Fishing characterized the Health Product's pricing mechanism as a "PPO Network". Trevor Pearson of ABA and Jennifer Henry of EBC described the Health Product as "like fully insured, you have PPO products and HMO products."

12.     ABA and EBC both described the Health Product as a level funded plan and on multiple occasions represented that the Health Product was not self-funded. Whenever a Peak Fishing representative would refer to the RBC plan as "self funded", the ABA and EBC representatives would interject "it's level funded". EBC and ABA described the difference between level funded and self-funded as Peak Fishing's financial obligation would never exceed the monthly premiums. Misrepresentations regarding the Plan being "level funded" and not "self-funded" continued throughout the term of the Plan and into the early part of 2020.

13.     ABA and EBC also recommended that ABA procure a Stop Loss Policy on Peak Fishing's behalf. The Defendants characterized the Stop Loss Policy solely in financial terms, that the Stop Loss Policy would fund all claims that exceeded Peak Fishing's monthly premium. Further, Defendants minimized the importance of the Stop Loss Policy, stating it was normal for the Stop Loss Policy to be procured after the Health Product was adopted. Peak Fishing was provided proposals and an application for the Stop Loss Policy, but neither Defendant provided additional explanation regarding the policy nor did they provide a draft of the policy itself.

14.     As part of the overall health benefit program, EBC also recommended that it, EBC, contract with MyMDSelect to provide concierge medical services for Peak Fishing's employees. To induce Peak Fishing to engage MyMDSelect, EBC represented

that MyMDSelect would provide a doctor in the Midland County area for live visits by Peak Fishing employees.  Peak Fishing relied on this representation in adopting MyMDSelect as part of the employee health benefit program.  A MyMDSelect doctor was never provided for the Midland County area yet the Plan continued to pay the MyMDSelect premium for those employees.

15.   Further, Defendants represented that Plan participants and beneficiaries would be able to freely choose their own providers, e.g. that employees and their dependents could use MyMDSelect, or they were free to choose any provider they wished. In selling the Plan, EBC touted the expected possibility that at the end of the plan year, there could be money remaining in the claims fund which could be used by Peak Fishing and its employees to lower their respective costs in the following plan year.

16.   Peak Fishing elected to adopt the Health Product and the MyMDSelect program effective on June 1, 2019.  These became the primary components of the Plan for which Plaintiff and Defendants served as fiduciaries. The Plan reduced the monthly cost of providing health benefits for Plan participants and Peak Fishing passed that savings on to its employees.

17.   Peak Fishing's employees experienced difficulties with the Plan almost immediately.  During the Plan's term, problems included a lack of recognition by health care providers, service refusals, pre-approval for services that were later declined, ABA directing participants to the hospital selected by ABA, balance billing from providers and other issues.

18.    Plan Participants and Dependents also experienced substantial delays in getting approval of Pre-Service Claims—claims for services which were medically

necessary but where a reasonable delay would not jeopardize the life or health of the patient.  Plan Participants and Beneficiaries regularly experienced delays of multiple weeks.

19.     On information and belief, the problems Peak Fishing and its families faced were known by or became known to EBC and ABA.  Neither EBC nor ABA advised or even informed Peak Fishing regarding the source of these issues or took material steps to alleviate or mitigate the problems.  The difficulties experienced by Peak Fishing's employees caused Peak Fishing a substantial loss in employee goodwill, the very goodwill Peak Fishing sought to cultivate in adopting the Plan.  In addition to the lost goodwill, Peak Fishing was investing a substantial, unexpected, amount of time in hearing employee complaints and working to ensure those complaints were being addressed by ABA.

20.     In October of 2019, Peak Fishing began investigating options for a replacement plan to protect and restore its employee goodwill and to mitigate against the ongoing administrative and operational burden being incurred.  Initial discussions included adoption of a different plan with ABA through EBC.  Ultimately, after consulting with EBC, Peak Fishing chose to terminate the Plan which automatically triggered termination of Peak Fishing's agreement with ABA.

21.     EBC assured Peak Fishing that the Plan would continue to operate as EBC and ABA had previously described until termination. Peak Fishing relied on that assurance in selecting December 31, 2019 as the Plan's termination date.   EBC recommended that Peak Fishing continue paying premiums on the Stop Loss Policy procured to fund claims under the Plan but offered no other suggestions or cautions

regarding the early termination.  Further, EBC insisted that it remain the broker of record for the ABA Plan until the Plan's termination, preserving its commissions for an additional two months while also continuing its fiduciary and legal obligations to Peak Fishing.

22.   In December 2019, Peak Fishing received startling news.  ABA refused to pay invoices from medical providers asserting that the claims fund was empty.  Both ABA and EBC sold the Plan to Peak Fishing by representing that Peak Fishing would never be liable for more than the monthly payment to ABA.  ABA's refusal to pay, more than 50 days after Peak Fishing formally notified ABA of its intent to terminate the Plan, was the first Peak Fishing had heard that it could be liable for amounts above the monthly payment.  Peak Fishing relied on EBC's and ABA's representations that it would never owe more than its monthly payment in selecting the December 31, 2019 termination date.

23.   The Plan incurred additional monetary damages because of ABA's and EBC's failure to properly advise Peak Fishing with respect to Plan termination.   The dollar amount of claims exceeding the claim fund balance would have been lower if the Plan were terminated on or before October 31, 2019.  Peak Fishing also paid at least four months of Stop Loss Policy premiums that it would have avoided had it received proper advice.

24.   All conditions precedent have been performed by Peak Fishing or have occurred.

## CAUSES OF ACTION

### Negligence

25.   Plaintiff incorporates paragraphs 1-24 as if fully restated here.

26.     EBC and ABA jointly made numerous misrepresentations to Peak Fishing to induce Peak Fishing in connection with marketing the ABA Health Product.  These misrepresentations included that the Health Product did not carry any of the financial risks of a self-insured plan; that the Health Product included a "PPO"; that the stop loss policy was only a financial tool and otherwise had no effect on the Health Product; that employees would have no or minimal problems in getting providers to accept the Plan; and that employees would have freedom to choose their providers under the Plan.  Each of these representations were false and Peak Fishing relied on them in choosing ABA as its Third Party Administrator and in adopting the ABA RBC health benefit plan.

27.     In addition to the above joint misrepresentations, EBC represented to Peak Fishing that MyMDSelect would have a live provider available in the Midland County area for Peak Fishing's Plan participants.  EBC also represented that Peak Fishing could reasonably expect the Plan's claims account to have excess funds available for reimbursement back to Peak Fishing at the end of the Plan year.  Peak Fishing relied on this representation in choosing to add and pay for the MyMDSelect program as part of its benefit package and in adopting the ABA RBC plan as its health benefit plan.

28.     Each of the foregoing representations was made at least to Janet Carreno of Peak's Houston Office.  The representations were made to Ms. Carreno in a live meeting in the Houston, Texas office, sent to her by email and conveyed to her over the phone.

Negligence:  Procurement of the Stop Loss Policy

29.     EBC and ABA each served as agents in the business of insurance with respect to procurement of the Stop Loss Policy.  EBC participated in soliciting, negotiating, and procuring the contract for the Stop Loss Policy.  ABA participated in

soliciting, negotiating, procuring, and collecting premiums with respect the contract for the Stop Loss Policy.

30.    As agents, EBC and ABA each had the duty to adequately explain the Stop Loss Policy to Peak Fishing as the insured.   Neither EBC nor ABA met such duty and Peak Fishing was harmed by their failure.   For example, both EBC and ABA led Peak Fishing to believe that the Stop Loss Policy deductible was a monthly deductible when in fact the deductible was annual.   Further, neither EBC nor ABA informed Peak Fishing that the Stop Loss Policy was a claims made policy rather than an occurrence policy. Peak Fishing discovered these facts about the Stop Loss Policy only after the Plan terminated at the end of calendar year 2019.   Peak Fishing, as Sponsor of the Plan, has suffered liability for claims under the Plan that exceeded Peak Fishing's monthly contributions to the Plan's claim fund.   Further, Peak Fishing paid an additional two months of Stop Loss Policy premiums following termination of the Plan in order to extend the reporting period for the claims made policy despite there being virtually no benefit to Peak for doing so.   Peak Fishing paid these amounts in addition to the premiums paid for the health insurance procured as a replacement for the Plan.

Negligent Misrepresentation:  Procurement of Health Product for Peak Fishing's Employees

31.    EBC and ABA also served as brokers with respect to Peak Fishing's search for health benefits to provide to its employees.   Specifically, EBC solicited and proposed a series of products, including fully funded insurance policies, as a possible benefit.   ABA solicited Peak to procure one of a number of health products that ABA desired to provide. EBC and ABA each violated its duty of care and competence in obtaining and/or

communicating information about the products when it provided Peak Fishing false information about the Health Product Peak Fishing ultimately adopted as the Plan.

32.     As Peak Fishing's Broker of Record, EBC had an independent duty to verify the information from ABA that EBC adopted or appeared to adopt when that information was transmitted to Peak Fishing.

33.     ABA and EBC each breached this duty of care and competence by providing Peak Fishing with a quote for the Health Product that included "Referenced Based Pricing" as a PPO Network; by providing a spreadsheet referencing the Health Product as including a PPO and by stating, in context of discussions regarding the specific Health Product, that plans such as the Health Product had PPOs and HMOs. This is particularly true when the specific Health Product being negotiated at the time contained neither an HMO nor a PPO.

34.     ABA and EBC further breached their duty of care in making representations about  the Product that conflicted with the Defendants' representation that Peak Fishing would never have liability above its monthly premiums. ABA and EBC relied on the ABA procured Stop Loss Policy as the basis for any limitation to Peak Fishing's liability under the Plan while the same Policy required ABA, at least for some Pre-Service Claims, to direct participants and beneficiaries to particular providers based on price negotiations occurring during pre-approval of the services.

35.     ABA and EBC breached their duty of care by representing that providers would readily accept the Health Product to cover services for Peak Fishing's employees and their families.  At best, ABA and EBC had limited experience using the Health Product with providers in the areas where they knew Peak Fishing's employees and their

dependents lived.  On information and belief, ABA and EBC ignored Peak Fishing's employee and dependent data and simply made reckless representations to close the sale.

36.    Peak Fishing reasonably relied on the above misrepresentations and was harmed by these misrepresentations separately and in combination.  Not only had EBC held itself out as specially situated to help Peak Fishing with its employee benefit needs, EBC stood cloaked in the legitimacy and goodwill of Peak Fishing's liability broker.  For example, the absence of a PPO's pre-negotiated pricing led the Plan's third party administrator, ABA, to instruct a family to use a hospital which they did not want to use. The affected family was not happy with being forced to a hospital not of their choosing. If the Plan had included a PPO, the family would have been able to choose any hospital in the Plan's network and not been directed to a specific provider based on a last minute decision by ABA.

37.    In another instance, an employee received services that the third party administrator determined should be covered at a cost below the employee's deductible and informed the medical provider of this determination.  The medical provider then billed the employee for an amount that exceeded the employee's deductible under the Plan. The employee paid the billed amount because ABA informed him the claim fell fully under the deductible.  Neither Peak Fishing nor its employees were properly informed by EBC regarding how to respond when receiving a balance bill or other excessive bill subject to the Plan.

38.    Other families in the Plan experienced substantial delays in getting approval for services subject to Pre-Service Claim procedures.  Unbeknownst to Peak Fishing, these delays were caused by provisions in the Stop Loss Policy that required ABA to

negotiate and reach agreement with providers before the services could be performed. These delays caused frustration among the affected families.  If the agreement had actually contained a PPO, such negotiations would not have been required and the affected families would not have suffered through the delays caused by ABA's Health Product.

39.     Peak Fishing was also harmed by providers not recognizing the Plan.  From the beginning, participants and beneficiaries would show their "insurance cards" and the provider would not have any clue about ABA and/or reference based pricing.  The providers would either reject the "insurance" or express concerns.

40.     Because of the foregoing, the employees and their dependents developed substantial concerns that they were not receiving and/or would not be able to receive the health care they should reasonably expect under an employer sponsored health plan.  Peak Fishing's management noted a substantial erosion of employee goodwill because of employees' difficulties with the Plan despite the significant management and administrative time Peak Fishing had devoted to resolving the problems being reported.

41.     Peak Fishing chose to terminate the Plan to mitigate the damages to its employee goodwill and the excessive operational and administrative burden incurred in connection with the Plan.  Peak Fishing incurred additional costs for its employee health benefits as result of such termination and these additional costs are costs of mitigating EBC's and ABA's negligence and negligent misrepresentations.

42.     EBC also breached its duties of care and competence in advising Peak Fishing when Peak Fishing sought to modify and eventually terminate the Plan.  Peak Fishing asked specific questions about the ABA procured Stop Loss Policy and the effect

of Plan termination on that Policy.  Peak Fishing expressed concerns that it would be liable for amounts over and above the monthly premium payments.  EBC failed to determine and/or inform Peak Fishing that the Stop Loss Policy was an annual deductible policy and that Peak would still (i) be expected to pay into the claims fund for claims exceeding prior claims fund contributions, (ii) pay ABA for processing claims ABA received from providers after the termination date, and (iii) that the Stop Loss Policy was unlikely to pay any money to Peak Fishing given the current claim totals.  Further, if it had properly evaluated Peak Fishing's situation, EBC would have advised Peak Fishing to terminate the Plan immediately because the claims fund had a positive balance at the end of September and again at the end of October.

43.    EBC was also negligent in failing to adequately describe the MyMDSelect benefit.  EBC never informed Peak Fishing that the live doctor benefit of MyMDSelect would never be reasonably available to employees in the Midland County region.  As a result of this negligence Peak Fishing paid for a benefit that neither it nor its employees received.

## Breach of Fiduciary Duties

44.    Plaintiff re-asserts each of Paragraph 1-43 as if fully set forth here.

45.    ABA is responsible as a fiduciary under 29 U.S.C. § 1104 with respect to all actions it and its employees, agents, or contractors took with respect to the Plan. Following adoption of the Plan, ABA exercised discretion to approve or deny claims, select contractors, disburse funds, assign pricing to services, and other actions without seeking any input, agreement, or ratification from Peak Fishing as the Plan Administrator.

46.    On information and belief, EBC is a fiduciary under the Plan with respect to certain acts in which EBC exercised discretionary authority with respect to Plan assets, administration or management.  For example, EBC exercised discretion over Plan assets by communicating that claims had been allowed and/or were covered under the Plan.

Breach of Fiduciary Duties in Administering Pre-Service Claims

47.    ABA breached its fiduciary duties to the Plan in violation 29 U.S.C. § 1104(a)(1) by failing to engage Peak Fishing, the Plan Administrator, with respect to negotiation and allowance of "Pre-Service Claims", as defined in the Plan Document and Summary Plan Description (attached hereto as Exhibit A).

48.    Several Plan participants and beneficiaries expressed frustration over delays in processing and approval of Pre-Service Claims.  The Plan provided for the Plan Administrator, Peak Fishing, to make coverage determinations.  Peak Fishing could have waived provisions of the Plan or amended the Plan to address or streamline the delays, particularly with one of the aims of the Plan being employee goodwill.  Under the circumstances, a prudent person would have disclosed the full reason for the delays and engaged the Plan Administrator in an effort to solve the problem.  ABA's failure to inform Peak Fishing why the delays were occurring violated the prudent person standard of 29 U.S.C. 1104(a)(1)(B) and constitutes a breach of fiduciary duty on the part of ABA.

49.    On information and belief, ABA did not consult with Peak Fishing on the Pre-Service Claim delays because ABA had a conflict of interest.  Specifically, ABA was forced to choose between meeting its prudent person obligations or continuing to hide the negligence and/or misrepresentation which occurred when ABA promoted its Health

Product and the Stop Loss Policy to Peak Fishing.  Thus, ABA administered the Plan under a conflict of interest in violation of 29 U.S.C. 1104(a)(1).

50.    For example, the Pre-Service Claims had to comply with the "Green Star Plus MRBP +50% Level Funded program and requirements" or the claims would not qualify as covered expenses under the Stop Loss Policy.  To meet the Green Star Plus requirement, ABA had to negotiate with providers and identify a specific provider who would charge for their services in a manner satisfactory under the Stop Loss Policy.  The need to negotiate pricing contradicted ABA's representation that the Plan included a PPO. Such negotiation also resulted in the Plan choosing providers for the participants and beneficiaries, contradicting ABA's representation that participants and beneficiaries would be able to choose their own providers.

51.    The ABA procured Stop Loss Policy also contained a provision that precluded amendment of the Plan without approval of the Stop Loss carrier.  If an unapproved amendment was made, Stop Loss coverage was terminated.  Even if the amendment was approved, the carrier could raise the monthly rates for the policy.  In other words, the Stop Loss Policy imposed substantial restrictions which the Plan must follow if the Plan was to provide the benefits ABA highlighted in order to become third party administrator.

52.    The limitations imposed by the ABA procured Stop Loss Policy served to reinforce the pain ABA would experience if it met its obligation to engage Peak Fishing and develop solutions to the Pre-Service Claim delays.  Faced with either disclosing its own misconduct or failing to properly administer the Plan, ABA chose to violate its duties to the Plan.

53.    Further, 29 U.S.C. § 1104(a)(1)(D) requires fiduciaries to administer the Plan pursuant to the documents governing the Plan.   As described above, ABA administered the Plan according to the requirements of the Stop Loss Policy, which was not a Plan Document, in violation of ABAs statutory fiduciary duties.

Breach of Fiduciary Duties when Communicating with Providers

54.    ABA also failed to document its agreements for Pre-Service Claims with the Providers who would perform the services.   On multiple occasions, ABA and EBC communicated that a Pre-Service Claim had been approved, the approved services were performed, and then the Provider refused to accept the payment that ABA indicated was agreed for the service.   The Providers never agreed to a payment other than their invoiced amount and ABA has not provided evidence of such Agreements to Peak Fishing or to the participants. The differences in the amounts invoiced and the payments proposed by ABA are substantial.   In one case, the provider invoice is approximately twenty-eight thousand dollars more than the amount ABA asserts the Provider should receive.   In another case, the claim was partially denied by ABA even after EBC communicated that the Pre-Service claim had been approved.

55.    In the alternative, EBC and/or ABA incorrectly informed Peak Fishing and the applicable participant that Pre-Service claims were allowed.   With respect to at least three Pre-Service Claims, EBC communicated to Peak Fishing and/or to the relevant participant that the claims had been "approved".   Either EBC incorrectly determined that the Pre-Service Claims were approved or ABA errantly informed EBC that the Pre-Service Claims were approved.   ABA, EBC, or both acted as fiduciaries in determining that claims were allowed and/or that it was permissible to communicate that the Plan had

approved the claims. A prudent person would have ensured that the claims were actually approved before communicating to the Participants or to the Plan Sponsor regarding such approval. The errant communications were therefore breaches of fiduciary duty by ABA and/or EBC in violation of 29 U.S.C. § 1101(a)(1).

Breach of Duty with Respect to Post-Service Claims

56.     ABA processed one or more Post-Service Claims, as defined in the Plan, according to requirements imposed under the Stop Loss Policy. The Stop Loss Policy incorporated requirements applicable to Post-Service Claims that were not contained in the Plan Documents. Failure to meet the Stop Loss Policy's requirements for Post-Service Claims would preclude the applicable claim from being a "Covered Expense" under and as defined in the Stop Loss Policy ABA had procured. ABA could not inform Peak Fishing of the requirements of the Stop Loss Policy without revealing it's negligence and/or misrepresentations in marketing that Policy to Peak Fishing As with the Pre-Service Claims, ABA's conduct created a conflict of interest under which ABA operated in processing the Post-Service Claims and such conflict of interest constituted a breach of fiduciary duty in violation of 29 U.S.C. 1104(a)(1).

57.     Further, ABA processed the Post-Service Claims according to the requirements of the Stop Loss Policy, which is not a Plan document. As such, ABA breached its duty to administer the Plan according to the Plan documents as required under 29 U.S.C. 1104f(a)(1)(D).

Failing to exercise due care in administering the Plan

58.     Peak Fishing, the Plan participants and beneficiaries experienced numerous problems with ABA's administration of the Plan. On multiple occasions, Dependents (as

defined in the Plan) were not entered into ABA's records despite the fact coverage was properly elected for those Dependents in the employee's completed paperwork. On numerous occasions, ABA failed to inform providers regarding claim decisions within the time frames defined by the Plan. On information and belief, such failures to meet the deadlines contributed to provider concerns about and/or resistance to accepting the Plan and contributed to the loss of employee goodwill suffered by Peak Fishing.

### DAMAGES

59.    The allegations of Paragraphs 1-58 are incorporated as if fully set out herein.

60.    Peak Fishing suffered loss of employee goodwill, in an amount to be proven at trial, as a result of the breaches of duty by ABA and EBC above. Peak Fishing terminated the Plan to mitigate such losses. Peak Fishing's costs incurred because of such termination are therefore recoverable from ABA and EBC as costs of mitigation. Peak Fishing's costs of mitigation are not yet fully liquidated and Peak Fishing estimates those costs will exceed $230,000.

61.    ABA administered the Plan and caused harm to Peak Fishing, the Participants, and their Dependents in whole or in part due to ABA's conflicts of interest. ABA should be required to make an accounting of and disgorge its profits earned in connection with the Plan.

62.    EBC damaged Peak Fishing by misrepresenting material information about MyMDSelect when marketing that product to Peak Fishing. Peak Fishing was harmed in the amount of $21,518 because it paid for services that were not useable by Peak Fishing's employees.

63.     EBC and ABA breached their duties in failing to properly advise Peak Fishing to terminate the Stop Loss Policy on October 31, 2019.  Peak Fishing was harmed in the amount of the four months of premiums it paid after that date, in an amount that exceeds $42,000.

64.     Peak Fishing has and will incur substantial costs and attorney fees in bringing causes of action on behalf of the Plan and such causes of action were necessitated by ABA's actions taken under conflicts of interest and other breaches of fiduciary duties. Peak Fishing is therefore entitled to recover its attorney fees incurred in this matter from Defendant ABA.

**PRAYER FOR RELIEF**

65.     WHEREFORE, Plaintiff prays for the following relief from the Court and Jury:

a.   That Defendants Assured Benefits Administrators, Inc. and Employee Benefits Consulting be held jointly and severally liable for damages to Peak resulting from their negligence and negligent misrepresentations.

b.   That Defendant Employee Benefits Consulting be held liable for its misrepresentations with respect to the MyMDSelect program and for its negligence in advising Plaintiff regarding termination of the Plan.

c.   That Defendant Assured Benefits Administrators be required to make an accounting of and disgorge its profits with respect to the Plan because it served as a fiduciary of the Plan while having direct conflicts of interest with the Plan.

d.   That Defendant Assured Benefits Administrators, Inc. be ordered to pay Plaintiff's costs and attorney accrued to bring causes of action on behalf of the Plan.

e.  That Plaintiff be awarded such other and further relief as may be just and appropriate.

Respectfully submitted

/s/ Michael Barnhart
Michael K. Barnhart
Texas Bar. No. 24040472
700 Louisiana-49th Floor
Houston, Texas 77002
(832) 418-1684 (telephone)
Michael.barnhart@peakfishingservices.com
**ATTORNEY FOR PLAINTIFF**
**PEAK FISHING SERVICES, LLC**