**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND-ODESSA DIVISION**

| | | |
|---|---|---|
| **PEAK FISHING SERVICES, LLC, FOR** | § | |
| **ITSELF AND AS FIDUCIARY OF THE** | § | |
| **PEAK FISHING SERVICES, LLC** | § | |
| **EMPLOYEE BENEFIT PLAN,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 7:20-cv-00211-DC** |
| | § | |
| **ASSURED BENEFIT ADMINISTRATORS,** | § | |
| **INC., EMPLOYEE BENEFITS** | § | |
| **CONSULTING,** | § | |
| *Defendants*. | § | |

**FIRST AMENDED COMPLAINT**

Plaintiff, Peak Fishing Services, LLC (hereinafter "Peak Fishing" or "Plaintiff"), on behalf of itself and as fiduciary of the Peak Fishing Services, LLC Employee Health Plan (the "Plan"), files this First Amended Complaint through its counsel against Defendants Assured Benefit Administrators, Inc. ("ABA"), Employee Benefits Consulting, LLC and Threlkeld Benefit Partners, LLC, (collectively "Defendants"), and for cause of action respectfully states and alleges as follows:

**PARTIES**

1.      Peak Fishing is a limited liability company organized under the laws of the State of Texas, doing business in the State of Texas with its headquarters in Midland, Texas.  Peak Fishing supplies tools and services in the oil and gas industry.  Peak Fishing is the Plan Sponsor and Plan Administrator of the Peak Fishing Services, LLC Employee Health Plan (the "Plan").  As Plan Sponsor and Plan Administrator, Peak Fishing is a fiduciary of the Plan and has standing to bring claims under 29 U.S.C. 1132(a) and (e).

2.      Assured Benefit Administrators, Inc., is a corporation organized and existing under the laws of Texas with an office at 221 N Kansas St., Suite 1610, El Paso, TX 79901.  ABA may be served through David A Rendall, its agent for service of process, at 8150 N. Central Expressway, Ste. 1700, Dallas TX 75006.  ABA served as third party administrator of the Plan and was a fiduciary of the Plan beginning no later than the Plan start date on June 1, 2019.  ABA has been served and has appeared in this case.

3.      Threlkeld Benefit Partners, LLC d/b/a Employee Benefits Consulting is a limited liability company doing business in Texas with an office at 2367 Oak Aly, Tyler, TX 75701.  EBC may be served through James B Gillen, Jr., at 613 Shelley Park Plaza, Tyler, TX 75701.  Mr. Gillen is the agent for service of process of Employee Benefits Consulting, LLC, which is EBC's Manager.   Threlkeld Benefit Partners, LLC has appeared in this matter through its attorney of record, Preston McGee, through the filing of Rule 7.1 Disclosures. Dkt. 17.

4.      Employee Benefits Consulting, LLC is a limited liability company doing business in Texas with an office at 2367 Oak Aly, Tyler, TX 75701.  Employee Benefits Consulting, LLC may be served through James B Gillen, Jr., at 613 Shelley Park Plaza, Tyler, TX 75701.  Employee Benefits Consulting, LLC has appeared through the filing of an Answer to the Plaintiff's Original Complaint.

5.      During calendar year 2019, both Threlkeld Benefits Partners, LLC and Employee Benefits Consulting, LLC provided broker services to Texas employers seeking to purchase employee benefit products.   At least one of these entities served as Broker of Record for Plaintiff with respect to Plaintiff's employee benefit program, including the Plan.  As further described below, at least one of these two entities acted as a fiduciary

of the Plan with respect to specific actions taken during the Plan's term.  On information and belief, sales and services activity directed to Peak Fishing was performed by both Threlkeld Benefit Partners, LLC and by Employee Benefits Consulting, LLC using the common assumed name "Employee Benefits Consulting".  Plaintiff therefore asserts that each of these entities are responsible for the activities described below because they functioned as alter egos of each other and they acted in concert to cause the described harms.  References to "the EBC entities" in this First Amended Complaint therefore refer to Threlkeld Benefit Partners, LLC and to Employee Benefits Consulting, LLC, both jointly and as separate entities.

## JURISDICTION/VENUE

6.     This Court has jurisdiction pursuant to 29 U.S.C. § 1132 (a) and (e) over Plaintiff's claims arising under ERISA, Title 29, Chapter 18 of the U.S. Code.  This Court has supplemental jurisdiction over claims not arising under Title 29 of the U.S. Code pursuant to 28 U.S.C. § 1367(a) as those claims involve the same Defendants and the conduct giving rise to the ERISA claims are intertwined with the conduct giving rise to the non-ERISA claims.

7.     Venue is proper in this District for each Defendant pursuant to 29 U.S.C. § 1132(e) because the Plan was administered, at least in part, in the Western District of Texas, Defendant ABA may be found in the Western District of Texas, and one or more of the breaches complained of below occurred in the Western District of Texas.

## STATEMENT OF FACTS

8.     Plaintiff incorporates paragraphs 1-7 as if fully restated here.

9.     This case arises from damages caused to the Plan and to Peak Fishing related to an employee health product (the "Health Product") promoted to Peak Fishing by ABA and the EBC Entities and from breaches of duties by Defendants as Plan fiduciaries under ERISA. ABA and the EBC Entities failed to properly advise Peak Fishing as to the features and risks of the Health Product.  ABA and the EBC Entities also made material misrepresentations on which Peak Fishing relied in adopting the Health Product offered by ABA and endorsed by the EBC Entities.

10.     During the first quarter of 2019, Peak Fishing began looking for opportunities to improve benefits provided to its employees and to cultivate employee goodwill.  As part of this effort, Peak Fishing sought a new group insurance policy to provide its employees and their dependents.  Peak Fishing's general liability insurance broker recommended that Peak Fishing engage the EBC Entities to help with this effort.

11.     Peak Fishing met with the EBC Entities which held itself out as specially qualified to assist and advise employers such as Peak Fishing with their employee health benefit plans.  Based on the representations of Peak Fishing's liability broker and of the EBC Entities, Peak Fishing engaged at least one of the EBC Entities as broker of record for its employee health benefit and related coverages.

12.     The EBC Entities, as Peak Fishing's broker, recommended ABA to Peak Fishing for consideration as third party administrator of Peak Fishing's employee health plan.

13.     ABA and the EBC Entities provided Peak Fishing with summaries of different health plan options.  One such option was the ABA "RBC" plan, which ABA and the EBC Entities both characterized as including a "PPO".  ABA's written proposal

to Peak Fishing characterized the Health Product's pricing mechanism as a "PPO Network". Trevor Pearson of ABA and Jennifer Henry of the EBC Entities described the Health Product as "like fully insured, you have PPO products and HMO products."

14.     ABA and the EBC Entities both described the Health Product as a level funded plan and on multiple occasions represented that the Health Product was not self-funded. Whenever a Peak Fishing representative would refer to the RBC plan as "self funded", ABA's and the EBC Entities' representatives would interject "it's level funded". The EBC Entities and ABA described the difference between level funded and self-funded as Peak Fishing's financial obligation would never exceed the monthly premiums. Misrepresentations regarding the Plan being "level funded" and not "self-funded" continued throughout the term of the Plan and into the early part of 2020.

15.     ABA and the EBC Entities also recommended that ABA procure a Stop Loss Policy on Peak Fishing's behalf. The Defendants characterized the Stop Loss Policy solely in financial terms, that the Stop Loss Policy would fund all claims that exceeded Peak Fishing's monthly premium. Further, Defendants minimized the importance of the Stop Loss Policy, stating it was normal for the Stop Loss Policy to be procured after the Health Product was adopted. Peak Fishing was provided proposals and an application for the Stop Loss Policy, but Defendants failed to provide additional explanation regarding the policy and did not provide a draft of the policy itself.

16.     As part of the overall health benefit program, the EBC Entities also recommended that it, the EBC Entities, contract with MyMDSelect to provide concierge medical services for Peak Fishing's employees. To induce Peak Fishing to engage MyMDSelect, the EBC Entities represented that MyMDSelect would provide a doctor in

the Midland County area for live visits by Peak Fishing employees.  Peak Fishing relied on this representation in adopting MyMDSelect as part of the employee health benefit program.  A MyMDSelect doctor was never provided for the Midland County area yet the Plan continued to pay the MyMDSelect premium for those employees.

17.     Further, Defendants represented that Plan participants and beneficiaries would be able to freely choose their own providers, e.g. that employees and their dependents could use MyMDSelect, or they were free to choose any provider they wished. In selling the Plan, the EBC Entities touted the expected possibility that at the end of the plan year, there could be money remaining in the claims fund which could be used by Peak Fishing and its employees to lower their respective costs in the following plan year.

18.     Peak Fishing elected to adopt the Health Product and the MyMDSelect program effective on June 1, 2019.  These became the primary components of the Plan for which Plaintiff and Defendants served as fiduciaries. The Plan reduced the monthly cost of providing health benefits for Plan participants and Peak Fishing passed that savings on to its employees.

19.     Peak Fishing's employees experienced difficulties with the Plan almost immediately.  During the Plan's term, problems included, at least, a lack of recognition by health care providers, service refusals, pre-approval for services that were later declined, ABA directing participants to the hospital selected by ABA, balance billing from providers.

20.      Plan Participants and Dependents also experienced substantial delays in getting approval of Pre-Service Claims—claims for services which were medically necessary but where a reasonable delay would not jeopardize the life or health of the

6

patient.  Plan Participants and Beneficiaries regularly experienced delays of multiple weeks.

21.    On information and belief, the problems Peak Fishing and its families faced were known by or became known to the EBC Entities and ABA.  Neither the EBC Entities nor ABA advised or even informed Peak Fishing regarding the source of these issues or took material steps to alleviate or mitigate the problems.  The difficulties experienced by Peak Fishing's employees caused Peak Fishing a substantial loss in employee goodwill, the very goodwill Peak Fishing sought to cultivate in adopting the Plan.  In addition to the lost goodwill, Peak Fishing was investing a substantial and unexpected amount of time in hearing employee complaints and working to ensure those complaints were being addressed by ABA.

22.    In October of 2019, Peak Fishing began investigating options for a replacement plan to protect and restore its employee goodwill and to mitigate against the ongoing administrative and operational burden being incurred.   Initial discussions included adoption of a different plan with ABA through the EBC Entities.  Ultimately, after consulting with the EBC Entities, Peak Fishing chose to terminate the Plan which automatically triggered termination of Peak Fishing's agreement with ABA.

23.    The EBC Entities assured Peak Fishing that the Plan would continue to operate as the EBC Entities and ABA had previously described until termination. Peak Fishing relied on that assurance in selecting December 31, 2019 as the Plan's termination date.  The EBC Entities recommended that Peak Fishing continue paying premiums on the Stop Loss Policy procured to fund claims under the Plan but offered no other suggestions or cautions regarding the early termination.  Further, the EBC Entities

insisted that it remain the broker of record for the ABA Plan until the Plan's termination, preserving its commissions for an additional two months while also continuing its fiduciary and legal obligations to Peak Fishing.

24.    In December 2019, Peak Fishing received startling news.  ABA refused to pay invoices from medical providers asserting that the claims fund was empty.  Both ABA and the EBC Entities sold the Plan to Peak Fishing by representing that Peak Fishing would never be liable for more than the monthly payment to ABA.  ABA's refusal to pay, more than 50 days after Peak Fishing formally notified ABA of its intent to terminate the Plan, was the first Peak Fishing had heard that it could be liable for amounts above the monthly payment.  Peak Fishing relied on the EBC Entities' and ABA's representations that it would never owe more than its monthly payment in selecting the December 31, 2019 termination date.

25.    The Plan incurred additional monetary damages because of ABA's and the EBC Entities' failure to properly advise Peak Fishing with respect to Plan termination. The dollar amount of claims exceeding the claim fund balance would have been lower if the Plan were terminated on or before October 31, 2019.  Peak Fishing also paid at least four months of Stop Loss Policy premiums that it would have avoided had it received proper advice.

26.    All conditions precedent have been performed by Peak Fishing or have occurred.  Peak Fishing provided written notice of the deceptive practices to the EBC Entities and ABA via Certified Mail, Return Receipt Requested on September 1, 2020.

## CAUSES OF ACTION

### Negligence

27.     Plaintiff incorporates paragraphs 1-26 as if fully restated here.

28.     The EBC Entities and ABA jointly made numerous misrepresentations to Peak Fishing to induce Peak Fishing in connection with marketing the ABA Health Product.  These misrepresentations included that the Health Product did not carry any of the financial risks of a self-insured plan; that the Health Product included a "PPO"; that the stop loss policy was only a financial tool and otherwise had no effect on the Health Product; that employees would have no or minimal problems in getting providers to accept the Plan; and that employees would have freedom to choose their providers under the Plan.  Each of these representations were false and Peak Fishing relied on them in choosing ABA as its Third Party Administrator and in adopting the ABA RBC health benefit plan.

29.     In addition to the above joint misrepresentations, the EBC Entities represented to Peak Fishing that MyMDSelect would have a live provider available in the Midland County area for Peak Fishing's Plan participants.  The EBC Entities also represented that Peak Fishing could reasonably expect the Plan's claims account to have excess funds available for reimbursement back to Peak Fishing at the end of the Plan year.  Peak Fishing relied on these representations in choosing to add and pay for the MyMDSelect program as part of its benefit package and in adopting the ABA RBC plan as its health benefit plan.

30.     Each of the foregoing representations was made at least to Janet Carreno of Peak's Houston Office.  The representations were made to Ms. Carreno in a live meeting in the Houston, Texas office, sent to her by email and conveyed to her over the phone.

Negligence:  Procurement of the Stop Loss Policy

31.    The EBC Entities and ABA each served as agents in the business of insurance with respect to procurement of the Stop Loss Policy.  The EBC Entities participated in soliciting, negotiating, and procuring the contract for the Stop Loss Policy. ABA participated in soliciting, negotiating, procuring, with respect to the contract for the Stop Loss Policy as well collecting premiums with respect to the Stop Loss Policy.

32.    As agents, the EBC Entities and ABA each had the duty to adequately explain the Stop Loss Policy to Peak Fishing as the insured.  Neither the EBC Entities nor ABA met such duty and Peak Fishing was harmed by their failure.  For example, both the EBC Entities and ABA led Peak Fishing to believe that the Stop Loss Policy deductible was a monthly deductible when in fact the deductible was annual.  Further, neither the EBC Entities nor ABA informed Peak Fishing that the Stop Loss Policy was a claims made policy rather than an occurrence policy.  Peak Fishing discovered these facts about the Stop Loss Policy only after the Plan terminated at the end of calendar year 2019.  Peak Fishing, as Sponsor of the Plan, has suffered liability for claims under the Plan that exceeded Peak Fishing's monthly contributions to the Plan's claim fund. Further, Peak Fishing paid an additional two months of Stop Loss Policy premiums following termination of the Plan in order to extend the reporting period for the claims made policy despite there being virtually no benefit to Peak for doing so.  Peak Fishing paid these amounts in addition to the premiums paid for the health insurance procured as a replacement for the Plan.

Negligent Misrepresentation:  Procurement of Health Product for Peak Fishing's Employees

33.     The EBC Entities and ABA also served as brokers with respect to Peak Fishing's search for health benefits to provide to its employees.  Specifically, the EBC Entities solicited and proposed a series of products, including fully funded insurance policies, as a possible benefit.  ABA solicited Peak to procure one of a number of health products that ABA desired to provide.  The EBC Entities and ABA each violated its duty of care and competence in obtaining and/or communicating information about the products when it provided Peak Fishing false information about the Health Product Peak Fishing ultimately adopted for the Plan.

34.     As Peak Fishing's Broker of Record, the EBC Entities had an independent duty to verify the information from ABA that the EBC Entities adopted or appeared to adopt when that information was transmitted to Peak Fishing.

35.     ABA and the EBC Entities each breached this duty of care and competence by providing Peak Fishing with a quote for the Health Product that included "Referenced Based Pricing" as a PPO Network; by providing a spreadsheet referencing the Health Product as including a PPO and by stating, in context of discussions regarding the specific Health Product, that plans such as the Health Product had PPOs and HMOs. This is particularly true when the specific Health Product being negotiated at the time contained neither an HMO nor a PPO.

36.     ABA and the EBC Entities breached their duty of care by misrepresenting that Peak Fishing's liability would never exceed the monthly premiums.  Neither ABA nor the EBC Entities ever counseled Peak Fishing or its employees regarding Plan Administration activities that would persist beyond the term of the Plan.  Specifically, the Plan was written on an occurrence basis.  ABA now claims its duties as TPA were

limited similarly to a claims made policy and that its duties were fully extinguished when the Plan terminated, leaving Peak Fishing to manage all remaining activity required under the Plan.  At no time in all of 2019, e.g. during marketing or pendency of the Plan, did the EBC Entities or ABA notify Peak of this contrast between the Plan and ABA's duties. Thus, ABA and the EBC Entities misrepresented the costs associated with the Plan to Peak Fishing, and did so prior to any of them becoming a fiduciary.

37.    ABA and the EBC Entities further breached their duty of care in making mutually exclusive representations about the Health Product and the Stop Loss Policy. ABA and the EBC Entities relied on, and represented to Peak Fishing that, the ABA procured Stop Loss Policy provided a limitation to Peak Fishing's liability under the Plan. The same Policy required ABA, at least for some Pre-Service Claims, to direct participants and beneficiaries to particular providers based on price negotiations occurring during pre-approval of the services.  Thus, the Stop Loss Policy—which theoretically limited the Plan's and Peak Fishing's financial liability—materially limited or in some cases eliminated Plan participants' rights to choose their own provider without increasing the participants' out of pocket costs. .

38.    ABA and the EBC Entities breached their duty of care by representing that providers would readily accept the Health Product to cover services for Peak Fishing's employees and their families.  At best, ABA and the EBC Entities had limited experience using the Health Product with providers in the areas where they knew Peak Fishing's employees and their dependents lived.  On information and belief, ABA and the EBC Entities ignored Peak Fishing's employee and dependent data and simply made reckless representations to close the sale.

39.    Peak Fishing reasonably relied on the above misrepresentations and was harmed by these misrepresentations separately and in combination.  Not only had the EBC Entities held themselves out as specially situated to help Peak Fishing with its employee benefit needs, the EBC Entities stood cloaked in the legitimacy and goodwill of Peak Fishing's liability broker.  For example, the absence of a PPO's pre-negotiated pricing led the Plan's third party administrator, ABA, to instruct a family to use a hospital which they did not want to use.  The affected family was not happy with being forced to a hospital not of their choosing.  If the Plan had included a PPO, the family would have been able to choose any hospital in the Plan's network and not been directed to a specific provider based on a last minute decision by ABA.

40.    In another instance, an employee received services that the third party administrator determined should be covered at a cost below the employee's deductible and informed the medical provider of this determination.  The medical provider then billed the employee for an amount that exceeded the employee's deductible under the Plan. The employee paid the billed amount because ABA informed him the claim fell fully under the deductible.  Neither Peak Fishing nor its employees were properly informed by the EBC Entities regarding how to respond when receiving a balance bill or other excessive bill subject to the Plan.

41.    Other families in the Plan experienced substantial delays in getting approval for services subject to Pre-Service Claim procedures.  Unbeknownst to Peak Fishing, these delays were caused by provisions in the Stop Loss Policy that required ABA to negotiate and reach agreement with providers before the services could be performed.  These delays caused frustration among the affected families.  If the agreement had

actually contained a PPO, such negotiations would not have been required and the affected families would not have suffered through the delays caused by ABA's Health Product.

42.     Peak Fishing was also harmed by providers not recognizing the Plan.  From the beginning, participants and beneficiaries would show their "insurance cards" and the provider would not have any clue about ABA and/or reference based pricing.  The providers would either reject the "insurance" or express concerns.

43.     Because of the foregoing, the employees and their dependents developed substantial concerns that they were not receiving and/or would not be able to receive the health care they should reasonably expect under an employer sponsored health plan.  Peak Fishing's management noted a substantial erosion of employee goodwill because of employees' difficulties with the Plan despite the significant management and administrative time Peak Fishing had devoted to resolving the problems being reported.

44.     Peak Fishing chose to terminate the Plan to mitigate the damages to its employee goodwill and the excessive operational and administrative burden incurred in connection with the Plan.  Peak Fishing incurred additional costs for its employee health benefits as result of such termination and these additional costs are costs of mitigating the EBC Entities' and ABA's negligence and negligent misrepresentations.

45.     The EBC Entities also breached its duties of care and competence in advising Peak Fishing when Peak Fishing sought to modify and eventually terminate the Plan.  Peak Fishing asked specific questions about the ABA procured Stop Loss Policy and the effect of Plan termination on that Policy.  Peak Fishing expressed concerns that it would be liable for amounts over and above the monthly premium payments.  The EBC

Entities failed to determine and/or inform Peak Fishing that the Stop Loss Policy was an annual deductible policy and that Peak would still (i) be expected to pay into the claims fund for claims exceeding prior claims fund contributions, (ii) pay ABA for processing claims ABA received from providers after the termination date, and (iii) that the Stop Loss Policy was unlikely to pay any money to Peak Fishing given the current claim totals. Further, if it had properly evaluated Peak Fishing's situation, the EBC Entities would have advised Peak Fishing to terminate the Plan immediately because the claims fund had a positive balance at the end of September and again at the end of October.

46.     The EBC Entities was also negligent in failing to adequately describe the MyMDSelect benefit.  The EBC Entities never informed Peak Fishing that the live doctor benefit of MyMDSelect would never be reasonably available to employees in the Midland County region.  As a result of this negligence, Peak Fishing paid for a benefit that neither it nor its employees received.

### Breach of the Texas Insurance Code

47.     Peak Fishing incorporates the allegations of paragraphs 1-46 as if fully set out herein.

48.     ABA, Employee Benefits Consulting, LLC and Threlkeld Benefits Partners, LLC acted in the business of insurance under Chapter 541 of the Texas Insurance Code. Each of the Defendants made misrepresentations regarding the Stop Loss Policy.  These false representations include, at least, a representation that the Stop Loss Policy would not affect Plan participants' ability to choose their own medical providers, and that the Stop Loss Policy would limit Peak Fishing's liability so that it never exceeded Peak Fishing's monthly payments to ABA.

15

49.     The misrepresentations and failures to disclose violate Chapter 541 of the Texas Insurance Code.  Peak was harmed by these violations at least through the amount of excess claim payments made under the Plan, the loss of employee goodwill, excess premiums paid for the Stop Loss Policy, and excess amounts paid for MyMDSelect,  On information and belief, the misrepresentations and failures to disclose were made knowingly as ABA and the EBC Entities were making these representations to multiple clients similarly situated to Peak Fishing and these clients experienced the same or similar problems in their plans.

**Texas Deceptive Trade Practices Act**

50.     Peak Fishing incorporates the allegations of paragraphs 1-49 as if fully set out herein.

51.     Peak Fishing was a consumer who sought insurance services and who sought and purchased employee health benefit services through each of the Defendants. As discussed above, Defendants engaged in deceptive practices by making false representations regarding the Stop Loss Policy and other insurance products and failed to disclose material information about both the Stop Loss, about ABA's third party administrator services, about MyMDSelect, and about the Plan.  Peak Fishing relied on the misrepresentations in engaging the services of ABA and adopting the Plan.  Further, each Defendant withheld material information to induce Peak Fishing to engage ABA and adopt the Plan, which Peak would not have done had all the material information been disclosed.

52.     Further, in September and October of 2019, Peak Fishing was a consumer with respect to the Plan as well as with respect to its desire to purchase a replacement

16

health product for its employees.  Threlkeld Benefits Partners, LLC and/or Employee Benefits Consulting, LLC provide false or misleading information with respect to the termination of the Plan and failed to disclose the benefits Peak Fishing would receive if it adopted a new product immediately rather than waiting until the end of the calendar year.  The EBC Entities misrepresented the effect of early termination on the Stop Loss Policy as well as the effect of early termination on the Plan.  Peak Fishing relied on these misrepresentations in choosing not to terminate the Plan until December 31, 2019 and was harmed by excess claim costs under Plan and by paying premiums on the Stop Loss Policy when the Stop Loss Policy provided virtually zero benefit to Peak Fishing.

53.    The misrepresentations and failures to disclose violate Chapter 17 of the Texas Business and Commerce and Code.  Peak was harmed by these violations at least through the amount of excess claim payments made under the Plan, the loss of employee goodwill, excess premiums paid for the Stop Loss Policy, and excess amounts paid for MyMDSelect,  On information and belief, the misrepresentations and failures to disclose were made knowingly as the EBC Entities were making these representations to multiple clients similarly situated to Peak Fishing and these clients experienced the same or similar problems in their plans.

**Breach of Fiduciary Duties**

54.    Plaintiff incorporates each of Paragraph 1-53 as if fully set forth here.

55.    ABA is responsible as a fiduciary under at least 29 U.S.C. §§ 1104 and 1109 with respect to all actions it and its employees, agents, or contractors took with respect to the Plan.  Following adoption of the Plan, ABA exercised discretion to approve or deny

claims, select contractors, disburse funds, assign pricing to services, and other actions without seeking any input, agreement, or ratification from Peak Fishing as the Plan Administrator.

56.    On information and belief, the EBC Entities were fiduciaries under the Plan with respect to certain acts in which the EBC Entities exercised discretionary authority with respect to Plan assets, administration or management.  For example, the EBC Entities exercised discretion over Plan assets by communicating that claims had been allowed and/or were covered under the Plan.

Breach of Fiduciary Duties in Administering Pre-Service Claims

57.    ABA breached its fiduciary duties to the Plan in violation 29 U.S.C. § 1104(a)(1) by failing to engage Peak Fishing, the Plan Administrator, with respect to negotiation and allowance of "Pre-Service Claims", as defined in the Plan Document and Summary Plan Description (attached hereto as Exhibit A).

58.    Several Plan participants and beneficiaries expressed frustration over delays in processing and approval of Pre-Service Claims.  The Plan provided for the Plan Administrator, Peak Fishing, to make coverage determinations.   Peak Fishing could have waived provisions of the Plan or amended the Plan to address or streamline the delays, particularly with one of the aims of the Plan being employee goodwill.   Under the circumstances, a prudent person would have disclosed the full reason for the delays and engaged the Plan Administrator in an effort to solve the problem.  ABA's failure to inform Peak Fishing why the delays were occurring violated the prudent person standard of 29 U.S.C. § 1104(a)(1)(B) and constitutes a breach of fiduciary duty on the part of ABA.

59.     On information and belief, ABA did not consult with Peak Fishing on the Pre-Service Claim delays because ABA had a conflict of interest.  Specifically, ABA was forced to choose between meeting its prudent person obligations or continuing to hide the negligence and/or misrepresentation which occurred when ABA promoted its Health Product and the Stop Loss Policy to Peak Fishing.  Thus, ABA administered the Plan under a conflict of interest in violation of 29 U.S.C. § 1104(a)(1) and 29 U.S.C. § 1109.

60.     For example, the Pre-Service Claims had to comply with the "Green Star Plus MRBP +50% Level Funded program and requirements" or the claims would not qualify as covered expenses under the Stop Loss Policy.  To meet the Green Star Plus requirement, ABA had to negotiate with providers and identify a specific provider who would charge for their services in a manner satisfactory under the Stop Loss Policy.  The need to negotiate pricing contradicted ABA's representation that the Plan included a PPO. Such negotiation also resulted in the Plan choosing providers for the participants and beneficiaries, contradicting ABA's representation that participants and beneficiaries would be able to choose their own providers.

61.     The ABA procured Stop Loss Policy also contained a provision that precluded amendment of the Plan without approval of the Stop Loss carrier.  If an unapproved amendment was made, Stop Loss coverage was terminated.  Even if the amendment was approved, the carrier could raise the monthly rates for the policy.  In other words, the Stop Loss Policy imposed substantial restrictions which the Plan must follow if the Plan was to provide the benefits ABA highlighted in order to become third party administrator.

62.    The limitations imposed by the ABA procured Stop Loss Policy served to reinforce the pain ABA would experience if it met its obligation to engage Peak Fishing and develop solutions to the Pre-Service Claim delays.  Faced with either disclosing its own misconduct or failing to properly administer the Plan, ABA chose to violate its duties to the Plan.

63.    Further, 29 U.S.C. § 1104(a)(1)(D) requires fiduciaries to administer the Plan pursuant to the documents governing the Plan.  As described above, ABA administered the Plan according to the requirements of the Stop Loss Policy, which was not a Plan Document, in violation of ABAs statutory fiduciary duties.

Breach of Fiduciary Duties when Communicating with Providers

64.    ABA also failed to document its agreements for Pre-Service Claims with the Providers who would perform the services.  On multiple occasions, ABA and the EBC Entities communicated that a Pre-Service Claim had been approved, the approved services were performed, and then the Provider refused to accept the payment that ABA indicated was agreed for the service.  The Providers never agreed to a payment other than their invoiced amount and ABA has not provided evidence of such Agreements to Peak Fishing or to the participants. The differences in the amounts invoiced and the payments proposed by ABA are substantial.  In one case, the provider invoice is approximately twenty-eight thousand dollars more than the amount ABA asserts the Provider should receive.  In another case, the claim was partially denied by ABA even after the EBC Entities communicated that the Pre-Service claim had been approved.

65.    In the alternative, the EBC Entities and/or ABA incorrectly informed Peak Fishing and the applicable participant that Pre-Service claims were allowed.  With respect

to at least three Pre-Service Claims, the EBC Entities communicated to Peak Fishing and/or to the relevant participant that the claims had been "approved".  Either the EBC Entities incorrectly determined that the Pre-Service Claims were approved or ABA errantly informed the EBC Entities that the Pre-Service Claims were approved. One or more of ABA and the EBC Entities, acted as fiduciaries in determining that claims were allowed and/or that it was permissible to communicate that the Plan had approved the claims.  A prudent person would have ensured that the claims were actually approved before communicating to the Participants or to the Plan Sponsor regarding such approval. The errant communications were therefore breaches of fiduciary duty by ABA and/or the EBC Entities in violation of 29 U.S.C. § 1101 et seq.

Breach of Duty with Respect to Post-Service Claims

66.     ABA processed one or more Post-Service Claims, as defined in the Plan, according to requirements imposed under the Stop Loss Policy. The Stop Loss Policy incorporated requirements applicable to Post-Service Claims that were not contained in the Plan Documents.  Failure to meet the Stop Loss Policy's requirements for Post-Service Claims would preclude the applicable claim from being a "Covered Expense" under and as defined in the Stop Loss Policy ABA had procured.  ABA could not inform Peak Fishing of the requirements of the Stop Loss Policy without revealing it's negligence and/or misrepresentations in marketing that Policy to Peak Fishing.  As with the Pre-Service Claims, ABA's conduct created a conflict of interest under which ABA operated in processing the Post-Service Claims and such conflict of interest constituted a breach of fiduciary duty in violation of 29 U.S.C. §§ 1104 and 1109.

67.     Further, ABA processed the Post-Service Claims according to the requirements of the Stop Loss Policy, which is not a Plan document.  As such, ABA breached its duty to administer the Plan according to the Plan documents as required under 29 U.S.C. 1104 (a)(1)(D).

Failing to exercise due care in administering the Plan

68.     Peak Fishing, the Plan participants and beneficiaries experienced numerous problems with ABA's administration of the Plan.  On multiple occasions, Dependents (as defined in the Plan) were not entered into ABA's records despite the fact coverage was properly elected for those Dependents in the employee's completed paperwork.  On numerous occasions, ABA failed to inform providers regarding claim decisions within the time frames defined by the Plan.  On information and belief, such failures to meet the deadlines contributed to provider concerns about and/or resistance to accepting the Plan and contributed to the loss of employee goodwill suffered by Peak Fishing.  Further, ABA failed to timely process claims, ignoring claims presented until such claims had been presented by the Provider a second time.  The Plan and Peak Fishing were harmed, at least, in that this practice artificially inflated the balance of the claims reserve and prevented Peak Fishing from having a clear understanding of the status of the Plan.  The inflated claims reserve, and underreported claim payments, hindered Peak Fishing's evaluation of the Plan's status in October of 2019.

**DAMAGES**

69.     Plaintiff incorporates each of Paragraph 1-68 as if fully set forth here.

70.     Peak Fishing suffered loss of employee goodwill, in an amount to be proven at trial, as a result of the breaches of duty by ABA and the EBC Entities above.  Peak

Fishing terminated the Plan to mitigate such losses. Peak Fishing's costs incurred because of such termination are therefore recoverable from ABA and the EBC Entities as costs of mitigation. Peak Fishing's costs of mitigation are not yet fully liquidated and Peak Fishing estimates those costs will exceed $230,000.

71.    ABA administered the Plan and caused harm to Peak Fishing, the Participants, and their Dependents in whole or in part due to ABA's conflicts of interest. ABA should be required to make an accounting of and disgorge its profits earned in connection with the Plan.

72.    The EBC Entities damaged Peak Fishing by misrepresenting material information about MyMDSelect when marketing that product to Peak Fishing. Peak Fishing was harmed in the amount of $21,518 because it paid for services that were not useable by Peak Fishing's employees.

73.    The EBC Entities and ABA breached their duties in failing to properly advise Peak Fishing to terminate the Stop Loss Policy on October 31, 2019. Peak Fishing was harmed in the amount of the four months of premiums it paid after that date, in an amount that exceeds $42,000.

74.    Peak Fishing has and will incur substantial costs and attorney fees in bringing causes of action on behalf of the Plan and such causes of action were necessitated by ABA's actions taken under conflicts of interest and other breaches of fiduciary duties. Peak Fishing is therefore entitled to recover its attorney fees incurred in this matter from Defendant ABA.

75.     The breaches of duties by ABA and the EBC Entities under the Texas Insurance Code and or the Texas Deceptive Trade Practices Act were knowing and Peak Fishing is entitled to treble damages for such breaches.

### PRAYER FOR RELIEF

76.     WHEREFORE, Plaintiff prays for the following relief from the Court and Jury:

a.      That Defendants Assured Benefits Administrators, Inc., Threlkeld Benefits Partners, LLC and Employee Benefits Consulting, LLC be held liable for damages to Peak resulting from their negligence and negligent misrepresentations;

b.      That Defendants Employee Benefits Consulting, LLC and Threlkeld Benefits Partners, LLC be held liable for their misrepresentations with respect to the MyMDSelect program and for its negligence in advising Plaintiff regarding termination of the Plan;

c.      That Defendants Assured Benefits Administrators, Inc., Threlkeld Benefits Partners, LLC and Employee Benefits Consulting, LLC be held liable for damages to Peak resulting from their misrepresentations, breaches of duty and deceptive practices under the Texas Insurance Code;

d.      That Defendants Assured Benefits Administrators, Inc., Threlkeld Benefits Partners, LLC and Employee Benefits Consulting, LLC be held liable to Peak under the Texas Deceptive Trade Practices Act for their misrepresentations and other deceptive practices;

e.      That Peak be awarded treble damages for each of the Defendants' bad faith pursuant to the Texas Insurance Code and deceptive practices pursuant to the Texas Insurance Code and/or the Texas Deceptive Trade Practices Act;

f.      That Defendant Assured Benefits Administrators be required to make an accounting of and disgorge its profits with respect to the Plan and make restitution to the Plan because it served as a fiduciary of the Plan while having direct conflicts of interest with the Plan;

g.      That Defendant Assured Benefits Administrators, Inc. be ordered to pay Plaintiff's costs and attorney accrued to bring causes of action on behalf of the Plan;

h.      That Defendants each be ordered to pay Peak Fishing's attorney fees due to their violations of the Texas Insurance Code and the Texas Deceptive Trade Practices Act;

i.      That Plaintiff be awarded such other and further relief as may be just and appropriate.

Respectfully submitted

SEILER MITBY, PLLC

/s/ Michael Barnhart
Michael K. Barnhart
Texas Bar. No. 24040472
2700 Research Forest Drive, Ste 100
The Woodlands, TX  77381
(281) 419-7770
(281-419-7791

**ATTORNEYS FOR PLAINTIFF**
**PEAK FISHING SERVICES, LLC**

Harper Estes
Texas Bar No. 00000083
hestes@lcalawfirm.com
LYNCH, CHAPPELL AND ALSUP
300 N. Marienfeld, Suite 700
Midland, Texas 79701
Telephone: (432) 683-3378
Facsimile:  (432) 683-2587

**ATTORNEY FOR PLAINTIFF PEAK**
**FISHING SERVICES, LLC**

Cause No. 7:20-cv-00211

# EXHIBIT A



# PLAN DOCUMENT
## AND SUMMARY PLAN DESCRIPTION

**COMPANY NAME** Peak Fishing Services, LLC

EFFECTIVE DATE June 1, 2019

RESTATED DATE June 1, 2019



ABA
Assured Benefits Administrators



# TABLE OF CONTENTS

Establishment of the Plan................................................................................................................1

Introduction.....................................................................................................................................2

Definitions........................................................................................................................................5

Eligibility for Coverage.................................................................................................................19

Termination of Coverage.............................................................................................................24

Continuation of Coverage...........................................................................................................25

General Limitations and Exclusions...........................................................................................31

Plan Administration......................................................................................................................34

Claim Procedures..........................................................................................................................36

Coordination of Benefits.............................................................................................................45

Medicare.........................................................................................................................................47

Third Party Recovery....................................................................................................................48

Miscellaneous Provisions.............................................................................................................51

Summary of Benefits....................................................................................................................54

Medical Benefits............................................................................................................................57

Utilization Management...............................................................................................................64

Prescription Drug Benefits..........................................................................................................67

HIPAA Privacy................................................................................................................................70

HIPAA Security...............................................................................................................................74

Participant's Rights.......................................................................................................................77

# ESTABLISHMENT OF THE PLAN

## ADOPTION OF THE PLAN DOCUMENT AND SUMMARY PLAN DESCRIPTION

THIS PLAN DOCUMENT AND SUMMARY PLAN DESCRIPTION ("Plan Document"), made by

**Peak Fishing Services, LLC**   (the "Company" or the "Plan Sponsor")

as of **June 1, 2019**

hereby sets forth the provisions of **Peak Fishing Services, LLC** (the "Plan"),

which was originally adopted by the Company, effective **June 1, 2019**   .

Any wording which may be contrary to Federal Laws or Statutes is hereby understood to meet the standards set forth in such. Also, any changes in Federal Laws or Statutes which could affect the Plan are also automatically a part of the Plan, if required.

### EFFECTIVE DATE

The Plan Document is effective as of the date first set forth above, and each amendment is effective as of the date set forth therein, (the "Effective Date").

### ADOPTION OF THE PLAN DOCUMENT

The Plan Sponsor, as the settlor of the Plan, hereby adopts this Plan Document as the written description of the Plan. This Plan Document represents both the Plan Document and the Summary Plan Description, which is required by sections 402 and 102 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. et seq. ("ERISA"). This Plan Document amends and replaces any prior statement of the health care coverage contained in the Plan or any predecessor to the Plan.

IN WITNESS WHEREOF, the Plan Sponsor has caused this Plan Document to be executed.

BY: **Peak Fishing Services, LLC**

NAME: Janet Carreno

TITLE: HR Director

DATE:

# INTRODUCTION

## INTRODUCTION AND PURPOSE; GENERAL PLAN INFORMATION

### INTRODUCTION AND PURPOSE

The Plan Sponsor has established the Plan for the benefit of eligible Employees and their eligible Dependents, in accordance with the terms and conditions described herein. Plan benefits are self-funded through a benefit fund or a trust established by the Plan Sponsor and self-funded with contributions from Participants and/or the Plan Sponsor. Participants in the Plan may be required to contribute toward their benefits. Contributions received from Participants are used to cover Plan costs and are expended immediately.

The Plan Sponsor's purpose in establishing the Plan is to protect eligible Employees and their Dependents against certain health expenses and to help defray the financial effects arising from Injury or Sickness. To accomplish this purpose, the Plan Sponsor must be mindful of the need to control and minimize health care costs through innovative and efficient plan design and cost containment provisions; and of abiding by the terms of the Plan Document, to allow the Plan Sponsor to effectively assign the resources available to help Participants in the Plan to the maximum feasible extent.

The Plan Sponsor is required under ERISA to provide to Participants a Plan Document and a Summary Plan Description; a combined Plan Document and Summary Plan Description, such as this document, is an acceptable structure for ERISA compliance. The Plan Sponsor has adopted this Plan Document as the written description of the Plan to set forth the terms and provisions of the Plan that provide for the payment or reimbursement of all or a portion of certain expenses for eligible benefits. The Plan Document is maintained by **Peak Fishing Services, LLC** and may be reviewed at any time during normal working hours by any Participant.

### GENERAL PLAN INFORMATION

NAME OF PLAN: Peak Fishing Services, LLC

#### PLAN SPONSOR

| | |
|---|---|
| Entity Name: | Peak Fishing Services, LLC |
| Address: | 1603 N Longview St., Kilgore, TX 75662 |
| Phone Number: | (713) 223-5751 |
| ID Number (EIN): | 81-3905389 |

#### PLAN ADMINISTRATOR

| | |
|---|---|
| Named Fiduciary: | Peak Fishing Services, LLC |
| Address: | 1603 N Longview St., Kilgore, TX 75662 |
| Phone Number: | (713) 223-5751 |

SOURCE OF FUNDING: Self-Funded

PLAN STATUS: Non-Grandfathered

APPLICABLE LAW: ERISA

PLAN YEAR: June 1st through May 31st

PLAN NUMBER: 501

PLAN TYPE: Medical, Prescription

## THIRD PARTY ADMINISTRATOR

| | |
|---|---|
| **Entity Name:** | Assured Benefits Administrators, Inc. |
| **Address:** | 221 North Kansas Street #1610, El Paso, Texas 79901 |
| **Phone Number:** | (800) 247-7114 |
| **Fax Number:** | (915) 532-1772 |

## UTILIZATION REVIEW MANAGER

| | |
|---|---|
| **Entity Name:** | CareValent |
| **Phone Number:** | (800) 247-7114 |

## PRESCRIPTION DRUG PLAN ADMINISTRATOR

*Please refer to your medical ID card for the Member service telephone number.*

## PARTICIPATING EMPLOYER(S)

| | |
|---|---|
| **Entity Name:** | Peak Fishing Services, LLC |
| **Address:** | 1603 N Longview St., Kilgore, TX 75662 |
| **Phone Number:** | (713) 223-5751 |

## AGENT FOR SERVICE OF PROCESS

| | |
|---|---|
| **Entity Name:** | Peak Fishing Services, LLC |
| **Address:** | 1603 N Longview St., Kilgore, TX 75662 |
| **Phone Number:** | (713) 223-5751 |

The Plan shall take effect for each Participating Employer on the Effective Date, unless a different date is set forth above opposite such Participating Employer's name.

### NON-ENGLISH LANGUAGE NOTICE

This Plan Document contains a summary in English of a Participant's plan rights and benefits under the Plan. If a Participant has difficulty understanding any part of this Plan Document, he or she may contact the Plan Administrator at the contact information above.

### LEGAL ENTITY; SERVICE OF PROCESS

The Plan is a legal entity. Legal notice may be filed with, and legal process served upon, the Plan Administrator.

### NOT A CONTRACT

This Plan Document and any amendments constitute the terms and provisions of coverage under this Plan. The Plan Document is not to be construed as a contract of any type between the Company and any Participant or to be consideration for, or an inducement or condition of, the employment of any Employee. Nothing in this Plan Document shall be deemed to give any Employee the right to be retained in the service of the Company or to interfere with the right of the Company to discharge any Employee at any time; provided, however, that the foregoing shall not be deemed to modify the provisions of any collective bargaining agreements which may be entered into by the Company with the bargaining representatives of any Employees.

### MENTAL HEALTH PARITY

Pursuant to the Mental Health Parity Act (MHPA) of 1996 and the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA), collectively, the mental health parity provisions in Part 7 of ERISA, this Plan applies its terms uniformly and enforces parity between covered health care benefits and covered mental health and substance disorder benefits relating to financial cost sharing restrictions and treatment duration limitations. For further details, please contact the Plan Administrator.

## NON-DISCRIMINATION

No eligibility rules or variations in contribution amounts will be imposed based on an eligible Employee's and his or her Dependent's/Dependents' health status, medical condition, claims experience, receipt of health care, medical history, genetic information, evidence of insurability, disability, or any other health status related factor. Coverage under this Plan is provided regardless of an eligible Employee's and his or her Dependent's/Dependents' race, color, national origin, disability, age, sex, gender identity or sexual orientation. Variations in the administration, processes or benefits of this Plan that are based on clinically indicated reasonable medical management practices, or are part of permitted wellness incentives, disincentives and/or other programs do not constitute discrimination.

## APPLICABLE LAW

This is a self-funded benefit plan coming within the purview of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan is funded with Employee and/or Employer contributions. As such, when applicable, Federal law and jurisdiction preempt State law and jurisdiction.

## DISCRETIONARY AUTHORITY

The Plan Administrator shall have sole, full and final discretionary authority to interpret all Plan provisions, including the right to remedy possible ambiguities, inconsistencies and/or omissions in the Plan and related documents; to make determinations in regards to issues relating to eligibility for benefits; to decide disputes that may arise relative to a Participant's rights; and to determine all questions of fact and law arising under the Plan.

## GRANDFATHERED/NON-GRANDFATHERED NOTICE

This group health plan believes this plan is a **Non-Grandfathered** under the Patient Protection and Affordable Care Act (the Affordable Care Act). As permitted by the Affordable Care Act, a grandfathered health plan can preserve certain basic health coverage that was already in effect when that law was enacted. Being a grandfathered health plan means that your plan may not include certain consumer protections of the Affordable Care Act that apply to other plans, for example, the requirement for the provision of preventive health services without any cost sharing. However, grandfathered health plans must comply with certain other consumer protections in the Affordable Care Act, for example, the elimination of lifetime limits on benefits.

Questions regarding which protections apply and which protections do not apply to a grandfathered or non-grandfatherd health plan and what might cause a plan to change from grandfathered health plan status can be directed to the plan administrator at:

> Peak Fishing Services, LLC
>
> 1603 N Longview St., Kilgore, TX 75662
>
> (713) 223-5751

You may also contact the Employee Benefits Security Administration, U.S. Department of Labor at 1-866-444-3272 or https://www.dol.gov.agencies/ebsa/laws-and-regulations/laws/affordable-care-act/for-employers-and-advisers. This website (in the Regulations and Guidance/Grandfathered Health Plans section) has a table summarizing which protections do and do not apply to Grandfathered Health Plans.

# DEFINITIONS

The following words and phrases shall have the following meanings when used in the Plan Document. **The following definitions are not an indication that charges for particular care, supplies or services are eligible for payment under the Plan, however they may be used to identify ineligible expenses; please refer to the appropriate sections of the Plan Document for that information.**

Some of the terms used in this document begin with a capital letter, even though the term normally would not be capitalized. These terms have special meaning under the Plan. Most terms will be listed in this Definitions section, but some terms are defined within the provision the term is used. Becoming familiar with the terms defined in the Definitions section will help to better understand the provisions of this Plan.

**Accident** "Accident" shall mean an event which takes place without one's foresight or expectation, or a deliberate act that results in unforeseen consequences.

**Accidental Bodily Injury / Accidental Injury** "Accidental Bodily Injury" or "Accidental Injury" shall mean an Injury sustained as the result of an Accident and independently of all other causes by an outside traumatic event or due to exposure to the elements.

**Actively At Work / Active Employment** An Employee is "Actively at Work" or in "Active Employment" on any day the Employee performs in the customary manner all of the regular duties of employment. An Employee will be deemed Actively at Work on each day of a regular paid vacation or on a regular non-working day on which the covered Employee is not totally disabled, provided the covered Employee was Actively at Work on the last preceding regular work day. An Employee shall be deemed Actively at Work if the Employee is absent from work due to a health factor, as defined by HIPAA, subject to the Plan's Leave of Absence provisions. An Employee will not be considered under any circumstances Actively at Work if he or she has effectively terminated employment.

**ADA** "ADA" shall mean the American Dental Association.

**Adverse Benefit Determination** "Adverse Benefit Determination" shall mean any of the following:

1. A denial in benefits.
2. A reduction in benefits.
3. A rescission of coverage, even if the rescission does not impact a current claim for benefits.
4. A termination of benefits.
5. A failure to provide or make payment (in whole or in part) for a benefit, including any such denial, reduction, termination, or failure to provide or make payment that is based on a determination of a Claimant's eligibility to participate in the Plan.
6. A denial, reduction, or termination of, or a failure to provide or make payment (in whole or in part) for, a benefit resulting from the application of any utilization review.
7. A failure to cover an item or service for which benefits are otherwise provided because it is determined to be Experimental or Investigational or not Medically Necessary or appropriate.

*Explanation of Benefits (EOB)* "Explanation of Benefits" shall mean a statement a health plan sends to a Participant which shows charges, payments and any balances owed. It may be sent by mail or e-mail. An Explanation of Benefits may serve as an Adverse Benefit Determination.

**Affordable Care Act (ACA)** The "Affordable Care Act (ACA)" means the health care reform law enacted in March 2010. The law was enacted in two parts: the Patient Protection and Affordable Care Act was signed into law on March 23, 2010 and was amended by the Health Care and Education Reconciliation Act on March 30, 2010. The name "Affordable Care Act" is commonly used to refer to the final, amended version of the law. In this document, the Plan uses the name Affordable Care Act (ACA) to refer to the health care reform law.

**AHA** "AHA" shall mean the American Hospital Association.

**Allowable Expenses** "Allowable Expenses" shall mean the Maximum Allowable Charge for any Medically Necessary, eligible item of expense, at least a portion of which is covered under this Plan. When some Other Plan pays first in accordance with the Application to Benefit Determinations provision in the Coordination of Benefits section, this Plan's Allowable Expenses shall in no event exceed the Other Plan's Allowable Expenses.

When some "Other Plan" provides benefits in the form of services (rather than cash payments), the Plan Administrator shall assess the value of said benefit(s) and determine the reasonable cash value of the service or services rendered, by determining the amount that would be payable in accordance with the terms of the Plan. Benefits payable under any Other Plan include the benefits that would have been payable had the claim been duly made therefore, whether or not it is actually made.

**Alternate Recipient** "Alternate Recipient" shall mean any Child of a Participant who is recognized under a Medical Child Support Order as having a right to enrollment under this Plan as the Participant's eligible Dependent. For purposes of the benefits provided under this Plan, an Alternate Recipient shall be treated as an eligible Dependent, but for purposes of the reporting and disclosure requirements under ERISA, an Alternate Recipient shall have the same status as a Participant.

**AMA** "AMA" shall mean the American Medical Association

**Ambulatory Surgical Center** "Ambulatory Surgical Center" shall mean any permanent public or private State licensed and approved (whenever required by law) establishment that operates exclusively for the purpose of providing Surgical Procedures to patients not requiring hospitalization with an organized medical staff of Physicians, with continuous Physician and nursing care by Registered Nurses (R.N.s). The patient is admitted to and discharged from the facility within the same working day as the facility does not provide service or other accommodations for patients to stay overnight.

**Approved Clinical Trial** "Approved Clinical Trial" means a phase I, II, III or IV trial that is Federally funded by specified Agencies (National Institutes of Health (NIH), Centers for Disease Control and Prevention (CDCP), Agency for Healthcare Research and Quality (AHRQ), Centers for Medicare and Medicaid Services (CMS), Department of Defense (DOD) or Veterans Affairs (VA), or a non-governmental entity identified by NIH guidelines) or is conducted under an Investigational new drug application reviewed by the Food and Drug Administration (FDA) (if such application is required).

The Affordable Care Act requires that if a "qualified individual" is in an "Approved Clinical Trial," the Plan cannot deny coverage for related services ("routine patient costs").

A "qualified individual" is someone who is eligible to participate in an "Approved Clinical Trial" and either the individual's doctor has concluded that participation is appropriate or the Participant provides medical and scientific information establishing that their participation is appropriate.

"Routine patient costs" include all items and services consistent with the coverage provided in the plan that is typically covered for a qualified individual who is not enrolled in a clinical trial. Routine patient costs do not include 1) the Investigational item, device or service itself; 2) items and services that are provided solely to satisfy data collection and analysis needs and that are not used in the direct clinical management of the patient; and 3) a service that is clearly inconsistent with the widely accepted and established standards of care for a particular Diagnosis.

**Assignment of Benefits** "Assignment of Benefits" shall mean an arrangement whereby the Participant, at the discretion of the Plan Administrator, assigns the right to seek and receive payment of eligible Plan benefits, less Deductibles, Copayments and the Coinsurance percentage that is not paid by the Plan, in strict accordance with the terms of this Plan Document, to a Provider. If a Provider accepts said arrangement, Providers' rights to receive Plan benefits are equal to those of a Participant, and are limited by the terms of this Plan Document. A Provider that accepts this arrangement indicates acceptance of an "Assignment of Benefits" and Deductibles, Copayments and the Coinsurance percentage that is the responsibility of the Participant, as consideration in full for services, supplies, and/or treatment rendered. The Plan Administrator may revoke or disregard an Assignment of Benefits previously issued to a Provider at its discretion and continue to treat the Participant as the sole beneficiary.

**Calendar Year** "Calendar Year" shall mean the 12 month period from January 1 through December 31 of each year.

**Cardiac Care Unit** "Cardiac Care Unit" shall mean a separate, clearly designated service area which is maintained within a Hospital and which meets all the following requirements:

1. It is solely for the care and treatment of critically ill patients who require special medical attention because of their critical condition.
2. It provides within such area special nursing care and observation of a continuous and constant nature not available in the regular rooms and wards of the Hospital.
3. It provides a concentration of special lifesaving equipment immediately available at all times for the treatment of patients confined within such area.
4. It contains at least two beds for the accommodation of critically ill patients.
5. It provides at least one professional Registered Nurse, in continuous and constant attendance of the patient confined in such area on a 24 hour a day basis.

**CDC** "CDC" shall mean Centers for Disease Control and Prevention.

**Child / Children** "Child" and/or "Children" shall mean the Employee's natural Child, any stepchild, legally adopted Child, or any other Child for whom the Employee has been named legal guardian, or any other Child for whom the Employee has been named legal guardian, or an "eligible foster child," which is defined as an individual placed with the Employee by an authorized placement agency or by judgment, decree or other order of a court of competent jurisdiction. For purposes of this definition, a legally adopted Child shall include a Child placed in an Employee's physical custody in anticipation of adoption. "Child" shall also mean a covered Employee's Child who is an Alternate Recipient under a Qualified Medical Child Support Order, as required by the Federal Omnibus Budget Reconciliation Act of 1993. A "legal guardian" is a person recognized by a court of law as having the duty of taking care of the person and managing the property and rights of a minor child.

**CHIP** "CHIP" refers to the Children's Health Insurance Program or any provision or section thereof, which is herein specifically referred to, as such act, provision or section may be amended from time to time.

**CHIPRA** "CHIPRA" refers to the Children's Health Insurance Program Reauthorization Act of 2009 or any provision or section thereof, which is herein specifically referred to, as such act.

**Chiropractic Care** "Chiropractic Care" shall mean the detection and correction, by manual or mechanical means, of the interference with nerve transmissions and expressions resulting from distortion, misalignment or dislocation of the spinal (vertebrae) column.

**Claim Determination Period** "Claim Determination Period" shall mean each Calendar Year.

**Claimant** "Claimant" shall mean a Participant of the Plan, or entity acting on his or her behalf, authorized to submit claims to the Plan for processing, and/or appeal an Adverse Benefit Determination.

**Clean Claim** A "Clean Claim" is one that can be processed in accordance with the terms of this document without obtaining additional information from the service Provider or a third party. It is a claim which has no defect or impropriety. A defect or impropriety shall include a lack of required sustaining documentation as set forth and in accordance with this document, or a particular circumstance requiring special treatment which prevents timely payment as set forth in this document, and only as permitted by this document, from being made. A Clean Claim does not include claims under investigation for fraud and abuse or claims under review for Medical Necessity or other coverage criteria, or fees under review for application of the Maximum Allowable Charge, or any other matter that may prevent the charge(s) from being Covered Expenses in accordance with the terms of this document.

*Filing a Clean Claim* A Provider submits a Clean Claim by providing the required data elements on the standard claims forms, along with any attachments and additional elements or revisions to data elements, attachments and additional elements, of which the Provider has knowledge. The Plan Administrator may require attachments or other information in addition to these standard forms (as noted elsewhere in this document and at other times prior to claim submittal) to ensure charges constitute Covered Expenses as defined by and in accordance with the terms of this document. The paper claim form or electronic file record must include all required data elements and must be complete, legible, and accurate. A claim will not be considered to be a Clean Claim if the Participant has failed to submit required forms or additional information to the Plan as well.

**CMS** "CMS" shall mean Centers for Medicare and Medicaid Services.

**COBRA** "COBRA" shall mean the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended.

**Coinsurance** "Coinsurance" shall mean a cost sharing feature of many plans. It requires a Participant to pay out-of-pocket a prescribed portion of the cost of Covered Expenses. The defined Coinsurance that a Participant must pay out-of-pocket is based upon his or her health plan design. Coinsurance is established as a predetermined percentage of the Maximum Allowable Charge for covered services and usually applies after a Deductible is met in a Deductible plan.

**Copayment / Copay** "Copayment" or "Copay" shall mean a dollar amount the Participant pays for health care expenses. In most plans, the Participant pays this after he or she meets his or her Deductible limit.

**Cosmetic Surgery** "Cosmetic Surgery" shall mean any expenses Incurred in connection with the care and treatment of, or operations which are performed for plastic, reconstructive, or cosmetic purposes or any other service or supply which are primarily used to improve, alter, or enhance appearance of a physical characteristic which is within the broad spectrum of normal but which may be considered displeasing or unattractive, except when required by an Injury.

**Covered Expense(s)** "Covered Expense(s)" shall mean a service or supply provided in accordance with the terms of this document, whose applicable charge amount does not exceed the Maximum Allowable Charge for an eligible Medically Necessary service, treatment or supply, meant to improve a condition or Participant's health, which is eligible for coverage in accordance with this Plan. When more than one treatment option is available, and one option is no more effective than another, the Covered Expense is the least costly option that is no less effective than any other option.

All treatment is subject to benefit payment maximums shown in the Summary of Benefits and as set forth elsewhere in this document.

**Custodial Care** "Custodial Care" shall mean care or confinement designated principally for the assistance and maintenance of the Participant, in engaging in the activities of daily living, whether or not totally disabled. This care or confinement could be rendered at home or by persons without professional skills or training. This care may relieve symptoms or pain but is not reasonably expected to improve the underlying medical condition. Custodial Care includes, but is not limited to, assistance in eating, dressing, bathing and using the toilet, preparation of special diets, supervision of medication which can normally be self-administered, assistance in walking or getting in and out of bed, and all domestic activities.

**Deductible** "Deductible" shall mean the aggregate amount for certain expenses for covered services that is the responsibility of the Participant to pay for him or herself each Calendar Year before the Plan will begin its payments.

**Dentist** "Dentist" shall mean a properly trained person holding a D.D.S. or D.M.D. degree and practicing within the scope of a license to practice dentistry within their applicable geographic venue.

**Dependent** "Dependent" shall mean one or more of the following person(s):

1. An Employee's present spouse, thereby possessing a valid marriage license; not annulled or voided in any way. A Dependent spouse shall therefore not be one whom is divorced from the Employee. A Dependent spouse shall include a common law spouse, when such marital status is legally recognized in the jurisdiction in which the Employee has his or her principal residence.

2. An Employee's opposite-sex and/or same-sex domestic partner who has the same principal place of abode for more than one half of the Calendar Year, and who relies on the Employee for more than one half of his or her support for the Calendar Year in which the domestic partner is enrolled for coverage under the Plan. NOTE: To the extent COBRA coverage is applicable, an Employee's domestic partner is not considered a qualified beneficiary and does not have independent rights under COBRA; however, an Employee's domestic partner will be entitled to COBRA continuation coverage as a dependent of a qualified beneficiary. An Employee's domestic partner and the domestic partner's enrolled children will be considered a qualified beneficiary and eligible to continue coverage under the COBRA provisions to the same extent as an Employee's spouse or Child.

3. An Employee's Child who is less than 26 years of age. NOTE: Coverage of a Dependent Child will continue until the end of the calendar month he or she turns 26 years of age.

4. An Employee's Child, regardless of age, who was continuously covered prior to attaining the limiting age as stated in the numbers above, who is mentally or physically incapable of sustaining his or her own living. Such Child must have been mentally or physically incapable of earning his or her own living prior to attaining the limiting age as stated in the numbers above. Written proof of such incapacity and dependency satisfactory to the Plan must be furnished and approved by the Plan within 31 days after the date the Child attains the limiting age as stated in the numbers above. The time limit for written proof of incapacity and dependency is 30 days following the original eligibility date for a new or re-enrolling Employee. The Plan may require, at reasonable intervals, subsequent proof satisfactory to the Plan during the next two years after such date. After such two year period, the Plan may require such proof, but not more often than once each year.

Active duty members of any armed force shall not be deemed to be "Dependents."

Residents of a country other than the United States shall not be deemed to be "Dependents."

An Employee's spouse must meet the following requirements:

1. Employee and spouse shall not have been engaged in a trial separation for more than 12 consecutive months upon the date a Clean Claim for Covered Expense(s) provided to spouse are received by the Plan.

2. Employee and spouse shall have been cohabitating at the same residence for the majority of the applicable Calendar Year. When an Employee or spouse is traveling or residing elsewhere as part of their profession, to care for a family member (due, for instance, to Illness or Injury), and/or is residing elsewhere due to their own Illness or Injury, for more than half of the applicable Calendar Year (and thus residing with each other for less than the majority of the applicable Calendar Year), but the primary residence of the Employee is also the spouse's primary residence for all legal, regulatory, and statutory purposes, this constitutes cohabitation as required by this provision.

The Plan Administrator has discretionary authority to interpret these terms, and determine spousal status as defined herein, to the extent allowed by law.

To establish a Dependent relationship, the Plan reserves the right to require documentation satisfactory to the Plan Administrator.

**Diagnosis** "Diagnosis" shall mean the act or process of identifying or determining the nature and cause of a Disease or Injury through evaluation of patient history, examination, and review of laboratory data.

**Diagnostic Service** "Diagnostic Service" shall mean an examination, test, or procedure performed for specified symptoms to obtain information to aid in the assessment of the nature and severity of a medical condition or the identification of a Disease or Injury. The Diagnostic Service must be ordered by a Physician or other professional Provider.

**Disease** "Disease" shall mean any disorder which does not arise out of, which is not caused or contributed to by, and which is not a consequence of, any employment or occupation for compensation or profit; however, if evidence satisfactory to the Plan is furnished showing that the individual concerned is covered as an Employee under any workers' compensation law, occupational disease law or any other legislation of similar purpose, or under the maritime doctrine of maintenance, wages, and cure, but that the disorder involved is one not covered under the applicable law or doctrine, then such disorder shall, for the purposes of the Plan, be regarded as a Sickness, Illness or Disease.

**Drug** "Drug" shall mean a Food and Drug Administration (FDA) approved Drug or medicine that is listed with approval in the United States Pharmacopeia, National Formulary or AMA Drug Evaluations published by the American Medical Association (AMA), that is prescribed for human consumption, and that is required by law to bear the legend: "Caution—Federal Law prohibits dispensing without prescription," or a State restricted drug (any medicinal sub-

stance which may be dispensed only by prescription, according to State law), legally obtained and dispensed by a licensed drug dispenser only, according to a written prescription given by a Physician and/or duly licensed Provider. "Drug" shall also mean insulin for purposes of injection.

**Durable Medical Equipment** "Durable Medical Equipment" shall mean equipment and/or supplies ordered by a health care Provider for everyday or extended use which meets all of the following requirements:

1.  Can withstand repeated use.
2.  Is primarily and customarily used to serve a medical purpose.
3.  Generally is not useful to a person in the absence of an Illness or Injury.
4.  Is appropriate for use in the home.

**Emergency** "Emergency" shall mean a situation or medical condition with symptoms of sufficient severity (including severe pain) that the absence of immediate medical attention and treatment would reasonably be expected to result in: (a) serious jeopardy to the health of the individual (or, with respect to a pregnant woman, the woman's unborn child); (b) serious impairment to bodily functions; or (c) serious dysfunction of any bodily organ or part. An Emergency includes, but is not limited to, severe chest pain, poisoning, unconsciousness, and hemorrhage. Other Emergencies and acute conditions may be considered on receipt of proof, satisfactory to the Plan, per the Plan Administrator's discretion, that an Emergency did exist. The Plan may, at its own discretion, request satisfactory proof that an Emergency or acute condition did exist.

**Emergency Medical Condition** "Emergency Medical Condition" shall mean a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) so that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in a condition described in clause (i), (ii), or (iii) of section 1867(e)(1)(A) of the Social Security Act (42 U.S.C. 1395dd(e)(1)(A)). In that provision of the Social Security Act, clause (i) refers to placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy; clause (ii) refers to serious impairment to bodily functions; and clause (iii) refers to serious dysfunction of any bodily organ or part.

**Emergency Services** Emergency Services" shall mean, with respect to an Emergency Medical Condition, the following:

1.  A medical screening examination (as required under section 1867 of the Social Security Act, 42 U.S.C. 1395dd) that is within the capability of the emergency department of a Hospital, including ancillary services routinely available to the emergency department to evaluate such Emergency Medical Condition.
2.  Such further medical examination and treatment, to the extent they are within the capabilities of the staff and facilities available at the Hospital, as are required under section 1867 of the Social Security Act (42 U.S.C. 1395dd) to stabilize the patient.

**Employee** "Employee" shall mean a person who is employed by the Employer on a full-time basis and regularly scheduled to work at least 30 hours per week (i.e. Non-variable Hour Employee) or a Variable Hour Employee who has averaged at least 30 hours per week for a complete Measurement Period and is currently in a Stability Period, as determined by the Plan Sponsor. An Employee will remain eligible throughout the Stability Period regardless of a change in employment status (including, but not limited to, a reduction in hours) provided the individual continues to be an employee in accordance with the Patient Protection and Affordable Care Act (as amended).

**The following definitions are associated with the Code Section 4980H (Employer Shared Responsibility) as enacted under the Affordable Care Act:**

*Administrative Period* shall mean a period of time selected by the Employer beginning immediately following the end of the Measurement Period and ending immediately before the start of the associated Stability Period. This period of time is used by the Employer to determine if Variable Hour Employees and/or Ongoing Employees are eligible for coverage and, if so, to make an offer of coverage. The Administrative Period also includes the period between a new Employee's start date and the beginning of the Initial Measurement Period, if the Initial Measurement Period does not begin on the employee's start date. An Administrative Period may not exceed 90 days.

*Full-time Employee or Full-time Employment* shall mean, with respect to a calendar month, an Employee who is employed an average of at least 30 hours per week with the Employer.

*Hour of Service* shall mean each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the employer; and each hour for which an Employee is paid, or entitled to payment by the employer for a period of time during which no duties are performed due to vacation, holiday, Illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence.

*Measurement Period* shall mean a period of time selected by the Employer during which Variable Hour Employee's and/or Ongoing Employee's Hours of Service are tracked to determine his or her employment status for benefit purposes.

1.  Initial Measurement Period - for a newly hired Variable Hour Employee, this Measurement Period will start from the date of hire and ends after 12 consecutive months of service.

2.    Standard Measurement Period - for Ongoing Employees, this Measurement Period will start on a date determined by the Plan Sponsor each year and will last for 12 consecutive months.

*New Employee* shall mean an Employee who has not been employed for at least one complete Standard Measurement Period, or who is treated as a New Employee following a period during which the Employee was credited with zero Hours of Service.

*Non-variable Hour Employee* shall mean an Employee reasonably expected at the time of hire to work 30 hours per week.

*Ongoing Employee* shall mean an Employee who has been employed by the Employer for at least one complete Measurement Period.

*Stability Period* shall mean a period selected by the Employer that immediately follows, and is associated with, a Standard Measurement Period or an Initial Measurement Period (and, if elected by the Employer, the Administrative Period associated with that Standard Measurement Period or Initial Measurement Period), and is used by the Employer as part of the Look-back Measurement Method. The Stability Period is a 12 period in which the Variable Hour Employee's and/or Ongoing Employee's eligibility status is fixed.

*Variable Hour Employee* shall mean an Employee, based on the facts and circumstances at the Employee's start date, whose reasonable expectation of average hours per week cannot be determined.

**Employer** "Employer" is Peak Fishing Services, LLC

**ERISA** "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

**Essential Health Benefits** "Essential Health Benefits" shall mean, under section 1302(b) of the Affordable Care Act, those health benefits to include at least the following general categories and the items and services covered within the categories: ambulatory patient services; Emergency Services; hospitalization; maternity and newborn care; mental health and substance abuse disorder services, including behavioral health treatment; prescription Drugs; rehabilitative and Habilitative Services and devices; laboratory services; preventive and wellness services and chronic disease management; and pediatric services, including oral and vision care.

**Exclusion** "Exclusion" shall mean conditions or services that this Plan does not cover.

**Experimental / Investigational** "Experimental" and/or "Investigational" ("Experimental") shall mean services or treatments that are not widely used or accepted by most practitioners or lack credible evidence to support positive short or long-term outcomes from those services or treatments and that are not the subject of, or in some manner related to, the conduct of an Approved Clinical Trial, as such term is defined herein; these services are not included under or as Medicare reimbursable procedures, and include services, supplies, care, procedures, treatments or courses of treatment which meet either of the following requirements:

1.    Do not constitute accepted medical practice under the standards of the case and by the standards of a reasonable segment of the medical community or government oversight agencies at the time rendered.
2.    Are rendered on a research basis as determined by the United States Food and Drug Administration and the AMA's Council on Medical Specialty Societies.

A drug, device, or medical treatment or procedure is Experimental if one of the following requirements is met:

1.    If the drug or device cannot be lawfully marketed without approval of the U.S. Food and Drug Administration and approval for marketing has not been given at the time the drug or device is furnished;
2.    If reliable evidence shows that the drug, device or medical treatment or procedure is the subject of ongoing Phase I, II, or III clinical trials or under study to determine all of the following:
    a.    Maximum tolerated dose.
    b.    Toxicity.
    c.    Safety.
    d.    Efficacy.
    e.    Efficacy as compared with the standard means of treatment or Diagnosis.
3.    If reliable evidence shows that the consensus among experts regarding the drug, device, or medical treatment or procedure is that further studies or clinical trials are necessary to determine all of the following:
    a.    Maximum tolerated dose.
    b.    Toxicity.
    c.    Safety.
    d.    Efficacy.
    e.    Efficacy as compared with the standard means of treatment or Diagnosis.

Reliable evidence shall mean one of more of the following:

1. Only published reports and articles in the authoritative medical and scientific literature.
2. The written protocol or protocols used by the treating facility or the protocol(s) of another facility studying substantially the same drug, device, or medical treatment or procedure.
3. The written informed consent used by the treating facility or by another facility studying substantially the same drug, device, or medical treatment or procedure.

Notwithstanding the above, a prescription drug for a treatment that has been approved by the Food and Drug Administration (FDA) but is used as a non-approved treatment shall not be considered Experimental/Investigational for purposes of this Plan and shall be afforded coverage to the same extent as any other prescription drug, provided that the drug is recognized by one of the following as being Medically Necessary for the specific treatment for which it has been prescribed:

1. The American Medical Association Drug Evaluations.
2. The American Hospital Formulary Service Drug Information.
3. The United States Pharmacopeia Drug Information.
4. A clinical study or review article in a reviewed professional journal.

Subject to a medical opinion, if no other Food and Drug Administration (FDA) approved treatment is feasible and as a result the Participant faces a life or death medical condition, the Plan Administrator retains discretionary authority to cover the services or treatment.

The Plan Administrator retains maximum legal authority and discretion to determine what is Experimental.

**Family Unit** "Family Unit" shall mean the Employee and his or her Dependents covered under the Plan.

**FDA** "FDA" shall mean Food and Drug Administration.

**Final Internal Adverse Benefit Determination** "Final Internal Adverse Benefit Determination" shall mean an Adverse Benefit Determination that has been upheld by the Plan at the conclusion of the internal claims and appeals process, or an Adverse Benefit Determination with respect to which the internal claims and appeals process has been deemed exhausted.

**FMLA** "FMLA" shall mean the Family and Medical Leave Act of 1993, as amended.

**FMLA Leave** "FMLA Leave" shall mean an unpaid, job protected Leave of Absence for certain specified family and medical reasons, which the Company is required to extend to an eligible Employee under the provisions of the FMLA.

**GINA** "GINA" shall mean the Genetic Information Nondiscrimination Act of 2008 (Public Law No. 110-233), which prohibits group health plans, issuers of individual health care policies, and employers from discriminating on the basis of genetic information.

**Habilitation / Habilitative Services** "Habilitation/Habilitative Services" shall mean health care services that help a person keep, learn, or improve skills and functioning for daily living. Examples include therapy for a child who is not walking or talking at the expected age. These services may include physical and occupational therapy, speech-language pathology and other services for people with disabilities in a variety of Inpatient and/or Outpatient settings.

**HIPAA** "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended.

**Home Health Care** "Home Health Care" shall mean the continual care and treatment of an individual if all of the requirements are met.

1. The institutionalization of the individual would otherwise have been required if Home Health Care was not provided.
2. The treatment plan covering the Home Health Care service is established and approved in writing by the attending Physician.
3. The Home Health Care is the result of an Illness or Injury.

**Home Health Care Agency** "Home Health Care Agency" shall mean an agency or organization which provides a program of Home Health Care and which meets one of the following requirements:

1. Is a Federally certified Home Health Care Agency and approved as such under Medicare.
2. Meets the established standards and is operated pursuant to applicable laws in the jurisdiction in which it is located and, is licensed and approved by the regulatory authority having the responsibility for licensing, where licensing is required.
3. Meets all of the following requirements.
   a. It is an agency which holds itself forth to the public as having the primary purpose of providing a Home Health Care delivery system bringing supportive services to the home.

b.  It has a full time administrator.

c.  It maintains written records of services provided to the patient.

d.  Its staff includes at least one Registered Nurse (R.N.) or it has nursing care by a Registered Nurse (R.N.) available.

e.  Its employees are bonded and it provides malpractice insurance.

**Hospital** "Hospital" shall mean an Institution, accredited by the Joint Commission on Accreditation of Hospitals (sponsored by the AMA and the AHA), under the supervision of a staff of Physicians that maintains diagnostic and therapeutic facilities on premises, for the provision of medical (including Surgical facilities for all Institutions other than those specializing in the care and treatment of mentally ill patients, provided such Institution is accredited as such a facility by the Joint Commission on Accreditation of Hospitals sponsored by the AMA and the AHA), diagnosis, treatment, and care to Injured or sick persons, on an Inpatient basis, with 24 hour a day nursing service by Registered Nurses.

To be deemed a "Hospital," the facility must be duly licensed if it is not a State tax supported Institution, and must not be primarily a place for rest, the aged, and/or a nursing home, custodial, or training institution; or an Institution which is supported in whole or in part by a Federal government fund.

Institutions and/or facilities not deemed to be a "Hospital" in accordance with Medicare, shall not be deemed to be Hospitals for this Plan's purposes.

"Hospital" shall also have the same meaning, where appropriate in context, set forth in the definition of "Ambulatory Surgical Center."

**HRSA** "HRSA" shall mean Health Resources and Services Administration.

**Illness** "Illness" shall have the meaning set forth in the definition of "Disease."

**Impregnation and Infertility Treatment** "Impregnation and Infertility Treatment" shall mean any services, supplies or Drugs related to the Diagnosis or treatment of infertility.

**Incurred** A Covered Expense is "Incurred" on the date the service is rendered or the supply is obtained. With respect to a course of treatment or procedure which includes several steps or phases of treatment, Covered Expenses are Incurred for the various steps or phases as the services related to each step are rendered and not when services relating to the initial step or phase are rendered. More specifically, Covered Expenses for the entire procedure or course of treatment are not Incurred upon commencement of the first stage of the procedure or course of treatment.

**Injury** "Injury" shall mean an Accidental Bodily Injury, which does not arise out of, which is not caused or contributed to by, and which is not a consequence of, any employment or occupation for compensation or profit.

**Inpatient** "Inpatient" shall mean a Participant who receives care as a registered and assigned bed patient while confined in a Hospital, other than in its outpatient department, where a room and board is charged by the Hospital.

**Institution** "Institution" shall mean a facility created and/or maintained for the purpose of practicing medicine and providing organized health care and treatment to individuals, operating within the scope of its license, such as a Hospital, Ambulatory Surgical Center, Psychiatric Hospital, community mental health center, Residential Treatment Facility, psychiatric treatment facility, Substance Abuse Treatment Center, alternative birthing center, Home Health Care Agency, or any other such facility that the Plan approves.

**Intensive Care Unit** "Intensive Care Unit" shall have the same meaning set forth in the definition of "Cardiac Care Unit."

**Intensive Outpatient Services** "Intensive Outpatient Services" shall mean programs that have the capacity for planned, structured, service provision of at least two hours per day and three days per week. The range of services offered could include group, individual, family or multi-family group psychotherapy, psychoeducational services, and medical monitoring. These services would include multiple or extended treatment/rehabilitation/counseling visits or professional supervision and support. Program models include structured "crisis intervention programs," "psychiatric or psychosocial rehabilitation," and some "day treatment."

**Leave of Absence** "Leave of Absence" shall mean a period of time during which the Employee must be away from his or her primary job with the Employer, while maintaining the status of Employee during said time away from work, generally requested by an Employee and having been approved by his or her Participating Employer, and as provided for in the Participating Employer's rules, policies, procedures and practices where applicable.

**Legal Separation** "Legal Separation" shall mean an arrangement to remain married but live apart, following a court order.

**Mastectomy** "Mastectomy" shall mean the Surgery to remove all or part of breast tissue as a way to treat or prevent breast cancer.

**Maximum Allowable Charge** "Maximum Allowable Charge" shall mean the benefit payable for a specific coverage item or benefit under the Plan. The Maximum Allowable Charge will always be a negotiated rate, if one exists; if no negotiated rate exists, the Maximum Allowable Charge will be determined and established by the Plan, at the Plan Administrator's discretion, using normative data and submitted information such as, but not limited to, any one

or more of the following, in the Plan Administrator's discretion:

1.   Medicare reimbursement rates (presently utilized by the Centers for Medicare and Medicaid Services ["CMS"]).
2.   Prices established by CMS utilizing standard Medicare Payment methods and/or based upon supplemental Medicare pricing data for items Medicare doesn't cover based on data from CMS).
3.   Prices established by CMS utilizing standard Medicare payment methods and/or based upon prevailing Medicare rates in the community for non-Medicare facilities for similar services and/or supplies provided by similarly skilled and trained providers of care).
4.   Prices established by CMS utilizing standard Medicare payment methods for items in alternate settings based on Medicare rates provided for similar services and/or supplies paid to similarly skilled and trained providers of care in traditional settings).
5.   Medicare cost data as reflected in the applicable individual provider's cost report(s).
6.   The fee(s) which the Provider most frequently charges the majority of patients for the service or supply.
7.   Amounts the Provider specifically agrees to accept as payment in full.
8.   Average wholesale price (AWP) and/or manufacturer's retail pricing (MRP).
9.   Medicare cost-to-charge ratios or other information regarding the actual cost to provide the service or supply.
10.  The allowable charge otherwise specified within the terms of this Plan.
11.  The prevailing range of fees charged in the same "area" (defined as a metropolitan area, county, or such greater area as is necessary to obtain a representative cross-section of Providers, persons or organizations rendering such treatment, services, or supplies for which a specific charge is made) by Providers of similar training and experience for the service or supply.
12.  With respect to Emergency Services, the Plan allowance is the greater of:
    a.   One hundred percent (100%) of the Plan's Maximum Allowable Charge payment formula (reduced for cost-sharing).
    b.   The amount that Medicare Parts A or B would pay (reduced for cost-sharing).

The Plan Administrator may in its discretion, taking into consideration specific circumstances, deem a greater amount to payable than the lesser of the aforementioned amounts. The Plan Administrator may take any or all of such factors into account but has no obligation to consider any particular factor. The Plan Administrator may also account for unusual circumstances or complications requiring additional or a lesser amount of time, skill and experience in connection with a particular service or supply; industry standards and practices as they relate to similar scenarios, and the cause of Injury or Illness necessitating the service(s) and/or charge(s).

In all instances, the Maximum Allowable Charge will be limited to an amount which, in the Plan Administrator's discretion, is charged for services or supplies that are not unreasonably caused by the treating Provider, including errors in medical care that are clearly identifiable, preventable, and serious in their consequence for patients. A finding of Provider negligence and/or malpractice is not required for services or fees to be considered ineligible pursuant to this provision.

The determination that fees for services are includable in the Maximum Allowable Charge will be made by the Plan Administrator, taking into consideration, but not limited to, the findings and assessments of the following entities: (a) The national medical associations, societies, and organizations; and (b) The Food and Drug Administration (FDA). To be includable in the Maximum Allowable Charge, services and fees must be in compliance with generally accepted billing practices for unbundling or multiple procedures.

The Plan Administrator has the discretionary authority to decide if a charge is covered under this Plan. The Maximum Allowable Charge will not include any identifiable billing mistakes including, but not limited to, up-coding, duplicate charges, and charges for services not performed.

**Maximum Eligible Charge** "Maximum Eligible Charge" fees shall be limited to Covered Expenses which are identified as eligible for payment by the Plan Administrator in accordance with the terms of this Plan. "Maximum Eligible Charge" amounts may be determined and established by the Plan, at the Plan Administrator's discretion, using normative data such as, but not limited to, the fee(s) which the Provider most frequently charges the majority of patients for the service or supply, amounts the Provider most often agrees to accept as payment in full either through direct negotiation or through a provider, average wholesale price (AWP) and/or manufacturer's retail pricing (MRP), the prevailing range of fees charged in the same "area" by Providers of similar training and experience for the service or supply, rates negotiated with the Plan, and/or Medicare reimbursement rates. Medicare rates plus 40% are generally considered to be Maximum Eligible Charge; however, the Plan Administrator may in its discretion, taking into consideration specific circumstances and negotiated terms, deem a greater amount to payable.

The term(s) "same geographic locale" and/or "area" shall be defined as a metropolitan area, county, or such greater area as is necessary to obtain a representative cross-section of Providers, persons or organizations rendering such treatment, services, or supplies for which a specific charge is made.

Furthermore, Maximum Eligible Charge shall be limited to those claims that, in the Plan Administrator's discretion, are services or supplies or fees for services or supplies that are necessary for the care and treatment of Illness or Injury not unreasonably caused by the treating Provider. Determination that fee(s) or services are therefore Maximum Eligible Charge will be made by the Plan Administrator, taking into consideration, but not limited to, the findings and assessments of the following entities: (a) the national medical associations, societies, and organizations; and (b) the Food and Drug Administration. To be Maximum Eligible Charge, service(s) and/or fee(s) must be in compliance with generally accepted billing practices for unbundling or multiple procedures. Services, supplies, care and/or treatment that results from errors in medical care that are clearly identifiable, preventable, and serious in their consequence for patients, are not Maximum Eligible Charge. The Plan Administrator retains discretionary authority to determine whether service(s) and/

or fee(s) are Maximum Eligible Charge based upon information presented to the Plan Administrator. A finding of Provider negligence and/or malpractice is not required for service(s) and/or fee(s) to be considered not Maximum Eligible Charge.

**Medical Child Support Order** "Medical Child Support Order" shall mean any judgment, decree or order (including approval of a domestic relations settlement agreement) issued by a court of competent jurisdiction that meets one of the following requirements:

1.  Provides for child support with respect to a Participant's Child or directs the Participant to provide coverage under a health benefits plan pursuant to a State domestic relations law (including a community property law).
2.  Is made pursuant to a law relating to medical child support described in §1908 of the Social Security Act (as added by Omnibus Budget Reconciliation Act of 1993 §13822) with respect to a group health plan.

**Medical Record Review** "Medical Record Review" is the process by which the Plan, based upon a Medical Record Review and audit, determines that a different treatment or different quantity of a Drug or supply was provided which is not supported in the billing, then the Plan Administrator may determine the Maximum Allowable Charge according to the Medical Record Review and audit results.

**Medically Necessary** "Medical Care Necessity", "Medically Necessary", "Medical Necessity" and similar language refers to health care services ordered by a Physician exercising prudent clinical judgment provided to a Participant for the purposes of evaluation, Diagnosis or treatment of that Participant's Sickness or Injury. Such services, to be considered Medically Necessary, must be clinically appropriate in terms of type, frequency, extent, site and duration for the Diagnosis or treatment of the Participant's Sickness or Injury. The Medically Necessary setting and level of service is that setting and level of service which, considering the Participant's medical symptoms and conditions, cannot be provided in a less intensive medical setting. Such services, to be considered Medically Necessary must be no more costly than alternative interventions, including no intervention and are at least as likely to produce equivalent therapeutic or diagnostic results as to the Diagnosis or treatment of the Participant's Sickness or Injury without adversely affecting the Participant's medical condition. The service must meet all of the following requirements:

1.  Its purpose must be to restore health.
2.  It must not be primarily custodial in nature.
3.  It is ordered by a Physician for the Diagnosis or treatment of a Sickness or Injury.
4.  The Plan reserves the right to incorporate CMS guidelines in effect on the date of treatment as additional criteria for determination of Medical Necessity and/or an Allowable Expense.

For Hospital stays, this means that acute care as an Inpatient is necessary due to the kind of services the Participant is receiving or the severity of the Participant's condition and that safe and adequate care cannot be received as an outpatient or in a less intensified medical setting. The mere fact that the service is furnished, prescribed or approved by a Physician does not mean that it is "Medically Necessary." In addition, the fact that certain services are excluded from coverage under this Plan because they are not "Medically Necessary" does not mean that any other services are deemed to be "Medically Necessary." To be Medically Necessary, all of these criteria must be met. Merely because a Physician or Dentist recommends, approves, or orders certain care does not mean that it is Medically Necessary. The Plan Administrator has the discretionary authority to decide whether care or treatment is Medically Necessary based on recommendations of the Plan Administrator's own medical advisors, the findings of the American Medical Association or similar organization, or any other sources that the Plan Administrator deems appropriate.

Off-label Drug use is considered Medically Necessary when all of the following conditions are met:

The Drug is approved by the Food and Drug Administration (FDA).

5.  The prescribed Drug use is supported by one of the following standard reference sources::
    a.  Micromedex® DRUGDEX®.
    b.  The American Hospital Formulary Service Drug Information.
    c.  Medicare approved Compendia.
    d.  Scientific evidence is supported in well-designed clinical trials published in peer-reviewed medical journals, which demonstrate that the Drug is safe and effective for the specific condition.
6.  The Drug is otherwise Medically Necessary to treat the specific condition, including life threatening conditions or chronic and seriously debilitating conditions.

**Medically Necessary Leave of Absence** "Medically Necessary Leave of Absence" shall mean a Leave of Absence by a full-time student Dependent at a postsecondary educational institution that meets all of the following requirements:

1.  Commences while such Dependent is suffering from an Illness or Injury.
2.  Is Medically Necessary.
3.  Causes such Dependent to lose student status for purposes of coverage under the terms of the Plan.

**Medicare** "Medicare" shall mean the Federal program by which health care is provided to individuals who are 65 or older, certain younger individuals with disabilities, and individuals with End-Stage Renal Disease, administered in accordance with parameters set forth by the Centers for Medicare and Medicaid Services (CMS) and Title XVIII of the Social Security Act of 1965, as amended, by whose terms it was established.

**Mental Health Parity Act of 1996 (MHPA) and Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA), Collectively, the Mental Health Parity Provisions in Part 7 of ERISA** "The Mental Health Parity Provisions" shall mean in the case of a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health or substance use disorder benefits, such plan or coverage shall ensure that all of the following requirements are met:

1. The financial requirements applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant financial requirements applied to substantially all medical and surgical benefits covered by the Plan (or coverage) and that there are no separate cost sharing requirements that are applicable only with respect to mental health or substance use disorder benefits, if these benefits are covered by the group health plan (or health insurance coverage is offered in connection with such a plan).

2. The treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the Plan (or coverage), and that there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits, if these benefits are covered by the group health plan (or health insurance coverage is offered in connection with such a plan).

**Mental or Nervous Disorder** "Mental or Nervous Disorder" shall mean any Disease or condition, regardless of whether the cause is organic, that is classified as a Mental or Nervous Disorder in the current edition of International Classification of Diseases, published by the U.S. Department of Health and Human Services, is listed in the current edition of Diagnostic and Statistical Manual of Mental Disorders, published by the American Psychiatric Association or other relevant State guideline or applicable sources. The fact that a disorder is listed in any of these sources does not mean that treatment of the disorder is covered by the Plan.

**National Medical Support Notice / NMSN** "National Medical Support Notice" or "NMSN" shall mean a notice that contains all of the following information:

1. The name of an issuing State child support enforcement agency.
2. The name and mailing address (if any) of the Employee who is a Participant under the Plan or eligible for enrollment.
3. The name and mailing address of each of the Alternate Recipients (i.e., the Child or Children of the Participant) or the name and address of a State or local official may be substituted for the mailing address of the Alternate Recipients(s).
4. Identity of an underlying child support order.

**No-Fault Auto Insurance** "No-Fault Auto Insurance" is the basic reparations provision of a law providing for payments without determining fault in connection with automobile Accidents.

**Nurse** "Nurse" shall mean an individual who has received specialized nursing training and is authorized to use the designation Registered Nurse (R.N.), Licensed Vocational Nurse (L.V.N.) or Licensed Practical Nurse (L.P.N.), and who is duly licensed by the State or regulatory agency responsible for such license in the State in which the individual performs the nursing services.

**Open Enrollment Period** "Open Enrollment Period" shall mean the month of May in each Calendar Year.

**Other Plan** "Other Plan" shall include, but is not limited to:

1. Any primary payer besides the Plan.
2. Any other group health plan.
3. Any other coverage or policy covering the Participant.
4. Any first party insurance through medical payment coverage, personal injury protection, no-fault coverage, uninsured or underinsured motorist coverage.
5. Any policy of insurance from any insurance company or guarantor of a responsible party.
6. Any policy of insurance from any insurance company or guarantor of a third party.
7. Workers' compensation or other liability insurance company.
8. Any other source, including but not limited to crime victim restitution funds, any medical, disability or other benefit payments, and school insurance coverage.

**Partial Hospitalization** "Partial Hospitalization" shall mean medically directed intensive, or intermediate short-term mental health and Substance Abuse treatment, for a period of less than twenty-four (24) hours but more than four (4) hours in a day in a licensed or certified facility or program.

**Participant** "Participant" shall mean any Employee or Dependent who is eligible for benefits (and enrolled) under the Plan.

**Patient Protection and Affordable Care Act (PPACA)** The "Patient Protection and Affordable Care Act (PPACA)" means the health care reform law enacted in March 2010, Public Law 111-148; PPACA, together with the Health Care and Education Reconciliation Act, is commonly referred to as Affordable Care Act (ACA). (See "Affordable Care Act").



**Physician** "Physician" shall mean a Doctor of Medicine (M.D.), Doctor of Osteopathy (D.O.), Doctor of Dental Surgery (D.D.S.), Doctor of Podiatry (D.P.M.), Doctor of Chiropractic (D.C.), Psychologist (Ph.D.), Audiologist, Certified Nurse Anesthetist, Licensed Professional Counselor, Licensed Professional Physical Therapist, Master of Social Work (M.S.W.), Occupational Therapist, Physiotherapist, Speech Language Pathologist, psychiatrist, midwife, and any other practitioner of the healing arts who is licensed and regulated by a State or Federal agency, acting within the scope of that license.

**Plan Year** "Plan Year" shall mean a period commencing on the Effective Date or any anniversary of the adoption of this Plan and continuing until the next succeeding anniversary.

**Pre-Admission Tests** "Pre-Admission Tests" shall mean those medical tests and Diagnostic Services completed prior to a scheduled procedure, including Surgery, or scheduled admissions to the Hospital or Inpatient health care facility provided that all of the following requirements are met:

1. The Participant obtains a written order from the Physician.
2. The tests are approved by both the Hospital and the Physician.
3. The tests are performed on an outpatient basis prior to Hospital admission.
4. The tests are performed at the Hospital into which confinement is scheduled, or at a qualified facility designated by the Physician who will perform the procedure or Surgery.

**Pregnancy** "Pregnancy" shall mean a physical state whereby a woman presently bears a child or children in the womb, prior to but likely to result in childbirth, miscarriage and/or non-elective abortion. Pregnancy is considered a Sickness for the purpose of determining benefits under this Plan.

**Preventive Care** "Preventive Care" shall mean certain Preventive Care services.

To comply with the ACA, and in accordance with the recommendations and guidelines, plans shall provide coverage for all of the following:

1. Evidence-based items or services rated A or B in the United States Preventive Services Task Force recommendations.
2. Recommendations of the Advisory Committee on Immunization Practices adopted by the Director of the Centers for Disease Control and Prevention.
3. Comprehensive guidelines for infants, children, and adolescents supported by the Health Resources and Services Administration (HRSA).
4. Comprehensive guidelines for women supported by the Health Resources and Services Administration (HRSA).

Copies of the recommendations and guidelines may be found here: http://www.uspreventiveservicestaskforce.org or at https://www.healthcare.gov/coverage/preventive-care-benefits/. For more information, Participants may contact the Plan Administrator / Employer.

**Prior Plan** "Prior Plan" shall mean the coverage provided on a group or group type basis by the group insurance policy, benefit plan or service plan that was terminated on the day before the Effective Date of the Plan and replaced by the Plan.

**Prior to Effective Date / After Termination Date** "Prior to Effective Date" or "After Termination Date" are dates occurring before a Participant gains eligibility from the Plan, or dates occurring after a Participant loses eligibility from the Plan, as well as charges Incurred Prior to the Effective Date of coverage under the Plan or after coverage is terminated, unless continuation of benefits applies.

**Privacy Standards** "Privacy Standards" shall mean the standards of the privacy of individually identifiable health information, as pursuant to HIPAA.

**Provider** "Provider" shall mean an entity whose primary responsibility is related to the supply of medical care. Each Provider must be licensed, registered, or certified by the appropriate State agency where the medical care is performed, as required by that State's law where applicable. Where there is no applicable State agency, licensure, or regulation, the Provider must be registered or certified by the appropriate professional body. The Plan Administrator may determine that an entity is not a "Provider" as defined herein if that entity is not deemed to be a "Provider" by the Centers for Medicare and Medicaid Services (CMS) for purposes arising from payment and/or enrollment with Medicare; however, the Plan Administrator is not so bound by CMS' determination of an entity's status as a Provider. All facilities must meet the standards as set forth within the applicable definitions of the Plan as it relates to the relevant provider type.

**Psychiatric Hospital** "Psychiatric Hospital" shall mean an Institution, appropriately licensed as a Psychiatric Hospital, established for the primary purpose of providing diagnostic and therapeutic psychiatric services for the treatment of mentally ill persons either by, or under the supervision of, a Physician. As such, to be deemed a "Psychiatric Hospital," the Institution must ensure every patient is under the care of a Physician and their staffing pattern must ensure the availability of a Registered Nurse 24 hours each day. Should the Institution fail to maintain clinical medical records on all patients permitting the determination of the degree and intensity of treatment to be provided, that Institution will not be deemed to be a "Psychiatric Hospital."

To be deemed a "Psychiatric Hospital," the Institution must be duly licensed and must not be primarily a place for rest, the aged, and/or a nursing home, custodial, or training institution.

**Qualified Medical Child Support Order / QMCSO** "Qualified Medical Child Support Order" or "QMCSO" shall mean a Medical Child Support Order, in

accordance with applicable law, and which creates or recognizes the existence of an Alternate Recipient's right to, or assigns to an Alternate Recipient the right to, receive benefits for which a Participant or eligible Dependent is entitled under this Plan.

**Rehabilitation** "Rehabilitation" shall mean treatment(s) designed to facilitate the process of recovery from Injury, Illness, or Disease to as normal a condition as possible.

**Rehabilitation Hospital** "Rehabilitation Hospital" shall mean an appropriately licensed Institution, which is established in accordance with all relevant Federal, State and other applicable laws, to provide therapeutic and restorative services to individuals seeking to maintain, reestablish, or improve motor-skills and other functioning deemed Medically Necessary for daily living, that have been lost or impaired due to Sickness and/or Injury. To be deemed a "Rehabilitation Hospital," the Institution must be legally constituted, operated, and accredited for its stated purpose by either the Joint Commission on Accreditation of Hospitals or the Commission on Accreditation for Rehabilitation Facilities, as well as approved for its stated purpose by the Centers for Medicare and Medicaid Services (CMS) for Medicare purposes.

To be deemed a "Rehabilitation Hospital," the Institution must be duly licensed and must not be primarily a place for rest, the aged, and/or a nursing home, custodial, or training institution.

**Residential Treatment Facility** "Residential Treatment Facility" shall mean a facility licensed or certified as such by the jurisdiction in which it is located to operate a program for the treatment and care of Participants diagnosed with alcohol, drug or Substance Abuse disorders or mental illness.

**Room and Board** "Room and Board" shall mean a Hospital's charge for any of the following:

1. Room and complete linen service.
2. Dietary service including all meals, special diets, therapeutic diets, required nourishment's, dietary supplements and dietary consultation.
3. All general nursing services including but not limited to coordinating the delivery of care, supervising the performance of other staff members who have delegated member care and member education.
4. Other conditions of occupancy which are Medically Necessary.

**Security Standards** "Security Standards" shall mean the final rule implementing HIPAA's Security Standards for the Protection of Electronic Protected Health Information (PHI), as amended.

**Service Waiting Period** "Service Waiting Period" shall mean an interval of time that must pass before an Employee or Dependent is eligible to enroll under the terms of the Plan. The Employee must be a continuously Active Employee of the Employer during this interval of time.

**Sickness** "Sickness" shall have the meaning set forth in the definition of "Disease."

**Skilled Nursing Facility** "Skilled Nursing Facility" shall mean a facility that fully meets all of the following requirements:

1. It is licensed to provide professional nursing services on an Inpatient basis to persons convalescing from Injury or Sickness. The service must be rendered by a Registered Nurse (R.N.) or by a Licensed Practical Nurse (L.P.N.) under the direction of a Registered Nurse. Services to help restore patients to self-care in essential daily living activities must be provided.
2. Its services are provided for compensation and under the full-time supervision of a Physician.
3. It provides 24 hour per day nursing services by licensed nurses, under the direction of a full-time Registered Nurse.
4. It maintains a complete medical record on each patient.
5. It has an effective utilization review plan.
6. It is not, other than incidentally, a place for rest, the aged, drug addicts, alcoholics, mentally disabled, Custodial Care, educational care or care of Mental or Nervous Disorders.
7. It is approved and licensed by Medicare.

**Substance Abuse / Substance Use Disorder** "Substance Abuse" and/or "Substance Use Disorder" shall mean any use of alcohol, any drug (whether obtained legally or illegally), any narcotic, or any hallucinogenic or other illegal substance, which produces a pattern of pathological use, causing impairment in social or occupational functioning, or which produces physiological dependency evidenced by physical tolerance or withdrawal. It is the excessive use of a substance, especially alcohol or a drug. The Diagnostic and Statistical Manual of Mental Disorders (DSM) definition of "Substance Use Disorder" is applied as outlined below.

A maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one or more, of the following, occurring within a 12 month period:

1. Recurrent substance use resulting in a failure to fulfill major role obligations at work, school or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions or expulsions from school; neglect of children or household).
2. Recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired

by substance use).

3.  Craving or a strong desire or urge to use a substance.

4.  Continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights).

The fact that a disorder is listed in the DSM does not mean that treatment of the disorder is covered by the Plan.

**Substance Abuse Treatment Center** "Substance Abuse Treatment Center" shall mean an Institution whose facility is licensed, certified or approved as a Substance Abuse Treatment Center by a Federal, State, or other agency having legal authority to so license; which is affiliated with a Hospital and whose primary purpose is providing diagnostic and therapeutic services for treatment of Substance Abuse. To be deemed a "Substance Abuse Treatment Center," the Institution must have a contractual agreement with the affiliated Hospital by which a system for patient referral is established, and implement treatment by means of a written treatment plan approved and monitored by a Physician. Where applicable, the "Substance Abuse Treatment Center" must also be appropriately accredited by the Joint Commission on Accreditation of Hospitals.

**Surgery** "Surgery" shall in the Plan Administrator's discretion mean the treatment of Injuries or disorders of the body by incision or manipulation, especially with instruments designed specifically for that purpose, and the performance of generally accepted operative and cutting procedures, performed within the scope of the Provider's license.

**Surgical Procedure** "Surgical Procedure" shall have the same meaning set forth in the definition of "Surgery."

**Third Party Administrator** "Third Party Administrator" shall mean the claims administrator which provides customer service and claims payment services only and does not assume any financial risk or obligation with respect to those claims.

**Uniformed Services** "Uniformed Services" shall mean the Armed Forces, the Army National Guard and the Air National Guard, when engaged in active duty for training, inactive duty training, or full time National Guard duty, the commissioned corps of the Public Health Service, and any other category of persons designated by the President of the United States in time of war or Emergency.

**USERRA** "USERRA" shall mean the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA").

All other defined terms in this Plan Document shall have the meanings specified in the Plan Document where they appear.

# ELIGIBILITY FOR COVERAGE

## ELIGIBILITY FOR INDIVIDUAL COVERAGE

Each Non-variable Hour Employee will become eligible for coverage under this Plan with respect to himself or herself **on the first day of the month** following completion of a Service Waiting Period of **date of hire**, provided the Employee has begun work for his or her Participating Employer. If the Employee is unable to begin work as scheduled, then his or her coverage will become effective on such later date when the Employee begins work.

Each Variable Hour Employee who has averaged the requisite Hours of Service, as defined herein, will become eligible for coverage under this Plan with respect to himself or herself upon completion of a complete Measurement Period. Coverage shall begin on the first day of the Stability Period, as defined herein.

Each Employee who was covered under the Prior Plan, if any, will be eligible on the Effective Date of this Plan. Any Service Waiting Period or portion thereof satisfied under the Prior Plan, if any, will be applied toward satisfaction of the Service Waiting Period of this Plan.

## REINSTATEMENT OF COVERAGE

An Employee who is terminated and rehired will be treated as a New Employee upon rehire only if the Employee was not credited with an Hour of Service with the Employer (or any member of the controlled or affiliated group) for a period of at least 13 consecutive weeks immediately preceding the date of rehire.

A Variable Hour Employee who is terminated and rehired will be treated as a continuing Employee upon rehire only if the Employee break in service did not exceed 13 weeks.

Upon return, coverage will be effective on the first of the month following the date of rehire, so long as all other eligibility criteria are satisfied.

## ELIGIBILITY DATES FOR DEPENDENT COVERAGE

Each Employee will become eligible for coverage under this Plan for his or her Dependents on the latest of the following dates:

1. His or her date of eligibility for coverage for himself or herself under the Plan.
2. The date coverage for his or her Dependents first becomes available under any amendment to the Plan, if such coverage was not provided under the Plan on the Effective Date of the Plan.
3. The first date upon which he or she acquires a Dependent.
4. The date the Dependent Child is eligible due to a qualifying status change event, as outlined in the Section 125 plan.

In no event will any Dependent Child be covered as a Dependent of more than one Employee who is covered under the Plan. In order for an Employee's Dependent to be covered under the Plan the Employee must be enrolled for coverage under the Plan.

"Michelle's Law" prohibits a group health plan, or a health insurance issuer that provides health insurance coverage in connection with a group health plan, from terminating coverage of a Dependent Child due to a qualifying "Medically Necessary Leave of Absence" from, or other change in enrollment at, a postsecondary educational Institution prior to the earlier of:

1. The date that is one year after the first day of the Medically Necessary Leave of Absence.
2. The date on which such coverage would otherwise terminate under the terms of the Plan.

In order to be a Medically Necessary Leave of Absence the student's leave must meet all of the following requirements:

1. Commence while the Dependent Child is suffering from a serious Illness or Injury.
2. Be Medically Necessary.
3. Cause the Dependent Child to lose student status for purposes of coverage under the terms of the parents' plan or coverage.

A Child is a "Dependent Child" under the law if he or she meets all of the following requirements:

1. Is a Dependent Child of a Participant under the terms of the Plan or coverage.
2. Was enrolled in the Plan or coverage, on the basis of being a student at a postsecondary educational Institution, immediately before the first day of the Medically Necessary Leave of Absence.

A treating Physician of the Dependent Child must certify that the Dependent Child is suffering from a serious Illness or Injury and that the Leave of Absence (or other change of enrollment) described is Medically Necessary.

## EFFECTIVE DATES OF COVERAGE; CONDITIONS

The coverage for which an individual is eligible under this Plan will become effective on the date specified below, subject to the conditions of this section.

1. **Enrollment Application (paper or electronic as applicable).** Employee(s) may seek to obtain coverage for themselves and/or Dependents via a form (either paper or electronic as applicable) furnished by the Plan Administrator, in a manner that is satisfactory to the Plan Administrator, and within 30 days following the applicable date of eligibility. If coverage is available and appropriate, coverage will become effective after review of the form, and upon the subsequent date such Employee or Dependents are eligible.

2. **Coverage as Both Employee and Dependent.** An eligible Participant may enroll in this Plan either as an Employee or as a Dependent, but not both.

3. **Birth of Dependent Child.** A newborn Child of a covered Employee will be considered eligible and will be covered from the moment of birth for Injury or Illness, including the Medically Necessary care and treatment of medically diagnosed congenital defects, birth abnormalities and prematurity, newborn care and Preventive Care if written notification to add the Child is received by the Plan Administrator within 30 days following the Child's date of birth. If written notification to add a newborn Child is received by the Plan Administrator AFTER the 30 day period immediately following the Child's date of birth, the Child is considered a late enrollee and not eligible for the Plan until the next Open Enrollment Period. A newborn Child of a Dependent Child is not eligible for this Plan unless the newborn Child meets the definition of an eligible Dependent.

4. **Newly Acquired Dependents.** If while an Employee is enrolled for coverage, that Employee acquires a Dependent, coverage for the newly acquired Dependent shall be effective on the date the Dependent becomes eligible only if the existing coverage extends to Dependents. If coverage for Dependents has not already been secured by the Employee, a written application must be made to the Plan within 30 days of the date of the newly acquired Dependent's eligibility, and any required contributions are also to be made if enrollment is otherwise approved by the Plan Administrator.

5. **Requirement for Employee Coverage.** Coverage for Dependents shall only be available to Dependents of Employees eligible for coverage for him or herself.

6. **Dependents of Multiple Employees.** If a Dependent may be deemed to be a Dependent of more than one Covered Employee, such Dependent shall be deemed to be a Dependent of one such Employee only.

7. **Medicaid Coverage.** An individual's eligibility for any State Medicaid benefits will not be taken into account by the Plan in determining that individual's eligibility under the Plan.

8. **FMLA Leave.** Regardless of any requirements set forth in the Plan, the Plan shall at all times comply with FMLA.

*NOTE: It is the responsibility of the enrolled Employee to notify his or her Employer of any changes in the Dependent's status.*

## SPECIAL AND OPEN ENROLLMENT

Federal law requires and the Plan provides so-called "Special Enrollment Periods," during which Employees may enroll in the Plan, even if they declined to enroll during an initial or subsequent eligibility period. The Special Enrollment rules are described in more detail within the Eligibility for Coverage section.

### Loss of Other Coverage

This Plan will permit an eligible Employee or Dependent (including his or her spouse) or domestic partner who is eligible, but not enrolled, to enroll for coverage under the terms of the Plan if each of the following conditions is met:

1. The eligible Employee or Dependent was covered under another group health plan or had other health insurance coverage at the time coverage under this Plan was offered.

2. The eligible Employee stated in writing at the time this Plan was offered, that the reason for declining enrollment was due to the eligible Employee having coverage under another group health plan or due to the Employee having other health insurance coverage.

3. The eligible Employee or Dependent lost other coverage pursuant to one of the following events:
   a. The eligible Employee or Dependent was under COBRA and the COBRA coverage was exhausted.
   b. The eligible Employee or Dependent was not under COBRA and the other coverage was terminated as a result of loss of eligibility (including as a result of Legal Separation, divorce, loss of Dependent status, death, termination of employment, or reduction in the number of hours worked).
   c. The eligible Employee or Dependent moved out of an HMO service area with no other option available.
   d. The Plan is no longer offering benefits to a class of similarly situated individuals.
   e. The benefit package option is no longer being offered and no substitute is available.
   f. The Employer contributions were terminated.

If an Employee is currently enrolled in a benefit package, the Employee may elect to enroll in another benefit package under the Plan if the following requirements are met:

1. Multiple benefit packages are available.

2. A Dependent of the enrolled Employee has a special enrollment right in the Plan because the Dependent has lost eligibility for other coverage.

Special enrollment rights will not be available to an Employee or Dependent if either of the following requirements is met:

1. The other coverage is/was available via COBRA Continuation Coverage and the Employee or Dependent failed to exhaust the maximum time available to him or her for such COBRA coverage; or
2. The Employee or Dependent lost the other coverage as a result of the individual's failure to pay premiums or required contributions or for cause (such as making a fraudulent claim or an intentional misrepresentation of a material fact in connection with the Other Plan).

For an eligible Employee or Dependent(s) who has met the conditions specified above, this Plan will be effective at 12:01 A.M. on the first day of the first calendar month beginning after the date the written or electronic request for enrollment (including the Participant's enrollment application, either paper or electronic as applicable, in the case of enrollment) is received by the Plan and the request is made within 30 days from loss of coverage. For example, if the Employee loses his or her other health coverage on April 22, he or she must notify the Plan Administrator and apply for coverage by close of business on May 22.

**New Dependent**

An Employee or Dependent who is eligible, but not enrolled in this Plan, may be eligible to enroll during a special enrollment period if an Employee acquires a new Dependent as a result of marriage, domestic partnership, legal guardianship, a foster child being placed with the Employee, birth, adoption, or placement for adoption. To be eligible for this special enrollment, the Employee must apply in writing or electronically, as applicable, no later than 30 days after he or she acquires the new Dependent. For example, if the Employee or Employee's spouse gives birth to a baby on June 22, he or she must notify the Plan Administrator and apply for coverage by close of business on July 22. The following conditions apply to any eligible Employee and Dependents:

An Employee or Dependent who is eligible, but not enrolled in this Plan, may enroll during a special enrollment period if one the following occurs:

1. The eligible Employee is a covered Employee under the terms of this Plan but elected not to enroll during a previous enrollment period.
2. An individual has become a Dependent of the eligible Employee through marriage, domestic partnership, legal guardianship, a foster child being placed with the Employee, birth, adoption, or placement for adoption.

If the conditions for special enrollment are satisfied, the coverage of the Dependent and/or Employee enrolled during the Special Enrollment Period will be effective at 12:01 A.M. for the following events:

1. In the case of marriage, on the date of the marriage.
2. For a domestic partnership, on the date of the domestic partnership agreement.
3. For a legal guardianship, on the date on which such Child is placed in the covered Employee's home pursuant to a court order appointing the covered Employee as legal guardian for the Child.
4. In the case of a foster child being placed with the Employee, on the date on which such Child is placed with the Employee by an authorized placement agency or by judgment, decree or other order of a court of competent jurisdiction.
5. In the case of a Dependent's birth, as of the date of birth.
6. In the case of a Dependent's adoption or placement for adoption, the date of the adoption or placement for adoption.

**Additional Special Enrollment Rights**

Employees and Dependents who are eligible but not enrolled are entitled to enroll under one of the following circumstances:

1. The Employee's or Dependent's Medicaid or State Child Health Insurance Plan (i.e. CHIP) coverage has terminated as a result of loss of eligibility and the Employee requests coverage under the Plan within 60 days after the termination.
2. The Employee or Dependent become eligible for a contribution / premium assistance subsidy under Medicaid or a State Child Health Insurance Plan (i.e. CHIP), and the Employee requests coverage under the Plan within 60 days after eligibility is determined.

If the conditions for special enrollment are satisfied, coverage for the Employee and/or his or her Dependent(s) will be effective at 12:01 A.M. on the first day following the enrollment.

**Open Enrollment**

Prior to the start of a Plan Year, this Plan has an Open Enrollment Period. Eligible Participants who are not covered under this Plan may enroll for coverage during Open Enrollment Periods. Employees who are enrolled will be given an opportunity to change their coverage effective the first day of the upcoming Plan Year. A Participant who fails to make an election during the Open Enrollment Period will automatically retain his or her present coverages. Coverage for Participants enrolling during an Open Enrollment Period will become effective on **June 1st**     as long as all other eligibility requirements have been met. If the other eligibility requirements have not been met, coverage for Participants enrolling during an Open Enrollment Period will become effective as stated in the provision, "Eligibility for Individual Coverage".

The terms of the Open Enrollment Period, including duration of the election period, shall be determined by the Plan Administrator and communicated prior to the start of an Open Enrollment Period. "Open Enrollment Period" shall mean the month of  **May**          in each Calendar Year.

**RELATION TO SECTION 125 CAFETERIA PLAN**

This Plan may also allow additional changes to enrollment due to change in status events under the employer's Section 125 Cafeteria Plan. Refer to the employer's Section 125 Cafeteria Plan for more information.

**QUALIFIED MEDICAL CHILD SUPPORT ORDERS**

This Plan will provide for immediate enrollment and benefits to the Child or Children of a Participant who are the subject of a Qualified Medical Child Support Order (QMCSO), regardless of whether the Child or Children reside with the Participant, provided the Child or Children are not already enrolled as an eligible Dependent as described in this Plan. If a QMCSO is issued, then the Child or Children shall become Alternate Recipient(s) of the benefits under this Plan, subject to the same limitations, restrictions, provisions and procedures as any other Participant. The Plan Administrator will determine if the order properly meets the standards described herein. A properly completed National Medical Support Notice (NMSN) will be treated as a QMCSO and will have the same force and effect.

To be considered a Qualified Medical Child Support Order, the Medical Child Support Order must contain the following information:

1. The name and last known mailing address (if any) of the Participant and the name and mailing address of each such Alternate Recipient covered by the order.
2. A reasonable description of the type of coverage to be provided by this Plan to each Alternate Recipient, or the manner in which such type of coverage is to be determined.
3. The period of coverage to which the order applies.
4. The name of this Plan.

A National Medical Support Notice shall be deemed a QMCSO if all of the following requirements are met:

1. It contains the information set forth in the Definitions section in the definition of "National Medical Support Notice."
2. It identifies either the specific type of coverage or all available group health coverage. If the Employer receives a NMSN that does not designate either specific type(s) of coverage or all available coverage, the Employer and the Plan Administrator will assume that all are designated.
3. It informs the Plan Administrator that, if a group health plan has multiple options and the Participant is not enrolled, the issuing agency will make a selection after the NMSN is qualified, and, if the agency does not respond within 20 days, the Child will be enrolled under the Plan's default option (if any).
4. It specifies that the period of coverage may end for the Alternate Recipient(s) only when similarly situated dependents are no longer eligible for coverage under the terms of the Plan, or upon the occurrence of certain specified events.

A NMSN need not be recognized as a QMCSO if it requires the Plan to provide any type or form of benefit, or any option, not otherwise provided to the Participants and eligible Participants without regard to the provisions herein, except to the extent necessary to meet the requirements of a State law relating to Medical Child Support Orders, as described in Social Security Act §1908 (as added by Omnibus Budget Reconciliation Act of 1993 §13822).

In the instance of any Medical Child Support Order received by this Plan, the Plan Administrator shall, as soon as administratively possible, perform the following:

1. In writing, notify the Participant and each Alternate Recipient covered by such Order (at the address included in the Order) of the receipt of such Order and the Plan's procedures for determining whether the Order qualifies as a QMCSO.
2. Make an administrative determination if the order is a QMCSO and notify the Participant and each affected Alternate Recipient of such determination.

In the instance of any National Medical Support Notice received by this Plan, the Plan Administrator shall perform the following:

1. Notify the State agency issuing the notice with respect to the Child whether coverage of the Child is available under the terms of the Plan and, if so:
   a. Whether the Child is covered under the Plan.
   b. Either the effective date of the coverage or, if necessary, any steps to be taken by the custodial parent or by the official of a State or political subdivision to effectuate the coverage.
2. Provide to the custodial parent (or any State official serving in a substitute capacity) a description of the coverage available and any forms or documents necessary to effectuate such coverage.

As required by Federal law, the Plan Administrator shall perform the following:

1. Establish reasonable procedures to determine whether Medical Child Support Order or National Medical Support Notice are Qualified Medical Child Support Orders.
2. Administer the provision of benefits under such qualified orders. Such procedures shall:



a.  Be in writing.
b.  Provide for the notification of each person specified in a Medical Child Support Order as eligible to receive benefits under the plan (at the address included in the Medical Child Support Order) of such procedures promptly upon receipt by the plan of the Medical Child Support Order.
c.  Permit an Alternate Recipient to designate a representative for receipt of copies of notices that are sent to the Alternate Recipient with respect to a Medical Child Support Order.

## ACQUIRED COMPANIES

Eligible Employees of an acquired company who are Actively at Work and were covered under the Prior Plan of the acquired company will be eligible for the benefits under this Plan on the date of acquisition. Any waiting period previously satisfied under the prior health plan will be applied toward satisfaction of the Service Waiting Period of this Plan. In the event that an acquired company did not have a health plan, all eligible Employees will be eligible on the date of the acquisition.

## GENETIC INFORMATION NONDISCRIMINATION ACT ("GINA")

"GINA" prohibits group health plans, issuers of individual health care policies, and employers from discriminating on the basis of genetic information.

The term "genetic information" means, with respect to any individual, information about any of the following:

1.  Such individual's genetic tests.
2.  The genetic tests of family members of such individual.
3.  The manifestation of a Disease or disorder in family members of such individual.

The term "genetic information" includes participating in clinical research involving genetic services. Genetic tests would include analysis of human DNA, RNA, chromosomes, proteins, or metabolites that detect genotypes, mutations, or chromosomal changes. Genetic information is a form of Protected Health Information (PHI) as defined by and in accordance with the Health Insurance Portability and Accountability Act of 1996 (HIPAA), and is subject to applicable Privacy and Security Standards.

Family members as it relates to GINA include dependents, plus all relatives to the fourth degree, without regard to whether they are related by blood, marriage, or adoption. Underwriting as it relates to GINA includes any rules for determining eligibility, computing premiums or contributions, and applying pre-existing condition limitations. Offering reduced premiums or other rewards for providing genetic information would be impermissible underwriting.

GINA will not prohibit a health care Provider who is treating an individual from requesting that the patient undergo genetic testing. The rules permit the Plan to obtain genetic test results and use them to make claims payment determinations when it is necessary to do so to determine whether the treatment provided to the patient was medically advisable and/or necessary.

The Plan may request, but not require, genetic testing in certain very limited circumstances involving research, so long as the results are not used for underwriting, and then only with written notice to the individual that participation is voluntary and will not affect eligibility for benefits, premiums or contributions. In addition, the Plan will notify and describe its activity to the Health and Human Services secretary of its activities falling within this exception.

While the Plan may collect genetic information after initial enrollment, it may not do so in connection with any annual renewal process where the collection of information affects subsequent enrollment. The Plan will not adjust premiums or increase group contributions based upon genetic information, request or require genetic testing or collect genetic information either prior to or in connection with enrollment or for underwriting purposes.

# TERMINATION OF COVERAGE

## TERMINATION DATES OF INDIVIDUAL COVERAGE

The coverage of any Employee for himself or herself under this Plan will terminate on the earliest to occur of the following dates:

1.  The date upon which the Plan is terminated.
2.  The last day of the month in, or with respect to which, he or she requests that such coverage be terminated, on the condition that such request is made on or before such date, unless prohibited by law (i.e., when election changes cannot be made due to Internal Revenue Code Section 125 "change in status" guidelines). *NOTE: The Employer offers these benefits in conjunction with a cafeteria plan under Section 125 of the Internal Revenue Code and a voluntary termination must comply with the requirements of the Code and the cafeteria plan.*
3.  The last day of the month for which the Employee has made a contribution, in the event of his or her failure to make, when due, any contribution for coverage for himself or herself to which he or she has agreed in writing.
4.  The last day of the month in which the Employee is no longer eligible for such coverage under the Plan.
5.  The last day of the month in which the termination of employment occurs.
6.  The last day of the month following the end of the Stability Period for Variable Hour Employees, if the Employee failed to qualify during the previous Measurement Period.
7.  Immediately upon submission of a fraudulent claim or any fraudulent information to the Plan (including enrollment information), by and/or on behalf of an Employee or his or her Dependent, or upon the Employee or his or her Dependent gaining knowledge of the submission, as determined by the Plan Administrator in its discretion, consistent with applicable laws and/or rules regarding such rescission.

## TERMINATION DATES OF DEPENDENT COVERAGE

The coverage for any Dependents of any Employee who are covered under the Plan will terminate on the earliest to occur of the following dates:

1.  The date upon which the Plan is terminated.
2.  Upon the discontinuance of coverage for Dependents under the Plan.
3.  The date of termination of the Employee's coverage for himself or herself under the Plan.
4.  The date of the expiration of the last period for which the Employee has made a contribution, in the event of his or her failure to make, when due, any contribution for coverage for Dependents to which he or she has agreed in writing.
5.  In the case of a Child age 26 or older for whom coverage is being continued due to mental or physical inability to earn his or her own living, the earliest to occur of:
    a.  Cessation of such disability or inability.
    b.  Failure to provide any required proof of continuous disability or inability or to submit to any required examination.
    c.  Upon the Child's no longer being dependent on the Employee for his or her support.
6.  The day immediately preceding the date such person is no longer a Dependent, except for Dependent Children, as defined herein, except as may be provided for in other areas of this section.
7.  The last day of the month in which such person ceases to be a Dependent Child, as defined herein, except as may be provided for in other areas of this section or within this document.
8.  For a Dependent Child whose coverage is required pursuant to a QMCSO, the last day of the calendar month as of which coverage is no longer required under the terms of the order or this Plan.
9.  Immediately upon submission of a fraudulent claim or any fraudulent information to the Plan (including enrollment information), by and/or on behalf of an Employee or his or her Dependent, or upon the Employee or his or her Dependent gaining knowledge of the submission, as determined by the Plan Administrator in its discretion, consistent with applicable laws and/or rules regarding such rescission.

*NOTE: The Employer offers these benefits in conjunction with a cafeteria plan under Section 125 of the Internal Revenue Code and a voluntary termination must comply with the requirements of the Code and the cafeteria plan.*

# CONTINUATION OF COVERAGE

## EMPLOYER CONTINUATION COVERAGE

Eligible Participants may seek to continue coverage upon the occurrence of any of the following:

1. Total Disability; coverage will continue for 90 days following the end of Active Employment.
2. Leave of Absence (not meeting the definition of a FMLA Leave); coverage will continue for 90 days.

The above noted leave(s) do not run concurrently with FMLA, USERRA or any State-mandated family or medical leave, and/or any other applicable leaves of absence. At the end of the period(s) listed above, the Participant's coverage will be deemed to have terminated for purposes of Continuation of Coverage under COBRA.

## CONTINUATION DURING FAMILY AND MEDICAL LEAVE ACT (FMLA) LEAVE

Regardless of the established leave policies mentioned above, the Plan shall at all times comply with FMLA. It is the intention of the Plan Administrator to provide these benefits only to the extent required by applicable law and not to grant greater rights than those so required. During a FMLA Leave, coverage will be maintained in accordance with the same Plan conditions as coverage would otherwise be provided if the covered Employee had been a continuously active employee during the entire leave period. If Plan coverage lapses during the FMLA Leave, coverage will be reinstated for the person(s) who had coverage under the Plan when the FMLA Leave began, upon the Employee's return to work at the conclusion of the FMLA Leave.

### Leave Entitlements

Eligible employees who work for a covered employer can take up to 12 weeks of unpaid, job-protected leave in a 12-month period for the following reasons:

1. The birth of a child or placement of a child for adoption or foster care with the eligible employee(s).
2. To bond with a child (leave must be taken within 1 year of the child's birth or placement) with the eligible employee(s).
3. To care for the employee's spouse, child, or parent who has a qualifying serious health condition.
4. For the employee's own qualifying serious health condition that makes the employee unable to perform the employee's job.
5. For qualifying exigencies related to the foreign deployment of a military member who is the employee's spouse, child, or parent.

Spouses employed by the same employer are jointly entitled to a combined total of 12 workweeks of FMLA leave for the birth and care of the newborn child, for placement of a child for adoption or foster care, and to care for a parent who has a serious health condition. Leave for birth and care or placement for adoption or foster care must conclude within 12 months of the birth or placement.

An eligible employee who is a covered servicemember's spouse, child, parent, or next of kin may also take up to 26 weeks of FMLA leave in a single 12-month period to care for the servicemember with a serious injury or illness.

An employee does not need to use leave in one block. When it is medically necessary or otherwise permitted, employees may take leave intermittently or on a reduced schedule.

Employees may choose, or an employer may require, use of accrued paid leave while taking FMLA leave. If an employee substitutes accrued paid leave for FMLA leave, the employee must comply with the employer's normal paid leave policies.

### Benefits and Protections

While employees are on FMLA leave, employers must continue health insurance coverage as if the employees were not on leave. Upon return from FMLA leave, most employees must be restored to the same job or one nearly identical to it with equivalent pay, benefits, and other employment terms and conditions.

An employer may not interfere with an individual's FMLA rights or retaliate against someone for using or trying to use FMLA leave, opposing any practice made unlawful by the FMLA, or being involved in any proceeding under or related to the FMLA.

### Eligibility Requirements

An employee who works for a covered employer must meet three criteria in order to be eligible for FMLA leave. The employee must meet all of the following requirements:

1. Have worked for the employer for at least 12 months.
2. Have at least 1,250 hours of service in the 12 months before taking leave.*
3. Work at a location where the employer has at least 50 employees within 75 miles of the employee's worksite.

*Special "hours of service" requirements apply to airline flight crew employees.

### Requesting Leave

Generally, employees must give 30-days' advance notice of the need for FMLA leave. If it is not possible to give 30-days' notice, an employee must notify the employer as soon as possible and, generally, follow the employer's usual procedures.

Employees do not have to share a medical diagnosis, but must provide enough information to the employer so it can determine if the leave qualifies for FMLA protection. Sufficient information could include informing an employer that the employee is or will be unable to perform his or her job functions, that a family member cannot perform daily activities, or that hospitalization or continuing medical treatment is necessary. Employees must inform the employer if the need for leave is for a reason for which FMLA leave was previously taken or certified.

Employers can require a certification or periodic recertification supporting the need for leave. If the employer determines that the certification is incomplete, it must provide a written notice indicating what additional information is required.

### Employer Responsibilities

Once an employer becomes aware that an employee's need for leave is for a reason that may qualify under the FMLA, the employer must notify the employee if he or she is eligible for FMLA leave and, if eligible, must also provide a notice of rights and responsibilities under the FMLA. If the employee is not eligible, the employer must provide a reason for ineligibility.

Employers must notify its employees if leave will be designated as FMLA leave, and if so, how much leave will be designated as FMLA leave.

### Enforcement

Employees may file a complaint with the U.S. Department of Labor, Wage and Hour Division, or may bring a private lawsuit against an employer.

The FMLA does not affect any federal or state law prohibiting discrimination or supersede any state or local law or collective bargaining agreement that provides greater family or medical leave rights.

<div align="center">

For additional information or to file a complaint:
**_U.S. Department of Labor Wage and Hour Division_**
Phone: 1-866-4-USWAGE (1-866-487-9243)
TTY: 1-877-889-5627
Website: https://www.dol.gov/whd/
WH1420a - REV 04/16

</div>

### CONTINUATION DURING USERRA

Participants who are absent from employment because they are in the Uniformed Services may elect to continue their coverage under this Plan for up to 24 months. To continue coverage, Participants must comply with the terms of the Plan, including election during the Plan's annual enrollment period; and pay their contributions, if any. In addition, USERRA also requires that, regardless of whether a Participant elected to continue his or her coverage under the Plan, his or her coverage and his or her Dependents' coverage be reinstated immediately upon his or her return to employment, so long as he or she meets certain requirements contained in USERRA. Participants should contact their participating Employer for information concerning their eligibility for USERRA and any requirements of the Plan.

### CONTINUATION DURING COBRA – INTRODUCTION

The right to this form of continued coverage was created by a Federal law, under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"). COBRA Continuation Coverage can become available to Participants when they otherwise would lose their group health coverage. It also can become available to other members of the Participant's family who are covered under the Plan when they otherwise would lose their group health coverage. Under the Plan, Qualified Beneficiaries that elect COBRA Continuation Coverage must pay the entire cost of the coverage, including a reasonable administration fee. There are several ways coverage will terminate, including the failure of the Participant or their covered Dependents to make timely payment of contributions or premiums. For additional information, Participants should contact the Participating Employer to determine if COBRA applies to him or her and/or his or her covered Dependents.

Participants may have other options available when group health coverage is lost. For example, a Participant may be eligible to buy an individual plan through the Health Insurance Marketplace. By enrolling in coverage through the Marketplace, the Participant may qualify for lower costs on his or her monthly premiums and lower out-of-pocket costs. Additionally, the Participant may qualify for a 30-day special enrollment period for another group health plan for which the Participant is eligible (such as a spouse's plan), even if that plan generally doesn't accept late enrollees.

### COBRA Continuation Coverage

"COBRA Continuation Coverage" is a continuation of Plan coverage when coverage would otherwise end because of a life event known as a "Qualifying Event." COBRA (and the description of COBRA Continuation Coverage contained in this Plan) does not apply to the following benefits (if available as part of the Employer's plan): life insurance, accidental death and dismemberment benefits and weekly income or long term disability benefits. The aforemen-

tioned benefits are not considered for continuation under COBRA. The Plan provides no greater COBRA rights than what COBRA requires – nothing in this Plan is intended to expand the Participant's rights beyond COBRA's requirements.

## Qualifying Events

Specific Qualifying Events are listed below. After a Qualifying Event, COBRA Continuation Coverage must be offered to each person who is a "Qualified Beneficiary." A Qualified Beneficiary is someone who is or was covered by the Plan, and has lost or will lose coverage under the Plan due to the occurrence of a Qualifying Event. The Employee and/or Employee's Dependents could therefore become Qualified Beneficiaries if applicable coverage under the Plan is lost because of the Qualifying Event.

An Employee, who is properly enrolled in this Plan and is a covered Employee, will become a Qualified Beneficiary if he or she loses his or her coverage under the Plan because either one of the following Qualifying Events happens:

1. The hours of employment are reduced.
2. The employment ends for any reason other than gross misconduct.

The spouse of a covered Employee will become a Qualified Beneficiary if he or she loses his or her coverage under the Plan because any of the following Qualifying Events happens:

1. The Employee dies.
2. The Employee's hours of employment are reduced.
3. The Employee's employment ends for any reason other than his or her gross misconduct.
4. The Employee becomes entitled to Medicare benefits (under Part A, Part B, or both).
5. The Employee becomes divorced or legally separated from his or her spouse.

Dependent Children will become Qualified Beneficiaries if they lose coverage under the Plan because any of the following Qualifying Events happens:

1. The parent-covered Employee dies.
2. The parent-covered Employee's hours of employment are reduced.
3. The parent-covered Employee's employment ends for any reason other than his or her gross misconduct.
4. The parent-covered Employee becomes entitled to Medicare benefits (Part A, Part B, or both).
5. The parents become divorced or legally separated.
6. The Child stops being eligible for coverage under the Plan as a Dependent Child.

## Employer Notice of Qualifying Events

When the Qualifying Event is the end of employment (for reasons other than gross misconduct), reduction of hours of employment, death of the covered Employee, or the covered Employee's becoming entitled to Medicare benefits (under Part A, Part B, or both), the Employer must notify the COBRA Administrator of the Qualifying Event.

## Employee Notice of Qualifying Events

In certain circumstances, the covered Employee or Qualified Beneficiary, in order to protect his or her rights under COBRA, is required to provide notification to the COBRA Administrator in writing, either by U.S. First Class Mail or hand delivery. These circumstances are any of the following:

1. **Notice of Divorce or Separation.** Notice of the occurrence of a Qualifying Event that is a divorce or Legal Separation of a covered Employee (or former Employee) from his or her spouse.
2. **Notice of Child's Loss of Dependent Status.** Notice of the occurrence of a Qualifying Event that is an individual's ceasing to be eligible as a Dependent Child under the terms of the Plan.
3. **Notice of a Second Qualifying Event.** Notice of the occurrence of a second Qualifying Event after a Qualified Beneficiary has become entitled to COBRA Continuation Coverage with a maximum duration of 18 (or 29) months.
4. **Notice Regarding Disability.** Notice that a Qualified Beneficiary entitled to receive COBRA Continuation Coverage with a maximum duration of 18 months has been determined by the Social Security Administration ("SSA") to be disabled at any time during the first 60 days of COBRA Continuation Coverage.
5. **Notice Regarding End of Disability.** Notice that a Qualified Beneficiary, with respect to whom a notice described above in #4 has been provided, has subsequently been determined by the SSA to no longer be disabled.

As indicated above, Notification of a Qualifying Event must be made in writing. Notice must be made by submitting the "Notice of Qualifying Event" form and mailing it by U.S. First Class Mail or hand delivery to the COBRA Administrator. This form is available, without charge, from the COBRA Administrator. Notification must include an adequate description of the Qualifying Event or disability determination. Please see the remainder of this section for additional information. Notification must be received by the COBRA Administrator.

A form of notice is available, free of charge, from the COBRA Administrator and must be used when providing the notice.

## Deadline For Providing the Notice

For Qualifying Events described above, notice must be furnished within 60 days of the latest occurring event set forth below:

1. The date upon which the Qualifying Event occurs.
2. The date upon which the Qualified Beneficiary loses (or would lose) Plan coverage due to a Qualifying Event.
3. The date upon which the Qualified Beneficiary is notified via the Plan's SPD or general notice, and/or becomes aware of their status as a Qualified Beneficiary and/or the occurrence of a Qualifying Event; as well as their subsequent responsibility to comply with the Plan's procedure(s) for providing notice to the COBRA Administrator regarding said status.

As described above, if an Employee or Qualified Beneficiary is determined to be disabled under the Social Security Act, the notice must be delivered no more than 60 days after the latest of:

1. The date of the disability determination by the SSA.
2. The date on which a Qualifying Event occurs.
3. The date on which the Qualified Beneficiary loses (or would lose) coverage under the Plan as a result of the Qualifying Event.
4. The date on which the Qualified Beneficiary is informed, through the furnishing of the Plan's SPD or the general notice, of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the COBRA Administrator.

In any event, this notice must be provided within the first 18 months of COBRA Continuation Coverage.

For a change in disability status described above, the notice must be furnished by the date that is 30 days after the later of:

1. The date of the final determination by the SSA that the Qualified Beneficiary is no longer disabled.
2. The date on which the Qualified Beneficiary is informed, through the furnishing of the Plan's SPD or the general notice, of both the responsibility to provide the notice and the Plan's procedures for providing such notice to the COBRA Administrator.

The notice must be postmarked (if mailed), or received by the COBRA Administrator (if hand delivered), by the deadline set forth above. If the notice is late, the opportunity to elect or extend COBRA Continuation Coverage is lost, and if the person is electing COBRA Continuation Coverage, his or her coverage under the Plan will terminate on the last date for which he or she is eligible under the terms of the Plan, or if the person is extending COBRA Continuation Coverage, such Coverage will end on the last day of the initial 18-month COBRA coverage period.

## Who Can Provide the Notice

Any individual who is the covered Employee (or former Employee) with respect to a Qualifying Event, or any representative acting on behalf of the covered Employee (or former Employee) or Qualified Beneficiary, may provide the notice. Notice by one individual shall satisfy any responsibility to provide notice on behalf of all related Qualified Beneficiaries with respect to the Qualifying Event.

## Required Contents of the Notice

After receiving a notice of a Qualifying Event, the Plan must provide the Qualified Beneficiary with an election notice, which describes their rights to COBRA Continuation Coverage and how to make such an election. The notice must contain the following information:

1. Name and address of the covered Employee or former Employee.
2. Name of the Plan and the name, address, and telephone number of the Plan's COBRA administrator.
3. Identification of the Qualifying Event and its date (the initial Qualifying Event and its date if the Qualifying Participant is already receiving COBRA Continuation Coverage and wishes to extend the maximum coverage period).
4. A description of the Qualifying Event (for example, divorce, Legal Separation, cessation of Dependent status, entitlement to Medicare by the covered Employee or former Employee, death of the covered Employee or former Employee, disability of a Qualified Beneficiary or loss of disability status).
   a. In the case of a Qualifying Event that is divorce Legal Separation,, name(s) and address(es) of spouse and Dependent Child or Children covered under the Plan, date of divorce Legal Separation, and a copy of the decree of divorce or Legal Separation.
   b. In the case of a Qualifying Event that is Medicare entitlement of the covered Employee or former Employee, date of entitlement, and name(s) and address(es) of spouse and Dependent Child or Children covered under the Plan.
   c. In the case of a Qualifying Event that is a Dependent Child's cessation of Dependent status under the Plan, name and address of the Child, reason the Child ceased to be an eligible Dependent (for example, attained limiting age).
   d. In the case of a Qualifying Event that is the death of the covered Employee or former Employee, the date of death, and name(s) and address(es) of spouse and Dependent Child or Children covered under the Plan.
   e. In the case of a Qualifying Event that is disability of a Qualified Beneficiary, name and address of the disabled Qualified Beneficiary, name(s) and address(es) of other family members covered under the Plan, the date the disability began, the date of the SSA's determination, and a copy of the SSA's determination.
   f. In the case of a Qualifying Event that is loss of disability status, name and address of the Qualified Beneficiary who is no longer disabled, name(s) and address(es) of other family members covered under the Plan, the date the disability ended and the date of the

SSA's determination.

5.  Identification of the Qualified Beneficiaries (by name or by status).
6.  An explanation of the Qualified Beneficiaries' right to elect continuation coverage.
7.  The date coverage will terminate (or has terminated) if continuation coverage is not elected.
8.  How to elect continuation coverage.
9.  What will happen if continuation coverage isn't elected or is waived.
10. What continuation coverage is available, for how long, and (if it is for less than 36 months), how it can be extended for disability or second qualifying events.
11. How continuation coverage might terminate early.
12. Premium payment requirements, including due dates and grace periods.
13. A statement of the importance of keeping the Plan Administrator informed of the addresses of Qualified Beneficiaries.
14. A statement that the election notice does not fully describe COBRA or the plan and that more information is available from the Plan Administrator and in the SPD.
15. A certification that the information is true and correct, a signature and date.

If a copy of the decree of divorce or Legal Separation or the SSA's determination cannot be provided by the deadline for providing the notice, complete and provide the notice, as instructed, by the deadline and submit the copy of the decree of divorce or Legal Separation or the SSA's determination within 30 days after the deadline. The notice will be timely if done so. However, no COBRA Continuation Coverage, or extension of such Coverage, will be available until the copy of the decree of divorce or Legal Separation or the SSA's determination is provided.

If the notice does not contain all of the required information, the COBRA Administrator may request additional information. If the individual fails to provide such information within the time period specified by the COBRA Administrator in the request, the COBRA Administrator may reject the notice if it does not contain enough information for the COBRA Administrator to identify the plan, the covered Employee (or former Employee), the Qualified Beneficiaries, the Qualifying Event or disability, and the date on which the Qualifying Event, if any, occurred.

**Electing COBRA Continuation Coverage**

Complete instructions on how to elect COBRA Continuation Coverage will be provided by the COBRA Administrator within 14 days of receiving the notice of the Qualifying Event. The individual then has 60 days in which to elect COBRA Continuation Coverage. The 60 day period is measured from the later of the date coverage terminates and the date of the notice containing the instructions. If COBRA Continuation Coverage is not elected in that 60 day period, then the right to elect it ceases.

Each Qualified Beneficiary will have an independent right to elect COBRA Continuation Coverage. Covered Employees may elect COBRA Continuation Coverage on behalf of all other Qualified Beneficiaries, including their spouses, and parents or a legal guardian may elect COBRA Continuation Coverage on behalf of their Children. In the event that the COBRA Administrator determines that the individual is not entitled to COBRA Continuation Coverage, the COBRA Administrator will provide to the individual an explanation as to why he or she is not entitled to COBRA Continuation Coverage.

**Duration of COBRA Continuation Coverage**

The maximum time period shown below shall dictate for how long COBRA Continuation Coverage will be available. The maximum time period for coverage is based on the type of the Qualifying Event and the status of the Qualified Beneficiary. Multiple Qualifying Events that may be combined under COBRA will not ordinarily continue coverage for more than 36 months beyond the date of the original Qualifying Event. When the Qualifying Event is "entitlement to Medicare," the 36 month continuation period is measured from the date of the original Qualifying Event. For all other Qualifying Events, the continuation period is measured from the date of the Qualifying Event, not the date of loss of coverage.

When the Qualifying Event is the death of the covered Employee (or former Employee), the covered Employee's (or former Employee's) becoming entitled to Medicare benefits (under Part A, Part B, or both), a divorce or Legal Separation, or a Dependent Child's losing eligibility as a Dependent Child, COBRA Continuation Coverage lasts for up to a total of 36 months.

When the Qualifying Event is the end of employment or reduction of the covered Employee's hours of employment, and the covered Employee became entitled to Medicare benefits less than 18 months before the Qualifying Event, COBRA Continuation Coverage for Qualified Beneficiaries other than the covered Employee lasts until 36 months after the date of Medicare entitlement. For example, if a covered Employee becomes entitled to Medicare eight months before the date on which his or her employment terminates, COBRA Continuation Coverage for his or her spouse and Children can last up to thirty-six months after the date of Medicare entitlement, which is equal to twenty-eight months after the date of the Qualifying Event (thirty-six months minus eight months).

Otherwise, when the Qualifying Event is the end of employment (for reasons other than gross misconduct) or reduction of the covered Employee's hours of employment, COBRA Continuation Coverage generally lasts for only up to a total of 18 months. There are two ways in which this eighteen month period of COBRA Continuation Coverage can be extended.

**Disability Extension of COBRA Continuation Coverage**

Disability can extend the 18 month period of continuation coverage for a Qualifying Event that is a termination of employment or reduction of hours, if an Employee or anyone in an Employee's family covered under the Plan is determined by the Social Security Administration ("SSA") to be disabled, and

the Employee notifies the COBRA Administrator. The Employee and his or her Dependents may thereby be entitled to an additional 11 months of COBRA Continuation Coverage, for a total of 29 months, if the disability started at some time before the 60th day of COBRA Continuation Coverage and lasts at least until the end of the 18 month period of COBRA Continuation Coverage. The Plan can charge 150% of the premium cost for the extended period of coverage.

### Second Qualifying Event Extension of COBRA Continuation Coverage

If an Employee's family experiences another Qualifying Event while receiving 18 months of COBRA Continuation Coverage, Dependents may receive up to 18 additional months of COBRA Continuation Coverage, for a maximum of 36 months, if notice of the second Qualifying Event is provided to the Plan Administrator or COBRA Administrator in accordance with the procedures set forth herein. This extension may be applicable to the Employee's death, Medicare Parts A and/or B eligibility, divorce Legal Separation,, or a loss of Dependent status under the terms of the Plan if the event would have also caused the spouse or Dependent Child to lose coverage under the Plan regardless of whether the first Qualifying Event had occurred.

### Shorter Duration of COBRA Continuation Coverage

COBRA establishes required periods of coverage for continuation health benefits. A plan, however, may provide longer periods of coverage beyond those required by COBRA. COBRA Qualified Beneficiaries generally are eligible for group coverage during a maximum of 18 months after Qualifying Events arising due to employment termination or reduction of hours of work. Certain Qualifying Events, or a second Qualifying Events during the initial period of coverage, may permit a Qualified Beneficiary to receive a maximum of 36 months of coverage.

It is not necessary that COBRA Continuation Coverage be in effect for the maximum period of time, as set forth herein. COBRA Continuation Coverage may conclude prior to the latest possible date if the Employer ceases to provide a group health plan to any Employee; the Qualified Beneficiary fails to make timely payment of any required contributions or premium; the Qualified Beneficiary gains coverage under another group health plan (as an Employee or otherwise) or becomes entitled to either Medicare Part A or Part B (whichever comes first); and/or any other event occurs which enables the Plan Administrator to terminate coverage without offering COBRA Continuation Coverage (such as the commission of fraud by the Qualified Beneficiary and/or their Dependent). COBRA Continuation Coverage shall be extended to the first day of the month 30 days (or more) subsequent to the date upon which the SSA determined that the Qualified Beneficiary is no longer disabled.

### Contribution and/or Premium Requirements

The cost of the elected COBRA Continuation Coverage must be paid within 45 days of its election. Payments will then be subsequently due on the first day of each month. COBRA Continuation Coverage will be canceled and will not be reinstated if any payment is made late; however, the Plan Administrator must allow for a 30 day grace period during which a late payment may still be made without the loss of COBRA Continuation Coverage.

### Trade Reform Act of 2002 and Trade Preferences Extension Act of 2015

The Trade Preferences Extension Act of 2015 has extended certain provisions of the Trade Reform Act of 2002, which created a special COBRA right applicable to certain employees who have been terminated or experienced a reduction of hours and who qualify for a "trade readjustment allowance" or "alternative trade adjustment assistance." These individuals can either take a Health Coverage Tax Credit (HCTC) or get advance payment of the applicable percentage of premiums paid for qualified health insurance coverage, including COBRA continuation coverage. These individuals are also entitled to a second opportunity to elect COBRA coverage for themselves and certain family members (if they did not already elect COBRA coverage). This election must be made within the 60-day period that begins on the first day of the month in which the individual becomes eligible for assistance under the Trade Reform Act of 2002. However, this election may not be made more than six months after the date the individual's group health plan coverage ends.

A Participant's eligibility for subsidies under the Trade Preferences Extension Act of 2015 affects his or her eligibility for subsidies that provide premium assistance for coverage purchased through the Health Insurance Marketplace. For each coverage month, a Participant must choose one or the other, and if he or she receives both during a tax year, the IRS will reconcile his or her eligibility for each subsidy through his or her individual tax return. Participants may wish to consult their individual tax advisors concerning the benefits of using one subsidy or the other.

Participants may contact the Plan Administrator for additional information or they have any questions they may call the Health Coverage Tax Credit Customer Contact Center toll-free at 1-866-628-4282. TTD/TTY callers may call toll-free at 1-866-626-4282. More information about the Trade Reform Act is available at www.doleta.gov/tradeact; for information about the Health Coverage Tax Credit (HCTC), please see: https://www.irs.gov/Credits-&-Deductions/Individuals/HCTC.

### Additional Information

Please contact the COBRA Administrator with any questions about the Plan and COBRA Continuation Coverage. Questions concerning the Plan or COBRA continuation coverage rights should be addressed to the COBRA Administrator. For more information about a Participant's rights the Employee Retirement Income Security Act (ERISA), including COBRA, HIPAA, the Affordable Care Act, and other laws affecting group health plans, contact the nearest Regional or District Office of the U.S. Department of Labor's Employee Benefits Security Administration (EBSA) or visit https://www.dol.gov/agencies/ebsa. (Addresses and phone numbers of Regional and District EBSA Offices are available through EBSA's website.) For more information about the Marketplace, visit www.HealthCare.gov.

### Current Addresses

Important information may be distributed by mail. In order to protect the rights of the Employee's family, the Employee should keep the COBRA Administrator informed of any changes in the addresses of family members.

# GENERAL LIMITATIONS & EXCLUSIONS

Some health care services are not covered by the Plan. All current medical conditions and medications for Employees and their covered dependents must be disclosed at the time of written application for coverage under the Plan. Any non-disclosed medical condition or prescription medication that is not listed and disclosed on the application will not be covered and all related charges will be denied under the Plan. Coverage is not available from the Plan for charges arising from care, supplies, treatment, and/or services:

**Administrative Costs.** That are solely for and/or applicable to administrative costs of completing claim forms or reports or for providing records wherever allowed by applicable law and/or regulation.

**After the Termination Date.** That are Incurred by the Participant on or after the date coverage terminates, even if payments have been predetermined for a course of treatment submitted before the termination date, unless otherwise deemed to be covered in accordance with the terms of the Plan or applicable law and/or regulation.

**Alcohol.** That arise from a Participant taking part in any activity made illegal due to the use of alcohol or a state of intoxication, even if the cause of the Illness or Injury is not related to the use of alcohol. Expenses will be covered for Injured Participants other than the person partaking in an activity made illegal due to the use of alcohol or a state of intoxication, and expenses may be covered for Substance Abuse treatment as specified in this Plan, if applicable. This Exclusion does not apply if the Injury (a) resulted from being the victim of an act of domestic violence, or (b) resulted from a documented medical condition (including both physical and mental health conditions).

**Broken Appointments.** That are charged solely due to the Participant's having failed to honor an appointment.

**Complications of Non-Covered Services.** That are required as a result of complications from a service not covered under the Plan, unless expressly stated otherwise.

**Confined Persons.** That are for services, supplies, and/or treatment of any Participant that were Incurred while confined and/or arising from confinement in a prison, jail or other penal institution .

**Cosmetic Surgery.** That are incurred in connection with the care and/or treatment of Surgical Procedures which are performed for plastic, reconstructive or cosmetic purposes or any other service or supply which are primarily used to improve, alter or enhance appearance, whether or not for psychological or emotional reasons, except to the extent where it is needed for: (a) repair or alleviation of damage resulting from an Accident; (b) because of infection or Illness; (c) because of congenital Disease, developmental condition or anomaly of a covered Dependent Child which has resulted in a functional defect. A treatment will be considered cosmetic for either of the following reasons: (a) its primary purpose is to beautify or (b) there is no documentation of a clinically significant impairment, meaning decrease in function or change in physiology due to Injury, Illness or congenital abnormality. The term "cosmetic services" includes those services which are described in IRS Code Section 213(d)(9).

**Custodial Care.** That do not restore health, unless specifically mentioned otherwise.

**Deductible.** That are amounts applied toward satisfaction of Deductibles and expenses that are defined as the Participant's responsibility in accordance with the terms of the Plan.

**Excess.** That exceed Plan limits, set forth herein and including (but not limited to) the Maximum Allowable Charge in the Plan Administrator's discretion and as determined by the Plan Administrator, in accordance with the Plan terms as set forth by and within this document.

**Experimental.** That are Experimental or Investigational.

**Foreign Travel.** That are received outside of the United States if travel is for the sole purpose of obtaining medical services, unless otherwise approved by the Plan Administrator.

**Government.** That the Participant obtains, but which is paid, may be paid, is provided or could be provided for at no cost to the Participant through any program or agency, in accordance with the laws or regulations of any government, or where care is provided at government expense, unless there is a legal obligation for the Participant to pay for such treatment or service in the absence of coverage. This Exclusion does not apply when otherwise prohibited by law, including laws applicable to Medicaid and Medicare.

**Government-Operated Facilities.** That meet the following requirements:

1.  That are services furnished to the Participant in any veteran's Hospital, military Hospital, Institution or facility operated by the United States



2.  government or by any State government or any agency or instrumentality of such governments.

2.  That are services or supplies which can be paid for by any government agency, even if the patient waives rights to those services or supplies.

*NOTE: This Exclusion does not apply to treatment of non-service related disabilities or for Inpatient care provided in a military or other Federal government Hospital to Dependents of active duty armed service personnel or armed service retirees and their Dependents. This Exclusion does not apply where otherwise prohibited by law.*

**Hazardous Pursuit, Hobby or Activity.** That are of an Injury or Sickness that results from engaging in a hazardous pursuit, hobby or activity. A pursuit, hobby or activity is hazardous if it involves or exposes an individual to risk of a degree or nature not customarily undertaken in the course of the Participant's customary occupation or if it involves leisure time activities commonly considered as involving unusual or exceptional risks, characterized by a constant threat of danger or risk of bodily harm including but not limited to: hang gliding, skydiving, bungee jumping, parasailing, use of all terrain vehicles, rock climbing, use of explosives, automobile racing, motorcycle racing, aircraft racing, or speed boat racing.

**Illegal Acts.** That are for any Injury or Sickness which is Incurred while taking part or attempting to take part in an illegal activity, including but not limited to misdemeanors and felonies, even if the cause of the Illness or Injury is not related to the commission of the illegal act. It is not necessary that an arrest occur, criminal charges be filed, or, if filed, that a conviction result. Proof beyond a reasonable doubt is not required to be deemed an illegal act. This Exclusion does not apply if the Injury (a) resulted from being the victim of an act of domestic violence, or (b) resulted from a documented medical condition (including both physical and mental health conditions).

**Illegal Drugs or Medications.** That are services, supplies, care or treatment to a Participant for Injury or Sickness Incurred while the Participant was voluntarily taking or was under the influence of any controlled substance, drug, hallucinogen or narcotic not administered on the advice of a Physician. Expenses will be covered for Injured Participants other than the person using controlled substances and expenses will be covered for Substance Abuse treatment as specified in this Plan. This Exclusion does not apply if the Injury (a) resulted from being the victim of an act of domestic violence, or (b) resulted from a documented medical condition (including both physical and mental health conditions).

**Immediate Family Member.** That are rendered by a member of the immediate Family Unit or person regularly residing in the same household; whether the relationship is by blood or exists in law.

**Incurred by Other Persons.** That are expenses actually Incurred by other persons.

**Long Term Care.** That are related to long term care.

**Medical Necessity.** That are not Medically Necessary and/or arise from services and/or supplies that are not Medically Necessary.

**Military Service.** That are related to conditions determined by the Veteran's Administration to be connected to active service in the military of the United States, except to the extent prohibited or modified by law.

Negligence. That are for Injuries resulting from negligence, misfeasance, malfeasance, nonfeasance or malpractice on the part of any caregiver, Institution, or Provider, as determined by the Plan Administrator, in its discretion, in light of applicable laws and evidence available to the Plan Administrator.

**No Coverage.** That are Incurred at a time when no coverage is in force for the applicable Participant and/or Dependent.

**No Legal Obligation.** That are for services provided to a Participant for which the Provider of a service does not and/or would not customarily render a direct charge, or charges Incurred for which the Participant or Plan has no legal obligation to pay, or for which no charges would be made in the absence of this coverage, including but not limited to charges for services not actually rendered, fees, care, supplies, or services for which a person, company or any other entity except the Participant or the Plan, may be liable for necessitating the fees, care, supplies, or services.

**Non-Disclosure.** All current medical conditions and medications for Employee and their covered dependents must be disclosed at the time of written application for coverage under the Plan. Any non-disclosed medical condition or prescription medication that is not listed and disclosed on the application will not be covered and all related charges will be denied under the Plan.

**Non-Prescription Drugs.** For drugs for use outside of a Hospital or other Inpatient facility that can be purchased over-the-counter and without a Physician's written prescription. Drugs for which there is a non-prescription equivalent available. This does not apply to the extent the non-prescription drug must be covered under Preventive Care, subject to the Affordable Care Act.

**Not Acceptable.** That are not accepted as standard practice by the AMA, ADA, or the Food and Drug Administration.

**Not Covered Provider.** That are performed by Providers that do not satisfy all the requirements per the Provider definition as defined within this Plan.

**Not Specified As Covered.** That are not specified as covered under any provision of this Plan.



**Occupational.** That are for any condition, Illness, Injury or complication thereof arising out of or in the course of employment, including self-employment, or an activity for wage or profit. Participants that are self-employed or employed by an employer that does not provide health benefits should ensure that they have other medical benefits to provide for medical care in the event they are hurt on the job. In most cases workers' compensation insurance will cover the costs, but if the Participant does not have such coverage he or she may end up with no coverage at all.

**Other than Attending Physician.** That are other than those certified by a Physician who is attending the Participant as being required for the treatment of Injury or Disease, and performed by an appropriate Provider.

**Postage, Shipping, Handling Charges, Etc.** That are for any postage, shipping or handling charges which may occur in the transmittal of information to the Third Party Administrator; including interest or financing charges.

**Prior to Coverage.** That are rendered or received prior to or after any period of coverage hereunder, except as specifically provided herein.

**Professional (and Semi-Professional) Athletics (Injury/Illness).** That are in connection with any Injury or Illness arising out of or in the course of any employment for wage or profit; or related to professional or semi-professional athletics, including practice.

**Prohibited by Law.** That are to the extent that payment under this Plan is prohibited by law.

**Provider Error.** That are required as a result of unreasonable Provider error.

**Self-Inflicted.** That are incurred due to an intentionally self-inflicted Injury or Illness, not definitively (a) arising from being the victim of an act of domestic violence, or (b) resulting from a documented medical condition (including both physical and mental health conditions).
Subrogation, Reimbursement, and/or Third Party Responsibility. That are for an Illness, Injury or Sickness not payable by virtue of the Plan's subrogation, reimbursement, and/or third party responsibility provisions.

**Unreasonable.** That are not reasonable in nature or in charge (see definition of Maximum Allowable Charge), or are required to treat Illness or Injuries arising from and due to a Provider's error, wherein such Illness, Injury, infection or complication is not reasonably expected to occur. This exclusion will apply to expenses directly or indirectly resulting from circumstances that, in the opinion of the Plan Administrator in its sole discretion, gave rise to the expense and are not generally foreseeable or expected amongst professionals practicing the same or similar type(s) of medicine as the treating Provider whose error caused the loss(es).

**Vehicle Accident.** For treatment of any Injury where it is determined that a Participant was involved in a motorcycle Accident while not wearing a helmet or in an automobile Accident while not wearing a seatbelt (or car seat), even if the cause of the Illness or Injury is not related to the failure of the Participant to wear a helmet or seatbelt (or car seat). This exclusion does not apply: (a) to Participants who were passengers on public transportation, ride for hire or livery services or (b) when a seatbelt or helmet is not required by law.

**War/Riot.** That incurred as a result of war or any act of war, whether declared or undeclared, or any act of aggression by any country, including rebellion or riot, when the Participant is a member of the armed forces of any country, or during service by a Participant in the armed forces of any country, or voluntary participation in a riot. This Exclusion does not apply to any Participant who is not a member of the armed forces, and does not apply to victims of any act of war or aggression.

*With respect to any Injury which is otherwise covered by the Plan, the Plan will not deny benefits otherwise provided for treatment of the Injury if the Injury results from being the victim of an act of domestic violence or a documented medical condition. To the extent consistent with applicable law, this exception will not require this Plan to provide particular benefits other than those provided under the terms of the Plan.*

# PLAN ADMINISTRATION

The Plan Administrator has been granted the authority to administer the Plan. The Plan Administrator has retained the services of the Third Party Administrator to provide certain claims processing and other technical services. Subject to the claims processing and other technical services delegated to the Third Party Administrator, the Plan Administrator reserves the unilateral right and power to administer and to interpret, construe and construct the terms and provisions of the Plan, including without limitation, correcting any error or defect, supplying any omission, reconciling any inconsistency and making factual determinations.

## PLAN ADMINISTRATOR

The Plan is administered by the Plan Administrator within the purview of ERISA and in accordance with these provisions. An individual, committee, or entity may be appointed by the Plan Sponsor to be Plan Administrator and serve at the convenience of the Plan Sponsor. If the appointed Plan Administrator or a committee member resigns, dies, is otherwise unable to perform, is dissolved, or is removed from the position, the Plan Sponsor shall appoint a new Plan Administrator as soon as reasonably possible.

The Plan Administrator may delegate to one or more individuals or entities part or all of its discretionary authority under the Plan, provided that any such delegation must be made in writing.

The Plan shall be administered by the Plan Administrator, in accordance with its terms. Policies, interpretations, practices, and procedures are established and maintained by the Plan Administrator. It is the express intent of this Plan that the Plan Administrator shall have maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make all interpretive and factual determinations as to whether any individual is eligible and entitled to receive any benefit under the terms of this Plan, to decide disputes which may arise with respect to a Participant's rights, and to decide questions of Plan interpretation and those of fact relating to the Plan. The decisions of the Plan Administrator will be final and binding on all interested parties. Benefits will be paid under this Plan only if the Plan Administrator, in its discretion, determines that the Participant is entitled to them.

If due to errors in drafting, any Plan provision does not accurately reflect its intended meaning, as demonstrated by prior interpretations or other evidence of intent, or as determined by the Plan Administrator in its sole and exclusive judgment, the provision shall be considered ambiguous and shall be interpreted by the Plan Administrator in a fashion consistent with its intent, as determined by the Plan Administrator. The Plan may be amended retroactively to cure any such ambiguity, notwithstanding anything in the Plan to the contrary.

The foregoing provisions of this Plan may not be invoked by any person to require the Plan to be interpreted in a manner which is inconsistent with its interpretations by the Plan Administrator. All actions taken and all determinations by the Plan Administrator shall be final and binding upon all persons claiming any interest under the Plan subject only to the claims appeal procedures of the Plan.

## DUTIES OF THE PLAN ADMINISTRATOR

The duties of the Plan Administrator include the following:

1. To administer the Plan in accordance with its terms.
2. To determine all questions of eligibility, status and coverage under the Plan.
3. To interpret the Plan, including the authority to construe possible ambiguities, inconsistencies, omissions and disputed terms.
4. To make factual findings.
5. To decide disputes which may arise relative to a Participant's rights and/or availability of benefits.
6. To prescribe procedures for filing a claim for benefits, to review claim denials and appeals relating to them and to uphold or reverse such denials.
7. To keep and maintain the Plan documents and all other records pertaining to the Plan.
8. To appoint and supervise a Third Party Administrator to pay claims.
9. To perform all necessary reporting as required by ERISA.
10. To establish and communicate procedures to determine whether a Medical Child Support Order is a QMCSO.
11. To delegate to any person or entity such powers, duties and responsibilities as it deems appropriate.
12. To perform each and every function necessary for or related to the Plan's administration.

## AMENDING AND TERMINATING THE PLAN

This Plan was established for the exclusive benefit of the Employees with the intention it will continue indefinitely; however, as the settlor of the Plan, the Plan Sponsor, through its directors and officers, may, in its sole discretion, at any time, amend, suspend or terminate the Plan in whole or in part. This includes amending the benefits under the Plan or the trust agreement (if any). All amendments to this Plan shall become effective as of a date established by the Plan Sponsor.

The process whereby amendments, suspension and/or termination of the Plan is accomplished, or any part thereof, shall be decided upon and/or

enacted by resolution of the Plan Sponsor's directors and officers if it is incorporated (in compliance with its articles of incorporation or bylaws and if these provisions are deemed applicable), or by the sole proprietor in his or her own discretion if the Plan Sponsor is a sole proprietorship, but always in accordance with applicable Federal and State law, including – where applicable – notification rules provided for and as required by ERISA.

If the Plan is terminated, the rights of the Plan Participants are limited to expenses Incurred before termination. In connection with the termination, the Plan Sponsor may establish a deadline by which all Claims must be submitted for consideration. Benefits will be paid only for Covered Expenses Incurred prior to the termination date and submitted in accordance with the rules established by the Plan Sponsor. Upon termination, any Plan assets will be used to pay outstanding claims and all expenses of Plan termination. As it relates to distribution of assets upon termination of the Plan, any contributions paid by Participants will be used for the exclusive purpose of providing benefits and defraying reasonable expenses related to Plan administration, and will not inure to the benefit of the Employer.

## SUMMARY OF MATERIAL MODIFICATION (SMM)

A Summary of Material Modifications reports changes in the information provided within the Summary Plan Description. Examples include a change to Deductibles, eligibility or the addition or deletion of coverage.

The Plan Administrator shall notify all covered Employees of any plan amendment considered a Summary of Material Modifications by the Plan as soon as administratively feasible after its adoption, but no later than within 210 days after the close of the Plan Year in which the changes became effective.

*NOTE: The Affordable Care Act (ACA) requires that if a Plan's Material Modifications are not reflected in the Plan's most recent Summary of Benefits and Coverage (SBC) then the Plan must provide written notice to Participants at least 60 days before the effective date of the Material Modification.*

## SUMMARY OF MATERIAL REDUCTION (SMR)

A Summary of Material Reduction (SMR) is a type of SMM. A Material Reduction generally means any modification that would be considered by the average participant to be an important reduction in covered services or benefits. Examples include reductions in benefits or increases in Deductibles or Copayments.

The Plan Administrator shall notify all eligible Employees of any plan amendment considered a Material Reduction in covered services or benefits provided by the Plan as soon as administratively feasible after its adoption, but no later than 60 days after the date of adoption of the reduction. Eligible Employees and beneficiaries must be furnished a summary of such reductions, and any changes so made shall be binding on each Participant. The 60 day period for furnishing a summary of Material Reduction does not apply to any Employee covered by the Plan who would reasonably expect to receive a summary through other means within the next 90 days.

Material Reduction disclosure provisions are subject to the requirements of ERISA and the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and any related amendments.

## MISUSE OF IDENTIFICATION CARD

If an Employee or covered Dependent permits any person who is not a covered Participant of the Family Unit to use any identification card issued, the Plan Sponsor may give Employee written notice that his (and his family's) coverage will be terminated in accordance with the Plan's provisions.

# CLAIM PROCEDURES

## CLAIM PROCEDURES; PAYMENT OF CLAIMS

### INTRODUCTION

In accordance with applicable law, the Plan will allow an authorized representative to act on a Claimant's behalf in pursuing or appealing a benefit claim.

The availability of health benefit payments is dependent upon Claimants complying with the following:

### HEALTH CLAIMS

Full and final authority to adjudicate claims and make determinations as to their payability by and under the Plan belongs to and resides solely with the Plan Administrator. The Plan Administrator shall make claims adjudication determinations after full and fair review and in accordance with the terms of this Plan, applicable law, and with ERISA. To receive due consideration, claims for benefits and questions regarding said claims should be directed to the Third Party Administrator. The Plan Administrator may delegate to the Third Party Administrator responsibility to process claims in accordance with the terms of the Plan and the Plan Administrator's directive(s). The Third Party Administrator is not a fiduciary of the Plan and does not have discretionary authority to make claims payment decisions or interpret the meaning of the Plan terms.

Written proof that expenses eligible for Plan reimbursement and/or payment were incurred, as well as proof of their eligibility for payment by the Plan, must be provided to the Plan Administrator via the Third Party Administrator. Although a provider of medical services and/or supplies may submit such claims directly to the Plan by virtue of an Assignment of Benefits, ultimate responsibility for supplying such written proof remains with the Claimant. The Plan Administrator may determine the time and fashion by which such proof must be submitted. No benefits shall be payable under the Plan if the Plan Administrator so determines that the claims are not eligible for Plan payment, or, if inadequate proof is provided by the Claimant or entities submitting claims to the Plan on the Claimant's behalf. A call from a Provider who wants to know if an individual is covered under the Plan, or if a certain procedure is covered by the Plan, prior to providing treatment is not a "claim," since an actual claim for benefits is not being filed with the Plan. These are simply requests for information, and any response is not a guarantee of benefits, since payment of benefits is subject to all Plan provisions, limitations and Exclusions. Once treatment is rendered, a Clean Claim must be filed with the Plan (which will be a "Post-service Claim"). At that time, a determination will be made as to what benefits are payable under the Plan. A Claimant has the right to request a review of an Adverse Benefit Determination. If the claim is denied at the end of the appeal process, as described below, the Plan's final decision is known as a Final Internal Adverse Benefit Determination. If the Claimant receives notice of a Final Internal Adverse Benefit Determination, or if the Plan does not follow the claims procedures properly, the Claimant then has the right to request an independent external review. The external review procedures are described below. The claims procedures are intended to provide a full and fair review. This means, among other things, that claims and appeals will be decided in a manner designed to ensure the independence and impartiality of the persons involved in making these decisions. Benefits will be payable to a Participant, or at the Plan Administrator's discretion, to a provider that has accepted an Assignment of Benefits as consideration in full for services rendered. The Plan Administrator may revoke an Assignment of Benefits previously issued to a Provider at its discretion and treat the Participant as the sole beneficiary.

According to Federal regulations which apply to the Plan, there are four types of claims: Pre-service (Urgent and Non-urgent), Concurrent Care and Post-service.

1.  **Pre-service Claims.** A "Pre-service Claim" occurs when issuance of payment by the Plan is dependent upon determination of payability prior to the receipt of the applicable medical care; however, if the Plan does not require the Claimant to obtain approval of a medical service prior to getting treatment, then there is no "Pre-service Claim." Urgent care or Emergency medical services or admissions will not require notice to the Plan prior to the receipt of care. Furthermore, if in the opinion of a Physician with knowledge of the Claimant's medical condition, pre-determination of payability by the Plan prior to the receipt of medical care (a Pre-service Claim) would result in a delay adequate to jeopardize the life or health of the Claimant, hinder the Claimant's ability to regain maximum function (compared to treatment without delay), or subject the Claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim, said claim may be deemed to be a "Pre-service Urgent Care Claim." In such circumstances, the Claimant is urged to obtain the applicable care without delay, and communicate with the Plan regarding their claim(s) as soon as reasonably possible. If, due to Emergency or urgency as defined above, a Pre-service claim is not possible, the Claimant must comply with the Plan's requirements with respect to notice required after receipt of treatment, and must file the claim as a Post-service Claim, as herein described. Pre-admission certification of a non-Emergency Hospital admission is a "claim" only to the extent of the determination made – that the type of procedure or condition warrants Inpatient confinement for a certain number of days. The rules regarding Pre-service Claims will apply to that determination only. Once a Claimant has the treatment in question, the claim for benefits relating to that treatment will be treated as a Post-service Claim.

2.  **Concurrent Claims.** If a Claimant requires an on-going course of treatment over a period of time or via a number of treatments, the Plan may approve of a "Concurrent Claim." In such circumstances, the Claimant must notify the Plan of such necessary ongoing or routine medical care, and the Plan will assess the Concurrent Claim as well as determine whether the course of treatment should be reduced or terminated. The Claimant, in turn, may request an extension of the course of treatment beyond that which the Plan has approved. If the

Plan does not require the Claimant to obtain approval of a medical service prior to getting treatment, then there is no need to contact the Plan Administrator to request an extension of a course of treatment, and the Claimant must simply comply with the Plan's requirements with respect to notice required after receipt of treatment, as herein described.

3. **Post-service Claims.** A "Post-service Claim" is a claim for benefits from the Plan after the medical services and/or supplies have already been provided.

## When Claims Must Be Filed

Post-service health claims (which must be Clean Claims) must be filed with the Third Party Administrator within 90 days of the date charges for the service(s) and/or supplies were Incurred. Benefits are based upon the Plan's provisions at the time the charges were Incurred. Claims filed later than that date shall be denied.

A Pre-service Claim (including a Concurrent claim that also is a Pre-service claim) is considered to be filed when the request for approval of treatment or services is made and received by the Third Party Administrator in accordance with the Plan's procedures.

A Post-service Claim is considered to be filed when the following information is received by the Third Party Administrator, together with the industry standard claim form:

1. The date of service.
2. The name, address, telephone number and tax identification number of the Provider of the services or supplies.
3. The place where the services were rendered.
4. The Diagnosis and procedure codes.
5. The amount of charges, which reflect any applicable PPO re-pricing, if any.
6. The name of the Plan.
7. The name of the covered Employee.
8. The name of the patient.

Upon receipt of this information, the claim will be deemed to be initiated with the Plan. The Third Party Administrator will determine if enough information has been submitted to enable proper consideration of the claim (a Clean Claim). If not, more information may be requested as provided herein. This additional information must be received by the Third Party Administrator within 45 days (48 hours in the case of Pre-service urgent care claims) from receipt by the Claimant of the request for additional information. Failure to do so may result in claims being declined or reduced.

## Timing of Claim Decisions

The Plan Administrator shall notify the Claimant, in accordance with the provisions set forth below, of any Adverse Benefit Determination (and, in the case of Pre-service claims and Concurrent claims, of decisions that a claim is payable in full) within the following timeframes:

1. *Pre-service Urgent Care Claims:*
   a. If the Claimant has provided all of the necessary information, as soon as possible, taking into account the medical exigencies, but not later than 72 hours after receipt of the claim.
   b. If the Claimant has not provided all of the information needed to process the claim, then the Claimant will be notified as to what specific information is needed as soon as possible, but not later than 24 hours after receipt of the claim.
   c. The Claimant will be notified of a determination of benefits as soon as possible, but not later than 48 hours, taking into account the medical exigencies, after the earliest of:
      i. The end of the period afforded the Claimant to provide the information.
      ii. The Plan's receipt of the specified information.
   d. If there is an Adverse Benefit Determination, a request for an expedited appeal may be submitted orally or in writing by the Claimant. All necessary information, including the Plan's benefit determination on review, may be transmitted between the Plan and the Claimant by telephone, facsimile, or other similarly expeditious method. Alternatively, the Claimant may request an expedited review under the external review process.

2. *Pre-service Non-urgent Care Claims:*
   a. If the Claimant has provided all of the information needed to process the claim, in a reasonable period of time appropriate to the medical circumstances, but not later than 15 days after receipt of the claim, unless an extension has been requested, then prior to the end of the 15 day extension period.
   b. If the Claimant has not provided all of the information needed to process the claim, then the Claimant will be notified as to what specific information is needed as soon as possible. The Claimant will be notified of a determination of benefits in a reasonable period of time appropriate to the medical circumstances, either prior to the end of the extension period (if additional information was requested during the initial processing period), or by the date agreed to by the Plan Administrator and the Claimant (if additional information was requested during the extension period).

3. *Concurrent Claims:*
   a. Plan Notice of Reduction or Termination. If the Plan Administrator is notifying the Claimant of a reduction or termination of a course

of treatment (other than by Plan amendment or termination), notification will occur before the end of such period of time or number of treatments. The Claimant will be notified sufficiently in advance of the reduction or termination to allow the Claimant to appeal and obtain a determination on review of that Adverse Benefit Determination before the benefit is reduced or terminated. This rule does not apply if benefits are reduced or eliminated due to plan amendment or termination. A similar process applies for claims based on a rescission of coverage for fraud or misrepresentation.

b.  Request by Claimant Involving Urgent Care. If the Plan Administrator receives a request from a Claimant to extend the course of treatment beyond the period of time or number of treatments involving urgent care, notification will occur as soon as possible, taking into account the medical exigencies, but not later than 24 hours after receipt of the claim, as long as the Claimant makes the request at least 24 hours prior to the expiration of the prescribed period of time or number of treatments. If the Claimant submits the request with less than 24 hours prior to the expiration of the prescribed period of time or number of treatments, the request will be treated as a claim involving urgent care and decided within the urgent care timeframe.

c.  Request by Claimant Involving Non-urgent Care. If the Plan Administrator receives a request from the Claimant for a claim not involving urgent care, the request will be treated as a new benefit claim and decided within the timeframe appropriate to the type of claim (either as a Pre-service Non-urgent claim or a Post-service claim).

d.  Request by Claimant Involving Rescission. With respect to rescissions, the following timetable applies:
    i.  Notification to Claimant: 30 days
    ii  Notification of Adverse Benefit Determination on appeal: 30 days

4.  **Post-service Claims:**
    a.  If the Claimant has provided all of the information needed to process the claim, in a reasonable period of time, but not later than 30 days after receipt of the claim, unless an extension has been requested, then prior to the end of the 15 day extension period.
    b.  If such an extension is necessary due to a failure of the Claimant to submit the information necessary to decide the claim, the notice of extension shall specifically describe the required information, and the Claimant shall be afforded at least 45 days from receipt of the notice within which to provide the specified information.
    c.  If the Claimant has not provided all of the information needed to process the claim and additional information is requested during the initial processing period, then the Claimant will be notified of a determination of benefits prior to the end of the extension period, unless additional information is requested during the extension period, then the Claimant will be notified of the determination by a date agreed to by the Plan Administrator and the Claimant.

5.  **Extensions:**
    a.  Pre-service Urgent Care Claims. No extensions are available in connection with Pre-service urgent care claims. (Applies to non-grandfathered plans only.)
    b.  Pre-service Non-urgent Care Claims. This period may be extended by the Plan for up to 15 days, provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Claimant, prior to the expiration of the initial 15 day processing period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision.
    c.  Post service Claims. This period may be extended by the Plan for up to 15 days, provided that the Plan Administrator both determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the Claimant, prior to the expiration of the initial 30 day processing period, of the circumstances requiring the extension of time and the date by which the Plan expects to render a decision.

6.  **Calculating Time Periods.** The period of time within which a benefit determination is required to be made shall begin at the time a claim is deemed to be filed in accordance with the procedures of the Plan.

## Notification of an Adverse Benefit Determination

The Plan Administrator shall provide a Claimant with a notice, either in writing or electronically (or, in the case of pre-service urgent care claims, by telephone, facsimile or similar method, with written or electronic notice following within three days), containing the following information:

1   Information sufficient to allow the Claimant to identify the claim involved (including date of service, the health care Provider, the claim amount, if applicable, and a statement describing the availability, upon request, of the Diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning).

2.  A reference to the specific portion(s) of the Plan Document upon which a denial is based.

3.  Specific reason(s) for a denial, including the denial code and its corresponding meaning, and a description of the Plan's standard, if any, that was used in denying the claim.

4.  A description of any additional information necessary for the Claimant to perfect the claim and an explanation of why such information is necessary.

5.  A description of the Plan's review procedures and the time limits applicable to the procedures, including a statement of the Claimant's right to bring a civil action under Section 502(a) of ERISA following an Adverse Benefit Determination on final review.

6.  A statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to the Claimant's claim for benefits.

7.  Upon request, the identity of any medical or vocational experts consulted in connection with a claim, even if the Plan did not rely upon their advice (or a statement that the identity of the expert will be provided, upon request).

8.  Any rule, guideline, protocol or similar criterion that was relied upon in making the determination (or a statement that it was relied upon

and that a copy will be provided to the Claimant, free of charge, upon request).

9.   In the case of denials based upon a medical judgment (such as whether the treatment is Medically Necessary or Experimental), either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Claimant's medical circumstances, or a statement that such explanation will be provided to the Claimant, free of charge, upon request.

10.  In a claim involving urgent care, a description of the Plan's expedited review process.

## APPEAL OF ADVERSE BENEFIT DETERMINATIONS

### Full and Fair Review of All Claims

In cases where a claim for benefits is denied, in whole or in part, and the Claimant believes the claim has been denied wrongly, the Claimant may appeal the denial and review pertinent documents. The claims procedures of this Plan provide a Claimant with a reasonable opportunity for a full and fair review of a claim and Adverse Benefit Determination. More specifically, the Plan provides:

1.   A 180 day timeframe following receipt of a notification of an initial Adverse Benefit Determination within which to appeal the determination. The Plan will not accept appeals filed after a 180 day timeframe.

2.   The opportunity to submit written comments, documents, records, and other information relating to the claim for benefits.

3.   The opportunity to review the Claim file and to present evidence and testimony as part of the internal claims and appeals process.

4.   A review that does not afford deference to the previous Adverse Benefit Determination and that is conducted by an appropriate named fiduciary of the Plan, who shall be neither the individual who made the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of such individual.

5.   A review that takes into account all comments, documents, records, and other information submitted by the Claimant relating to the claim, without regard to whether such information was submitted or considered in the prior benefit determination.

6.   That, in deciding an appeal of any Adverse Benefit Determination that is based in whole or in part upon a medical judgment, the Plan fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment, who is neither an individual who was consulted in connection with the Adverse Benefit Determination that is the subject of the appeal, nor the subordinate of any such individual.

7.   Upon request, the identity of medical or vocational experts whose advice was obtained on behalf of the Plan in connection with a claim, even if the Plan did not rely upon their advice.

8.   That a Claimant will be provided, free of charge: (a) reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim in possession of the Plan Administrator or Third Party Administrator; (b) information regarding any voluntary appeals procedures offered by the Plan; (c) information regarding the Claimant's right to an external review process; (d) any internal rule, guideline, protocol or other similar criterion relied upon, considered or generated in making the adverse determination; and (e) an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Claimant's medical circumstances.

9.   That a Claimant will be provided, free of charge, and sufficiently in advance of the date that the notice of Final Internal Adverse Benefit Determination is required, with new or additional evidence considered, relied upon, or generated by the Plan in connection with the Claim, as well as any new or additional rationale for a denial at the internal appeals stage, and a reasonable opportunity for the Claimant to respond to such new evidence or rationale.

## REQUIREMENTS FOR APPEAL

### Requirements for First Level Appeal

The Claimant must file an appeal regarding a Post-service claim and applicable Adverse Benefit Determination, in writing within 180 days following receipt of the notice of an Adverse Benefit Determination.

*For Pre-service Claims.* Oral appeals should be submitted in writing as soon as possible after it has been initiated. To file any appeal in writing, the Claimant's appeal must be addressed as follows:

*Assured Benefits Administrators, Inc*
*Address: PO Box 211517, Eagan, MN 55121*
*Phone: (800) 247-7114*
*Fax: (915) 532-1772*

*For Post-service Claims.* To file any appeal in writing, the Claimant's appeal must be addressed as follows:

*Assured Benefits Administrators, Inc*
*Address: PO Box 211517, Eagan, MN 55121*
*Phone: (800) 247-7114*
*Fax: (915) 532-1772*

It shall be the responsibility of the Claimant or authorized representative to submit an appeal under the provisions of the Plan. Any appeal must include:

1   The name of the Employee/Claimant.

2.  The Employee/Claimant's social security number.
3.  The group name or identification number.
4.  All facts and theories supporting the claim for benefits.
5.  A statement in clear and concise terms of the reason or reasons for disagreement with the handling of the claim.
6.  Any material or information that the Claimant has which indicates that the Claimant is entitled to benefits under the Plan.

If the Claimant provides all of the required information, it may be that the expenses will be eligible for payment under the Plan.

## Timing of Notification of Benefit Determination on Review
The Plan Administrator shall notify the Claimant of the Plan's benefit determination on review within the following timeframes:

1.  **Pre-service Urgent Care Claims:** As soon as possible, taking into account the medical exigencies, but not later than 72 hours after receipt of the appeal.
2.  **Pre-service Non-urgent Care Claims:** Within a reasonable period of time appropriate to the medical circumstances, but not later than 30 days after receipt of the appeal.
3.  **Concurrent Claims:** The response will be made in the appropriate time period based upon the type of claim; Pre-service Urgent, Pre-service Non-urgent or Post-service.
4.  **Post-service Claims:** Within a reasonable period of time, but not later 30 days per internal appeal.

**Calculating Time Periods.** The period of time within which the Plan's determination is required to be made shall begin at the time an appeal is filed in accordance with the procedures of this Plan, without regard to whether all information necessary to make the determination accompanies the filing.

## Manner and Content of Notification of Adverse Benefit Determination on Review
The Plan Administrator shall provide a Claimant with notification, with respect to Pre-service urgent care claims, by telephone, facsimile or similar method, and with respect to all other types of claims, in writing or electronically, of a Plan's Adverse Benefit Determination on review, setting forth:

1.  Information sufficient to allow the Claimant to identify the claim involved (including date of service, the health care Provider, the claim amount, if applicable, and a statement describing the availability, upon request, of the Diagnosis code and its corresponding meaning, and the treatment code and its corresponding meaning).
2.  Specific reason(s) for a denial, including the denial code and its corresponding meaning, and a description of the Plan's standard, if any, that was used in denying the claim, and a discussion of the decision.
3.  A reference to the specific portion(s) of the plan provisions on which the denial is based.
4.  The identity of any medical or vocational experts consulted in connection with a claim, even if the Plan did not rely upon their advice (or a statement that the identity of the expert will be provided, upon request).
5.  A statement that the Claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the Claimant's claim for benefits.
6.  Any rule, guideline, protocol or similar criterion that was relied upon, considered, or generated in making the determination will be provided free of charge. If this is not practical, a statement will be included that such a rule, guideline, protocol or similar criterion was relied upon in making the determination and a copy will be provided to the Claimant, free of charge, upon request.
7.  A description of any additional information necessary for the Claimant to perfect the claim and an explanation of why such information is necessary.
8.  A description of available internal appeals and external review processes, including information regarding how to initiate an appeal.
9.  A description of the Plan's review procedures and the time limits applicable to the procedures. This description will include information on how to initiate the appeal and a statement of the Claimant's right to bring a civil action under section 502(a) of ERISA following an Adverse Benefit Determination on final review.
10. In the case of denials based upon a medical judgment (such as whether the treatment is Medically Necessary or Experimental), either an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the Claimant's medical circumstances, will be provided. If this is not practical, a statement will be included that such explanation will be provided to the Claimant, free of charge, upon request.
11. The following statement: "You and your Plan may have other voluntary alternative dispute resolution options, such as mediation. One way to find out what may be available is to contact your local U.S. Department of Labor Office and your State insurance regulatory agency."
12. Information about the availability of, and contact information for, an applicable office of health insurance consumer assistance or ombudsman established under applicable federal law to assist Participants with the internal claims and appeals and (for non-grandfathered plans) external review processes.

## Furnishing Documents in the Event of an Adverse Determination
In the case of an Adverse Benefit Determination on review, the Plan Administrator shall provide such access to, and copies of, documents, records, and other information described in the provision relating to "Manner and Content of Notification of Adverse Benefit Determination on Review" as appropriate.



## Decision on Review

The decision by the Plan Administrator or other appropriate named fiduciary of the Plan on review will be final, binding and conclusive and will be afforded the maximum deference permitted by law. All claim review procedures provided for in the Plan must be exhausted before any legal action is brought.

## External Review Process

The Federal external review process does not apply to a denial, reduction, termination, or a failure to provide payment for a benefit based on a determination that a Claimant or beneficiary fails to meet the requirements for eligibility under the terms of a group health plan. The Federal external review process, in accordance with the current Affordable Care Act regulations, applies only to:

1.  Any eligible Adverse Benefit Determination (including a Final Internal Adverse Benefit Determination) by a plan or issuer that involves medical judgment (including, but not limited to, those based on the plan's or issuer's requirements for Medical Necessity, appropriateness, health care setting, level of care, or effectiveness of a covered benefit; or its determination that a treatment is Experimental or Investigational), as determined by the external reviewer.
2.  A rescission of coverage (whether or not the rescission has any effect on any particular benefit at that time).

### *Standard external review*

Standard external review is an external review that is not considered expedited (as described in the "expedited external review" paragraph in this section).

1.  ***Request for external review.*** The Plan will allow a Claimant to file a request for an external review with the Plan if the request is filed within four months after the date of receipt of a notice of an Adverse Benefit Determination or Final Internal Adverse Benefit Determination. If there is no corresponding date four months after the date of receipt of such a notice, then the request must be filed by the first day of the fifth month following the receipt of the notice. For example, if the date of receipt of the notice is October 30, because there is no February 30, the request must be filed by March 1. If the last filing date would fall on a Saturday, Sunday, or Federal holiday, the last filing date is extended to the next day that is not a Saturday, Sunday, or Federal holiday.
2.  ***Preliminary review.*** Within five business days following the date of receipt of the external review request, the Plan will complete a preliminary review of the request to determine whether:
    a.  The Claimant is or was covered under the Plan at the time the health care item or service was requested or, in the case of a retrospective review, was covered under the Plan at the time the health care item or service was provided.
    b.  The Adverse Benefit Determination or the Final Internal Adverse Benefit Determination does not relate to the Claimant's failure to meet the requirements for eligibility under the terms of the Plan (e.g., worker classification or similar determination).
    c.  The Claimant has exhausted the Plan's internal appeal process unless the Claimant is not required to exhaust the internal appeals process under the final regulations.
    d.  The Claimant has provided all the information and forms required to process an external review. Within one business day after completion of the preliminary review, the Plan will issue a notification in writing to the Claimant. If the request is complete but not eligible for external review, such notification will include the reasons for its ineligibility and contact information for the Employee Benefits Security Administration (toll-free number 866-444-EBSA (3272)). If the request is not complete, such notification will describe the information or materials needed to make the request complete and the Plan will allow a Claimant to perfect the request for external review within the four-month filing period or within the 48 hour period following the receipt of the notification, whichever is later.
3.  ***Referral to Independent Review Organization.*** The Plan will assign an independent review organization (IRO) that is accredited by URAC or by a similar nationally-recognized accrediting organization to conduct the external review. Moreover, the Plan will take action against bias and to ensure independence. Accordingly, the Plan will contract with (or direct the Third Party Administrator to contract with, on its behalf) at least three IROs for assignments under the Plan and rotate claims assignments among them (or incorporate other independent unbiased methods for selection of IROs, such as random selection). In addition, the IRO may not be eligible for any financial incentives based on the likelihood that the IRO will support the denial of benefits.
4.  ***Reversal of Plan's decision.*** Upon receipt of a notice of a final external review decision reversing the Adverse Benefit Determination or Final Internal Adverse Benefit Determination, the Plan will provide coverage or payment for the claim without delay, regardless of whether the plan intends to seek judicial review of the external review decision and unless or until there is a judicial decision otherwise.

### *Expedited external review*

1.  ***Request for expedited external review.*** The Plan will allow a Claimant to make a request for an expedited external review with the Plan at the time the Claimant receives:
    a.  An Adverse Benefit Determination if the Adverse Benefit Determination involves a medical condition of the Claimant for which the timeframe for completion of a standard internal appeal under the final regulations would seriously jeopardize the life or health of the Claimant or would jeopardize the Claimant's ability to regain maximum function and the Claimant has filed a request for an expedited internal appeal.
    b.  A Final Internal Adverse Benefit Determination, if the Claimant has a medical condition where the timeframe for completion of a standard external review would seriously jeopardize the life or health of the Claimant or would jeopardize the Claimant's ability to regain maximum function, or if the Final Internal Adverse Benefit Determination concerns an admission, availability of care, continued

stay, or health care item or service for which the Claimant received Emergency Services, but has not been discharged from a facility.

2.  ***Preliminary review.*** Immediately upon receipt of the request for expedited external review, the Plan will determine whether the request meets the reviewability requirements set forth above for standard external review. The Plan will immediately send a notice that meets the requirements set forth above for standard external review to the Claimant of its eligibility determination.

3.  ***Referral to Independent Review Organization.*** Upon a determination that a request is eligible for external review following the preliminary review, the Plan will assign an IRO pursuant to the requirements set forth above for standard review. The Plan will provide or transmit all necessary documents and information considered in making the Adverse Benefit Determination or Final Internal Adverse Benefit Determination to the assigned IRO electronically or by telephone or facsimile or any other available expeditious method. The assigned IRO, to the extent the information or documents are available and the IRO considers them appropriate, will consider the information or documents described above under the procedures for standard review. In reaching a decision, the assigned IRO will review the claim de novo and is not bound by any decisions or conclusions reached during the Plan's internal claims and appeals process.

4.  ***Notice of final external review decision.*** The Plan's (or Third Party Administrator's) contract with the assigned IRO will require the IRO to provide notice of the final external review decision, in accordance with the requirements set forth above, as expeditiously as the Claimant's medical condition or circumstances require, but in no event more than 72 hours after the IRO receives the request for an expedited external review. If the notice is not in writing, within 48 hours after the date of providing that notice, the assigned IRO will provide written confirmation of the decision to the Claimant and the Plan.

## TWO LEVELS OF APPEAL

### Requirements for Second Level Appeal

The Claimant must file an appeal regarding a Post-service claim and applicable Adverse Benefit Determination, in writing within 60 days following receipt of the notice of the first level Adverse Benefit Determination.

This Plan requires two levels of appeal by a Claimant before the Plan's internal appeals are exhausted. For each level of appeal, the Claimant and the Plan are subject to the same procedures, rights, and responsibilities as stated within this Plan. Each level of appeal is subject to the same submission and response guidelines. Once a Claimant receives an Adverse Benefit Determination in response to an initial claim for benefits, the Claimant may appeal that Adverse Benefit Determination, which will constitute the initial appeal. If the Claimant receives an Adverse Benefit Determination in response to that initial appeal, the Claimant may appeal that Adverse Benefit Determination as well, which will constitute the final internal appeal. If the Claimant receives an Adverse Benefit Determination in response to the Claimant's second appeal, such Adverse Benefit Determination will constitute the Final Internal Adverse Benefit Determination, and the Plan's internal appeals procedures will have been exhausted.

## Deemed Exhaustion of Internal Claims Procedures and De Minimis

### Exception to the Deemed Exhaustion Rule

A Claimant will not be required to exhaust the internal claims and appeals procedures described above if the Plan fails to adhere to the claims procedures requirements. In such an instance, a Claimant may proceed immediately to the External Review Program or make a claim in court. However, the internal claim and appeals procedures will not be deemed exhausted (meaning the Claimant must adhere to them before participating in the External Review Program or bringing a claim in court) in the event of a de minimis violation that does not cause, and is not likely to cause, prejudice or harm to the Claimant as long as the Plan Administrator demonstrates that the violation was for good cause or due to matters beyond the control of the Plan, the violation occurred in the context of an ongoing, good faith exchange of information between the Plan and the Claimant, and the violation is not reflective of a pattern or practice of non- compliance.

If a Claimant believes the Plan Administrator has engaged in a violation of the claims procedures and would like to pursue an immediate review, the Claimant may request that the Plan provide a written explanation of the violation, including a description of the Plan's basis for asserting that the violation should not result in a "deemed exhaustion" of the claims procedures. The Plan will respond to this request within ten days. If the External Reviewer or a court rejects a request for immediate review because the Plan has met the requirements for the "de minimis" exception described above, the Plan will provide the Claimant with notice of an opportunity to resubmit and pursue an internal appeal of the claim.

## APPOINTMENT OF AUTHORIZED REPRESENTATIVE

A Claimant may designate another individual to be an authorized representative and act on his or her behalf and communicate with the Plan with respect to a specific benefit claim or appeal of a denial. This authorization must be in writing, signed and dated by the Claimant, and include all the information required in the authorized representative form. The appropriate form can be obtained from the Plan Administrator or the Third Party Administrator.

The Plan will permit, in a medically urgent situation, such as a claim involving Urgent Care, a Claimant's treating health care practitioner to act as the Claimant's authorized representative without completion of the authorized representative form. Should a Claimant designate an authorized representative, all future communications from the Plan will be conducted with the authorized representative instead of the Claimant, unless the Plan Administrator is otherwise notified in writing by the Claimant. A Claimant can revoke the authorized representative at any time. A Claimant may authorize only one person as an authorized representative at a time. Recognition as an authorized representative is completely separate from a Provider accepting an Assignment of Benefits, requiring a release of information, or requesting completion a similar form. An Assignment of Benefits by a Claimant shall not be recognized as a designation of the Provider as an authorized representative. Assignment and its limitations under this Plan are described below.

## AUTOPSY

Upon receipt of a claim for a deceased Claimant for any condition, Sickness, or Injury is the basis of such claim, the Plan maintains the right to request an autopsy be performed upon said Claimant. The request for an autopsy may be exercised only where not prohibited by any applicable law.

## PAYMENT OF BENEFITS

Where benefit payments are allowable in accordance with the terms of this Plan, payment shall be made in U.S. Dollars (unless otherwise agreed upon by the Plan Administrator). Payment shall be made, in the Plan Administrator's discretion, to an assignee of an Assignment of Benefits, but in any instance may alternatively be made to the Claimant, on whose behalf payment is made and who is the recipient of the services for which payment is being made. Should the Claimant be deceased, payment shall be made to the Claimant's heir, assign, agent or estate (in accordance with written instructions), or, if there is no such arrangement and in the Plan Administrator's discretion, the institute and/or Provider who provided the care and/or supplies for which payment is to be made – regardless of whether an Assignment of Benefits occurred.

### Assignments

Assignment by a Claimant to the Provider of the Claimant's right to submit claims for payment to the Plan, and receive payment from the Plan, may be achieved via an Assignment of Benefits, if and only if the Provider accepts said Assignment of Benefits as consideration in full for services rendered. If benefits are paid, however, directly to the Claimant – despite there being an Assignment of Benefits – the Plan shall be deemed to have fulfilled its obligations with respect to such payment, and it shall be the Claimant's responsibility to compensate the applicable Provider(s). The Plan will not be responsible for determining whether an Assignment of Benefits is valid; and the Claimant shall retain final authority to revoke such Assignment of Benefits if a Provider subsequently demonstrates an intent not to accept it as payment in full for services rendered. As such, payment of benefits will be made directly to the assignee unless a written request not to honor the assignment, signed by the Claimant, has been received.

No Claimant shall at any time, either during which he or she is a Claimant in the Plan, or following his or her termination as a Claimant, in any manner, have any right to assign his or her right to sue to recover benefits under the Plan, to enforce rights due under the Plan or to any other causes of action which he or she may have against the Plan or its fiduciaries. This prohibition applies to Providers as well.

A Provider which accepts an Assignment of Benefits, in accordance with this Plan as consideration in full for services rendered, is bound by the rules and provisions set forth within the terms of this document.

Benefits due to any Provider will be considered "assigned" to such Provider and will be paid directly to such Provider, whether or not a written Assignment of Benefits was executed. Notwithstanding any assignment or non-Assignment of Benefits to the contrary, upon payment of the benefits due under the Plan, the Plan is deemed to have fulfilled its obligations with respect to such benefits, whether or not payment is made in accordance with any assignment or request.

Providers and any other person or entity accepting payment from the Plan or to whom a right to benefits has been assigned, in consideration of services rendered, agrees to be bound by the terms of this Plan and agrees to submit claims for reimbursement in strict accordance with applicable law, ICD, and/or CPT standards, Medicare guidelines, HCPCS standards, or other standards approved by the Plan Administrator or insurer.

### Non U.S. Providers

A Provider of medical care, supplies, or services, whose primary facility, principal place of business or address for payment is located outside the United States shall be deemed to be a "Non U.S. Provider." Claims for medical care, supplies, or services provided by a Non U.S. Provider and/or that are rendered outside the United States of America, may be deemed to be payable under the Plan by the Plan Administrator, subject to all Plan Exclusions, limitations, maximums and other provisions. Assignment of Benefits to a Non U.S. Provider is prohibited absent an explicit written waiver executed by the Plan Administrator. If Assignment of Benefits is not authorized, the Claimant is responsible for making all payments to Non U.S. Providers, and is solely responsible for subsequent submission of proof of payment to the Plan. Only upon receipt of such proof of payment, and any other documentation needed by the Plan Administrator to process the claims in accordance with the terms of the Plan, shall reimbursement by the Plan to the Claimant be made. If payment was made by the Claimant in U.S. currency (American dollars), the maximum reimbursable amount by the Plan to the Claimant shall be that amount. If payment was made by the Claimant using any currency other than U.S. currency (American dollars), the Plan shall utilize an exchange rate in effect on the Incurred date as established by a recognized and licensed entity authorized to so establish said exchange rates. The Non U.S. Provider shall be subject to, and shall act in compliance with, all U.S. and other applicable licensing requirements; and claims for benefits must be submitted to the Plan in English.

### Recovery of Payments

Occasionally, benefits are paid more than once, are paid based upon improper billing or a misstatement in a proof of loss or enrollment information, are not paid according to the Plan's terms, conditions, limitations or Exclusions, or should otherwise not have been paid by the Plan. As such this Plan may pay benefits that are later found to be greater than the Maximum Allowable Charge. In this case, this Plan may recover the amount of the overpayment from the source to which it was paid, primary payers, or from the party on whose behalf the charge(s) were paid. As such, whenever the Plan pays benefits exceeding the amount of benefits payable under the terms of the Plan, the Plan Administrator has the right to recover any such erroneous payment directly from the person or entity who received such payment and/or from other payers and/or the Claimant or Dependent on whose behalf such payment was made.

A Claimant, Dependent, Provider, another benefit plan, insurer, or any other person or entity who receives a payment exceeding the amount of benefits payable under the terms of the Plan or on whose behalf such payment was made, shall return or refund the amount of such erroneous payment to the Plan within 30 days of discovery or demand. The Plan Administrator shall have no obligation to secure payment for the expense for which the erroneous payment was made or to which it was applied.

The person or entity receiving an erroneous payment may not apply such payment to another expense. The Plan Administrator shall have the sole discretion to choose who will repay the Plan for an erroneous payment and whether such payment shall be reimbursed in a lump sum. When a Claimant or other entity does not comply with the provisions of this section, the Plan Administrator shall have the authority, in its sole discretion, to deny payment of any claims for benefits by the Claimant and to deny or reduce future benefits payable (including payment of future benefits for other injuries or Illnesses) under the Plan by the amount due as reimbursement to the Plan. The Plan Administrator may also, in its sole discretion, deny or reduce future benefits (including future benefits for other injuries or Illnesses) under any other group benefits plan maintained by the Plan Sponsor. The reductions will equal the amount of the required reimbursement.

Providers and any other person or entity accepting payment from the Plan or to whom a right to benefits has been assigned, in consideration of services rendered, payments and/or rights, agrees to be bound by the terms of this Plan and agree to submit claims for reimbursement in strict accordance with their State's health care practice acts, ICD or CPT standards, Medicare guidelines, HCPCS standards, or other standards approved by the Plan Administrator or insurer. Any payments made on claims for reimbursement not in accordance with the above provisions shall be repaid to the Plan within 30 days of discovery or demand or incur prejudgment interest of 1.5% per month. If the Plan must bring an action against a Claimant, Provider or other person or entity to enforce the provisions of this section, then that Claimant, Provider or other person or entity agrees to pay the Plan's attorneys' fees and costs, regardless of the action's outcome.

Further, Claimant and/or their Dependents, beneficiaries, estate, heirs, guardian, personal representative, or assigns (Claimants) shall assign or be deemed to have assigned to the Plan their right to recover said payments made by the Plan, from any other party and/or recovery for which the Claimant(s) are entitled, for or in relation to facility-acquired condition(s), Provider error(s), or damages arising from another party's act or omission for which the Plan has not already been refunded.

The Plan reserves the right to deduct from any benefits properly payable under this Plan the amount of any payment which has been made for any of the following circumstances:

1. In error.
2. Pursuant to a misstatement contained in a proof of loss or a fraudulent act.
3. Pursuant to a misstatement made to obtain coverage under this Plan within two years after the date such coverage commences.
4. With respect to an ineligible person.
5. In anticipation of obtaining a recovery if a Claimant fails to comply with the Plan's Third Party Recovery, Subrogation and Reimbursement provisions.
6. Pursuant to a claim for which benefits are recoverable under any policy or act of law providing for coverage for occupational injury or disease to the extent that such benefits are recovered. This provision (6) shall not be deemed to require the Plan to pay benefits under this Plan in any such instance.

The deduction may be made against any claim for benefits under this Plan by a Claimant or by any of his covered Dependents if such payment is made with respect to the Claimant or any person covered or asserting coverage as a Dependent of the Claimant.

If the Plan seeks to recoup funds from a Provider, due to a claim being made in error, a claim being fraudulent on the part of the Provider, and/or the claim that is the result of the Provider's misstatement, said Provider shall, as part of its assignment to benefits from the Plan, abstain from billing the Claimant for any outstanding amount(s).

**Medicaid Coverage**

A Claimant's eligibility for any State Medicaid benefits will not be taken into account in determining or making any payments for benefits to or on behalf of such Claimant. Any such benefit payments will be subject to the State's right to reimbursement for benefits it has paid on behalf of the Claimant, as required by the State Medicaid program; and the Plan will honor any Subrogation rights the State may have with respect to benefits which are payable under the Plan.

**Limitation of Action**

A Claimant cannot bring any legal action against the Plan to recover reimbursement until 90 days after the Claimant has properly submitted a request for reimbursement as described in this section and all required reviews of the Claimant's claim have been completed. If the Claimant wants to bring a legal action against the Plan, he or she must do so within two years from the expiration of the time period in which a request for reimbursement must be submitted or he or she loses any rights to bring such an action against the Plan.

A Claimant cannot bring any legal action against the Plan for any other reason unless he or she first completes all the steps in the appeal process described in this section. After completing that process, if he or she wants to bring a legal action against the Plan he or she must do so within two years of the date he or she is notified of the final decision on the appeal or he or she will lose any rights to bring such an action against the Plan.

# COORDINATION OF BENEFITS

## BENEFITS SUBJECT TO THIS PROVISION

The following only applies to the medical benefits of the Plan.

## Excess Insurance

If at the time of Injury, Sickness, Disease or disability there is available, or potentially available any other source of coverage (including but not limited to coverage resulting from a judgment at law or settlements), the benefits under this Plan shall apply only as an excess over such other sources of coverage.

The Plan's benefits will be excess to, whenever possible, any of the following:

1.   Any primary payer besides the Plan.
2.   Any first party insurance through medical payment coverage, personal injury protection, no-fault coverage, uninsured or underinsured motorist coverage.
3.   Any policy of insurance from any insurance company or guarantor of a third party.
4.   Workers' compensation or other liability insurance company.
5.   Any other source, including but not limited to crime victim restitution funds, any medical, disability or other benefit payments, and school insurance coverage.

## VEHICLE LIMITATION

When medical payments are available under any vehicle insurance, the Plan shall pay excess benefits only, without reimbursement for vehicle plan and/or policy deductibles. This Plan shall always be considered secondary to such plans and/or policies. This applies to all forms of medical payments under vehicle plans and/or policies regardless of its name, title or classification.

## EFFECT ON BENEFITS
### Application to Benefit Determinations

The plan that pays first according to the rules in the provision entitled "Order of Benefit Determination" will pay as if there were no Other Plan involved. The secondary and subsequent plans will pay the balance due up to 100% of the total Allowable Expenses. When there is a conflict in the rules, this Plan will never pay more than 50% of Allowable Expenses when paying secondary. Benefits will be coordinated on the basis of a Claim Determination Period.

When medical payments are available under automobile insurance, this Plan will pay excess benefits only, without reimbursement for automobile plan deductibles. This Plan will always be considered the secondary carrier regardless of the individual's election under personal injury protection (PIP) coverage with the automobile insurance carrier.

In certain instances, the benefits of the Other Plan will be ignored for the purposes of determining the benefits under this Plan. This is the case when all of the following occur:

1.   The Other Plan would, according to its rules, determine its benefits after the benefits of this Plan have been determined.
2.   The rules in the provision entitled "Order of Benefit Determination" would require this Plan to determine its benefits before the Other Plan.

### Order of Benefit Determination

For the purposes of the provision entitled "Application to Benefit Determinations," the rules establishing the order of benefit determination are:

1.   A plan without a coordinating provision will always be the primary plan.
2.   The benefits of a plan which covers the person on whose expenses claim is based, other than as a dependent, shall be determined before the benefits of a plan which covers such person as a Dependent.
3.   If the person for whom claim is made is a dependent child covered under both parents' plans, the plan covering the parent whose birthday (month and day of birth, not year) falls earlier in the year will be primary, except:
     a.   When the parents were never married, are separated, or are divorced, the benefits of a plan which covers the child as a dependent of the parent with custody will be determined before the benefits of a plan which covers the child as a dependent of the parent without custody.
     b.   When the parents are divorced and the parent with custody of the child has remarried, the benefits of a plan which covers the child as a dependent of the parent with custody shall be determined before the benefits of a plan which covers that child as a dependent of the stepparent, and the benefits of a plan which covers that child as a dependent of the stepparent will be determined before the benefits of a plan which covers that child as a dependent of the parent without custody.
     c.   *Notwithstanding the above, if there is a court decree which would otherwise establish financial responsibility for the child's health care expenses, the benefits of the plan which covers the child as a dependent of the parent with such financial responsibility shall

be determined before the benefits of any Other Plan which covers the child as a dependent child.

4. When the rules above do not establish an order of benefit determination, the benefits of a plan which has covered the person on whose expenses claim is based for the longer period of time shall be determined before the benefits of a plan which has covered such person the shorter period of time.

5. To the extent required by Federal and State regulations, this Plan will pay before any Medicare, Tricare, Medicaid, State child health benefits or other applicable State health benefits program.

## RIGHT TO RECEIVE AND RELEASE NECESSARY INFORMATION

The Plan Administrator may, without notice to or consent of any person, release to or obtain any information from any insurance company or other organization or individual any information regarding coverage, expenses, and benefits which the Plan Administrator, at its sole discretion, considers necessary to determine, implement and apply the terms of this provision or any provision of similar purpose of any Other Plan. Any Participant claiming benefits under this Plan shall furnish to the Plan Administrator such information as requested and as may be necessary to implement this provision.

## FACILITY OF PAYMENT

A payment made under any Other Plan may include an amount that should have been paid under this Plan. The Plan Administrator may, in its sole discretion, pay any organizations making such other payments any amounts it shall determine to be warranted in order to satisfy the intent of this provision. Any such amount paid under this provision shall be deemed to be benefits paid under this Plan. The Plan Administrator will not have to pay such amount again and this Plan shall be fully discharged from liability.

## RIGHT OF RECOVERY

In accordance with the Recovery of Payments provision, whenever payments have been made by this Plan with respect to Allowable Expenses in a total amount, at any time, in excess of the maximum amount of payment necessary at that time to satisfy the intent of this Coordination of Benefits section, the Plan shall have the right to recover such payments, to the extent of such excess, from any one or more of the following as this Plan shall determine: any person to or with respect to whom such payments were made, or such person's legal representative, any insurance companies, or any other individuals or organizations which the Plan determines are responsible for payment of such Allowable Expenses, and any future benefits payable to the Participant or his or her Dependents. Please see the Recovery of Payments provision above for more details.



## APPLICABLE TO ACTIVE EMPLOYEES AND THEIR SPOUSES AGES 65 AND OVER

An active Employee and his or her spouse (ages 65 and over) may, at the option of such Employee, elect or reject coverage under this Plan. If such Employee elects coverage under this Plan, the benefits of this Plan shall be determined before any benefits provided by Medicare. If coverage under this Plan is rejected by such Employee, benefits listed herein will not be payable even as secondary coverage to Medicare.

## APPLICABLE TO ALL OTHER PARTICIPANTS ELIGIBLE FOR MEDICARE BENEFITS

To the extent required by Federal regulations, this Plan will pay before any Medicare benefits. There are some circumstances under which Medicare would be required to pay its benefits first. In these cases, benefits under this Plan would be calculated as secondary payor (as described under the section entitled "Coordination of Benefits"). If the Provider accepts assignment with Medicare, Covered Expenses will not exceed the Medicare approved expenses.

## APPLICABLE TO MEDICARE SERVICES FURNISHED TO END STAGE RENAL DISEASE ("ESRD") PARTICIPANTS COVERED UNDER THIS PLAN

If any Participant is eligible for Medicare benefits because of ESRD, the benefits of the Plan will be determined before Medicare benefits for the first 18 months of Medicare entitlement (with respect to charges Incurred on or after February 1, 1991 and before August 5, 1997), and for the first 30 months of Medicare entitlement (with respect to charges Incurred on or after August 5, 1997), unless applicable Federal law provides to the contrary, in which event the benefits of the Plan will be determined in accordance with such law.

# THIRD PARTY RECOVERY

## THIRD PARTY RECOVERY, SUBROGATION AND REIMBURSEMENT

**PAYMENT CONDITION**

The Plan, in its sole discretion, may elect to conditionally advance payment of benefits in those situations where an Injury, Sickness, Disease or disability is caused in whole or in part by, or results from the acts or omissions of Participants, and/or their Dependents, beneficiaries, estate, heirs, guardian, personal representative, or assigns (collectively referred to hereinafter in this section as "Participant(s)") or a third party, where any party besides the Plan may be responsible for expenses arising from an incident, and/or other funds are available, including but not limited to no-fault, uninsured motorist, underinsured motorist, medical payment provisions, third party assets, third party insurance, and/or guarantor(s) of a third party (collectively "Coverage").

Participant(s), his or her attorney, and/or legal guardian of a minor or incapacitated individual agrees that acceptance of the Plan's conditional payment of medical benefits is constructive notice of these provisions in their entirety and agrees to maintain 100% of the Plan's conditional payment of benefits or the full extent of payment from any one or combination of first and third party sources in trust, without disruption except for reimbursement to the Plan or the Plan's assignee. The Plan shall have an equitable lien on any funds received by the Participant(s) and/or their attorney from any source and said funds shall be held in trust until such time as the obligations under this provision are fully satisfied. The Participant(s) agrees to include the Plan's name as a co-payee on any and all settlement drafts. Further, by accepting benefits the Participant(s) understands that any recovery obtained pursuant to this section is an asset of the Plan to the extent of the amount of benefits paid by the Plan and that the Participant shall be a trustee over those Plan assets.

In the event a Participant(s) settles, recovers, or is reimbursed by any Coverage, the Participant(s) agrees to reimburse the Plan for all benefits paid or that will be paid by the Plan on behalf of the Participant(s). When such a recovery does not include payment for future treatment, the Plan's right to reimbursement extends to all benefits paid or that will be paid by the Plan on behalf of the Participant(s) for charges incurred up to the date such Coverage or third party is fully released from liability, including any such charges not yet submitted to the Plan. If the Participant(s) fails to reimburse the Plan out of any judgment or settlement received, the Participant(s) will be responsible for any and all expenses (fees and costs) associated with the Plan's attempt to recover such money. Nothing herein shall be construed as prohibiting the Plan from claiming reimbursement for charges incurred after the date of settlement if such recovery provides for consideration of future medical expenses.

If there is more than one party responsible for charges paid by the Plan, or may be responsible for charges paid by the Plan, the Plan will not be required to select a particular party from whom reimbursement is due. Furthermore, unallocated settlement funds meant to compensate multiple injured parties of which the Participant(s) is/are only one or a few, that unallocated settlement fund is considered designated as an "identifiable" fund from which the plan may seek reimbursement.

**SUBROGATION**

As a condition to participating in and receiving benefits under this Plan, the Participant(s) agrees to assign to the Plan the right to subrogate and pursue any and all claims, causes of action or rights that may arise against any person, corporation and/or entity and to any Coverage to which the Participant(s) is entitled, regardless of how classified or characterized, at the Plan's discretion, if the Participant(s) fails to so pursue said rights and/or action.

If a Participant(s) receives or becomes entitled to receive benefits, an automatic equitable lien attaches in favor of the Plan to any claim, which any Participant(s) may have against any Coverage and/or party causing the Sickness or Injury to the extent of such conditional payment by the Plan plus reasonable costs of collection. The Participant is obligated to notify the Plan or its authorized representative of any settlement prior to finalization of the settlement, execution of a release, or receipt of applicable funds. The Participant is also obligated to hold any and all funds so received in trust on the Plan's behalf and function as a trustee as it applies to those funds until the Plan's rights described herein are honored and the Plan is reimbursed.

The Plan may, at its discretion, in its own name or in the name of the Participant(s) commence a proceeding or pursue a claim against any party or Coverage for the recovery of all damages to the full extent of the value of any such benefits or conditional payments advanced by the Plan.

If the Participant(s) fails to file a claim or pursue damages against:

1. The responsible party, its insurer, or any other source on behalf of that party.
2. Any first party insurance through medical payment coverage, personal injury protection, no-fault coverage, uninsured or underinsured motorist coverage.
3. Any policy of insurance from any insurance company or guarantor of a third party.
4. Workers' compensation or other liability insurance company.
5. Any other source, including but not limited to crime victim restitution funds, any medical, disability or other benefit payments, and school insurance coverage.

The Participant(s) authorizes the Plan to pursue, sue, compromise and/or settle any such claims in the Participant's/Participants' and/or the Plan's name

and agrees to fully cooperate with the Plan in the prosecution of any such claims. The Participant(s) assigns all rights to the Plan or its assignee to pursue a claim and the recovery of all expenses from any and all sources listed above.

## RIGHT OF REIMBURSEMENT

The Plan shall be entitled to recover 100% of the benefits paid or payable benefits Incurred, that have been paid and/or will be paid by the Plan, or were otherwise Incurred by the Participant(s) prior to and until the release from liability of the liable entity, as applicable, without deduction for attorneys' fees and costs or application of the common fund doctrine, made whole doctrine, or any other similar legal or equitable theory, and without regard to whether the Participant(s) is fully compensated by his or her recovery from all sources. The Plan shall have an equitable lien which supersedes all common law or statutory rules, doctrines, and laws of any State prohibiting assignment of rights which interferes with or compromises in any way the Plan's equitable lien and right to reimbursement. The obligation to reimburse the Plan in full exists regardless of how the judgment or settlement is classified and whether or not the judgment or settlement specifically designates the recovery or a portion of it as including medical, disability, or other expenses and extends until the date upon which the liable party is released from liability. If the Participant's/Participants' recovery is less than the benefits paid, then the Plan is entitled to be paid all of the recovery achieved. Any funds received by the Participant are deemed held in constructive trust and should not be dissipated or disbursed until such time as the Participant's obligation to reimburse the Plan has been satisfied in accordance with these provisions. The Participant is also obligated to hold any and all funds so received in trust on the Plan's behalf and function as a trustee as it applies to those funds until the Plan's rights described herein are honored and the Plan is reimbursed.

No court costs, experts' fees, attorneys' fees, filing fees, or other costs or expenses of litigation may be deducted from the Plan's recovery without the prior, express written consent of the Plan.

The Plan's right of subrogation and reimbursement will not be reduced or affected as a result of any fault or claim on the part of the Participant(s), whether under the doctrines of causation, comparative fault or contributory negligence, or other similar doctrine in law. Accordingly, any lien reduction statutes, which attempt to apply such laws and reduce a subrogating Plan's recovery will not be applicable to the Plan and will not reduce the Plan's reimbursement rights.

These rights of subrogation and reimbursement shall apply without regard to whether any separate written acknowledgment of these rights is required by the Plan and signed by the Participant(s).

This provision shall not limit any other remedies of the Plan provided by law. These rights of subrogation and reimbursement shall apply without regard to the location of the event that led to or caused the applicable Sickness, Injury, Disease or disability.

## PARTICIPANT IS A TRUSTEE OVER PLAN ASSETS

Any Participant who receives benefits and is therefore subject to the terms of this section is hereby deemed a recipient and holder of Plan assets and is therefore deemed a trustee of the Plan solely as it relates to possession of any funds which may be owed to the Plan as a result of any settlement, judgment or recovery through any other means arising from any injury or accident. By virtue of this status, the Participant understands that he or she is required to:

1. Notify the Plan or its authorized representative of any settlement prior to finalization of the settlement, execution of a release, or receipt of applicable funds.
2. Instruct his or her attorney to ensure that the Plan and/or its authorized representative is included as a payee on all settlement drafts.
3. In circumstances where the Participant is not represented by an attorney, instruct the insurance company or any third party from whom the Participant obtains a settlement, judgment or other source of Coverage to include the Plan or its authorized representative as a payee on the settlement draft.
4. Hold any and all funds so received in trust, on the Plan's behalf, and function as a trustee as it applies to those funds, until the Plan's rights described herein are honored and the Plan is reimbursed.

To the extent the Participant disputes this obligation to the Plan under this section, the Participant or any of its agents or representatives is also required to hold any/all settlement funds, including the entire settlement if the settlement is less than the Plan's interests, and without reduction in consideration of attorneys' fees, for which he or she exercises control, in an account segregated from their general accounts or general assets until such time as the dispute is resolved.

No Participant, beneficiary, or the agents or representatives thereof, exercising control over plan assets and incurring trustee responsibility in accordance with this section will have any authority to accept any reduction of the Plan's interest on the Plan's behalf.

## RELEASE OF LIABILITY

The Plan's right to reimbursement extends to any incident related care that is received by the Participant(s) (Incurred) prior to the liable party being released from liability. The Participant's/Participants' obligation to reimburse the Plan is therefore tethered to the date upon which the claims were Incurred, not the date upon which the payment is made by the Plan. In the case of a settlement, the Participant has an obligation to review the "lien" provided by the Plan and reflecting claims paid by the Plan for which it seeks reimbursement, prior to settlement and/or executing a release of any liable or potentially liable third party, and is also obligated to advise the Plan of any incident related care incurred prior to the proposed date of settlement and/or release, which is not listed but has been or will be incurred, and for which the Plan will be asked to pay.

**EXCESS INSURANCE**

If at the time of Injury, Sickness, Disease or disability there is available, or potentially available any Coverage (including but not limited to Coverage resulting from a judgment at law or settlements), the benefits under this Plan shall apply only as an excess over such other sources of Coverage, except as otherwise provided for under the Plan's Coordination of Benefits section.

The Plan's benefits shall be excess to any of the following:

1. The responsible party, its insurer, or any other source on behalf of that party.
2. Any first party insurance through medical payment coverage, personal injury protection, no-fault coverage, uninsured or underinsured motorist coverage.
3. Any policy of insurance from any insurance company or guarantor of a third party.
4. Workers' compensation or other liability insurance company.
5. Any other source, including but not limited to crime victim restitution funds, any medical, disability or other benefit payments, and school insurance coverage.

**SEPARATION OF FUNDS**

Benefits paid by the Plan, funds recovered by the Participant(s), and funds held in trust over which the Plan has an equitable lien exist separately from the property and estate of the Participant(s), such that the death of the Participant(s), or filing of bankruptcy by the Participant(s), will not affect the Plan's equitable lien, the funds over which the Plan has a lien, or the Plan's right to subrogation and reimbursement.

**WRONGFUL DEATH**

In the event that the Participant(s) dies as a result of his or her Injuries and a wrongful death or survivor claim is asserted against a third party or any Coverage, the Plan's subrogation and reimbursement rights shall still apply, and the entity pursuing said claim shall honor and enforce these Plan rights and terms by which benefits are paid on behalf of the Participant(s) and all others that benefit from such payment.

**OBLIGATIONS**

It is the Participant's/Participants' obligation at all times, both prior to and after payment of medical benefits by the Plan:

1. To cooperate with the Plan, or any representatives of the Plan, in protecting its rights, including discovery, attending depositions, and/or cooperating in trial to preserve the Plan's rights.
2. To provide the Plan with pertinent information regarding the Sickness, Disease, disability, or Injury, including accident reports, settlement information and any other requested additional information.
3. To take such action and execute such documents as the Plan may require to facilitate enforcement of its subrogation and reimbursement rights.
4. To do nothing to prejudice the Plan's rights of subrogation and reimbursement.
5. To promptly reimburse the Plan when a recovery through settlement, judgment, award or other payment is received.
6. To notify the Plan or its authorized representative of any incident related claims or care which may be not identified within the lien (but has been incurred) and/or reimbursement request submitted by or on behalf of the Plan.
7. To notify the Plan or its authorized representative of any settlement prior to finalization of the settlement.
8. To not settle or release, without the prior consent of the Plan, any claim to the extent that the Participant may have against any responsible party or Coverage.
9. To instruct his or her attorney to ensure that the Plan and/or its authorized representative is included as a payee on any settlement draft.
10. In circumstances where the Participant is not represented by an attorney, instruct the insurance company or any third party from whom the Participant obtains a settlement to include the Plan or its authorized representative as a payee on the settlement draft.
11. To make good faith efforts to prevent disbursement of settlement funds until such time as any dispute between the Plan and Participant over settlement funds is resolved.

If the Participant(s) and/or his or her attorney fails to reimburse the Plan for all benefits paid, to be paid,Incurred, or that will be Incurred, prior to the date of the release of liability from the relevant entity, as a result of said Injury or condition, out of any proceeds, judgment or settlement received, the Participant(s) will be responsible for any and all expenses (whether fees or costs) associated with the Plan's attempt to recover such money from the Participant(s).

The Plan's rights to reimbursement and/or subrogation are in no way dependent upon the Participant's/Participants' cooperation or adherence to these terms.

**OFFSET**

If timely repayment is not made, or the Participant and/or his or her attorney fails to comply with any of the requirements of the Plan, the Plan has the right, in addition to any other lawful means of recovery, to deduct the value of the Participant's amount owed to the Plan. To do this, the Plan may refuse payment of any future medical benefits and any funds or payments due under this Plan on behalf of the Participant(s) in an amount equivalent to any outstanding amounts owed by the Participant to the Plan. This provision applies even if the Participant has disbursed settlement funds.

**MINOR STATUS**

In the event the Participant(s) is a minor as that term is defined by applicable law, the minor's parents or court-appointed guardian shall cooperate in any and all actions by the Plan to seek and obtain requisite court approval to bind the minor and his or her estate insofar as these subrogation and reimbursement provisions are concerned.

If the minor's parents or court-appointed guardian fail to take such action, the Plan shall have no obligation to advance payment of medical benefits on behalf of the minor. Any court costs or legal fees associated with obtaining such approval shall be paid by the minor's parents or court-appointed guardian.

**LANGUAGE INTERPRETATION**

The Plan Administrator retains sole, full and final discretionary authority to construe and interpret the language of this provision, to determine all questions of fact and law arising under this provision, and to administer the Plan's subrogation and reimbursement rights with respect to this provision. The Plan Administrator may amend the Plan at any time without notice.

**SEVERABILITY**

In the event that any section of this provision is considered invalid or illegal for any reason, said invalidity or illegality shall not affect the remaining sections of this provision and Plan. The section shall be fully severable. The Plan shall be construed and enforced as if such invalid or illegal sections had never been inserted in the Plan.

# MISCELLANEOUS PROVISIONS

## CLERICAL ERROR/DELAY

Any clerical error by the Plan Administrator or an agent of the Plan Administrator in keeping pertinent records or a delay in making any changes to such records will not invalidate coverage otherwise validly in force or continue coverage validly terminated. Contributions made in error by Participants due to such clerical error will be returned to the Participant; coverage will not be inappropriately extended. Contributions that were due but not made, in error and due to such clerical error will be owed immediately upon identification of said clerical error. Failure to so remedy amounts owed may result in termination of coverage. Effective Dates, waiting periods, deadlines, rules, and other matters will be established based upon the terms of the Plan, as if no clerical error had occurred. An equitable adjustment of contributions will be made when the error or delay is discovered.

If, an overpayment occurs in a Plan reimbursement amount, the Plan retains a contractual right to the overpayment. The person or institution receiving the overpayment will be required to return the incorrect amount of money. In the case of a Plan Participant, the amount of overpayment may be deducted from future benefits payable.

## CONFORMITY WITH APPLICABLE LAWS

Any provision of this Plan that is contrary to any applicable law, equitable principle, regulation or court order (if such a court is of competent jurisdiction) will be interpreted to comply with said law, or, if it cannot be so interpreted, shall be automatically amended to satisfy the law's minimum requirement, including, but not limited to, stated maximums, Exclusions, or statutes of limitations. It is intended that the Plan will conform to the requirements of ERISA, as it applies to Employee welfare plans, as well as any other applicable law.

## FRAUD

Under this Plan, coverage may be retroactively canceled or terminated (rescinded) if a Participant acts fraudulently or intentionally makes material misrepresentations of fact. It is a Participant's responsibility to provide accurate information and to make accurate and truthful statements, including information and statements regarding family status, age, relationships, etc. It is also a Participant's responsibility to update previously provided information and statements. Failure to do so may result in coverage of Participants being canceled, and such cancellation may be retroactive.

If a Participant, or any other entity, submits or attempts to submit a claim for or on behalf of a person who is not a Participant of the Plan; submits a claim for services or supplies not rendered; provides false or misleading information in connection with enrollment in the Plan; or provides any false or misleading information to the Plan as it relates to any element of its administration; that shall be deemed to be fraud. If a Participant is aware of any instance of fraud, and fails to bring that fraud to the Plan Administrator's attention, that shall also be deemed to be fraud. Fraud will result in immediate termination of all coverage under this Plan for the Participant and their entire Family Unit of which the Participant is a member.

A determination by the Plan that a rescission is warranted will be considered an Adverse Benefit Determination for purposes of review and appeal. A Participant whose coverage is being rescinded will be provided a 30 day notice period as described under the Affordable Care Act (ACA) and regulatory guidance. Claims Incurred after the retroactive date of termination shall not be further processed and/or paid under the Plan. Claims Incurred after the retroactive date of termination that were paid under the Plan will be treated as erroneously paid claims under this Plan.

## HEADINGS

The headings used in this Plan Document are used for convenience of reference only. Participants are advised not to rely on any provision because of the heading.

## WORD USAGE

Wherever any words are used herein in the singular or plural, they shall be construed as though they were in the plural or singular, as the case may be, in all cases where they would so apply.

## NO WAIVER OR ESTOPPEL

All parts, portions, provisions, conditions, and/or other items addressed by this Plan shall be deemed to be in full force and effect, and not waived, absent an explicit written instrument expressing otherwise; executed by the Plan Administrator. Absent such explicit waiver, there shall be no estoppel against the enforcement of any provision of this Plan. Failure by any applicable entity to enforce any part of the Plan shall not constitute a waiver, either as it specifically applies to a particular circumstance, or as it applies to the Plan's general administration. If an explicit written waiver is executed, that waiver shall only apply to the matter addressed therein, and shall be interpreted in the most narrow fashion possible.

## PLAN CONTRIBUTIONS

The Plan Administrator shall, from time to time, evaluate the funding method of the Plan and determine the amount to be contributed by the Participating Employer and the amount to be contributed (if any) by each Participant.

The Plan Sponsor shall fund the Plan in a manner consistent with the provisions of the Internal Revenue Code, ERISA, and such other laws and regulations as shall be applicable to the end that the Plan shall be funded on a lawful and sound basis. The manner and means by which the Plan is funded shall be solely determined by the Plan Sponsor, to the extent allowed by applicable law.

Notwithstanding any other provision of the Plan, the Plan Administrator's obligation to pay claims otherwise allowable under the terms of the Plan shall be limited to its obligation to make contributions to the Plan as set forth in the preceding paragraph. Payment of said claims in accordance with these procedures shall discharge completely the Company's obligation with respect to such payments.

In the event that the Company terminates the Plan, then as of the effective date of termination, the Employer and eligible Employees shall have no further obligation to make additional contributions to the Plan and the Plan shall have no obligation to pay claims Incurred after the termination date of the Plan.

### RIGHT TO RECEIVE AND RELEASE INFORMATION

The Plan Administrator may, without notice to or consent of any person, release to or obtain any information from any insurance company or other organization or person any information regarding coverage, expenses, and benefits which the Plan Administrator, at its sole discretion, considers necessary to determine and apply the provisions and benefits of this Plan. In so acting, the Plan Administrator shall be free from any liability that may arise with regard to such action. Any Participant claiming benefits under this Plan shall furnish to the Plan Administrator such information as requested and as may be necessary to implement this provision.

### WRITTEN NOTICE

Any written notice required under this Plan which, as of the Effective Date, is in conflict with the law of any governmental body or agency which has jurisdiction over this Plan shall be interpreted to conform to the minimum requirements of such law.

### RIGHT OF RECOVERY

In accordance with the Recovery of Payments provision, whenever payments have been made by this Plan in a total amount, at any time, in excess of the maximum amount of benefits payable under this Plan, the Plan shall have the right to recover such payments, to the extent of such excess, from any one or more of the following as this Plan shall determine: any person to or with respect to whom such payments were made, or such person's legal representative, any insurance companies, or any other individuals or organizations which the Plan determines are responsible for payment of such amount, and any future benefits payable to the Participant or his or her Dependents. See the Recovery of Payments provision for full details.

### STATEMENTS

All statements made by the Company or by a Participant will, in the absence of fraud, be considered representations and not warranties, and no statements made for the purpose of obtaining benefits under this document will be used in any contest to avoid or reduce the benefits provided by the document unless contained in a written application for benefits and a copy of the instrument containing such representation is or has been furnished to the Participant.

Any Participant who knowingly and with intent to defraud the Plan, files a statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any material fact, commits a fraudulent act. The Participant may be subject to prosecution by the United States Department of Labor. Fraudulently claiming benefits may be punishable by a substantial fine, imprisonment, or both.

### BINDING ARBITRATION

*NOTE: The Employee is enrolled in a plan provided by the Employer that is subject to ERISA; any dispute involving an Adverse Benefit Determination must be resolved under ERISA's claims procedure rules, and is not subject to mandatory binding arbitration. The individual may pursue voluntary binding arbitration after he or she has completed an appeal under ERISA.*

Any dispute or claim, of whatever nature, arising out of, in connection with, or in relation to this Plan, or breach or rescission thereof, or in relation to care or delivery of care, including any claim based on contract, tort or statute, must be resolved by arbitration if the amount sought exceeds the jurisdictional limit of the small claims court. Any dispute regarding a claim for damages within the jurisdictional limits of the small claims court will be resolved in such court.

The Federal Arbitration Act shall govern the interpretation and enforcement of all proceedings under this Binding Arbitration provision. To the extent that the Federal Arbitration Act is inapplicable, or is held not to require arbitration of a particular claim, State law governing agreements to arbitrate shall apply.

The Participant and the Plan Administrator agree to be bound by this Binding Arbitration provision and acknowledge that they are each giving up their right to a trial by court or jury.

The Participant and the Plan Administrator agree to give up the right to participate in class arbitration against each other. Even if applicable law permits class actions or class arbitrations, the Participant waives any right to pursue, on a class basis, any such controversy or claim against the Plan Administrator and the Plan Administrator waives any right to pursue on a class basis any such controversy or claim against the Participant.

The arbitration findings will be final and binding except to the extent that State or Federal law provides for the judicial review of arbitration proceedings. The arbitration is begun by the Participant making written demand on the Plan Administrator. The arbitration will be conducted by Judicial Arbitration and Mediation Services ("JAMS") according to its applicable Rules and Procedures. If, for any reason, JAMS is unavailable to conduct the arbitration, the arbitration will be conducted by another neutral arbitration entity, by mutual agreement of the Participant and the Plan Administrator, or by order of the court, if the Participant and the Plan Administrator cannot agree.

The costs of the arbitration will be allocated per the JAMS Policy on Consumer Arbitrations. If the arbitration is not conducted by JAMS, the costs will be shared equally by the parties, except in cases of extreme financial hardship, upon application to the neutral arbitration entity to which the parties have agreed, in which cases, the Plan Administrator will assume all or a portion of the costs of the arbitration.

## UNCLAIMED SELF-INSURED PLAN FUNDS

In the event a benefits check issued by the Third Party Administrator for this self-insured Plan is not cashed within one year of the date of issue, the check will be voided and the funds will be returned to this Plan and applied to the payment of current benefits and administrative fees under this Plan. In the event a Participant subsequently requests payment with respect to the voided check, the Third Party Administrator for the self-insured Plan shall make such payment under the terms and provisions of the Plan as in effect when the claim was originally processed. Unclaimed self-insured Plan funds may be applied only to the payment of benefits (including administrative fees) under the Plan pursuant to ERISA and any other applicable State law(s).

# SUMMARY OF BENEFITS

**GENERAL LIMITS**

Payment for any of the expenses listed below is subject to all Plan Exclusions, limitations and provisions. All coverage figures, if applicable, are after the out of pocket Deductible has been satisfied. Benefits for Pregnancy expenses are paid the same as any other Sickness. NOTE: Preventive care charges for Pregnancy are covered under the Preventive Care benefit in the Medical Benefits section.

See the Utilization Management section for more information regarding Pre-Certification and/or Notification requirements.

Please note affirmation that a treatment, service, or supply is of a type compensable by the Plan is not a guarantee that the particular treatment, service, or supply in question, upon receipt of a Clean Claim and review by the Plan Administrator, will be eligible for payment.

**BALANCE BILLING**

In the event that a claim submitted by a Provider is subject to a medical bill review or medical chart audit and that some or all of the charges in connection with such claim are repriced because of billing errors and/or overcharges, it is the Plan's position that the Participant should not be responsible for payment of any charges denied as a result of the medical bill review or medical chart audit, and should not be balance billed for the difference between the billed charges and the amount determined to be payable by the Plan Administrator. However, balance billing is legal in many jurisdictions, and the Plan has no control over Providers that engage in balance billing practices.

The Participant is responsible for any applicable payment of Coinsurances, Deductibles, and out-of-pocket maximums and may be billed for any or all of these.

**CHOICE OF PROVIDERS**

The Plan is not intended to disturb the Physician-patient relationship. Each Participant has a free choice of any Physician or surgeon, and the Physician-patient relationship shall be maintained. Physicians and other health care Providers are not agents or delegates of the Plan Sponsor, Company, A current list of Physician Providers is available, without charge, through the Third Party Administrator's website (located at www.abadmin.com). If the Participant does not have access to a computer at his or her home, he or she may access this website at his or her place of employment. If he or she has any questions about how to do this, he or she should contact the Human Relations Department or (903) 746-2873. The Physician Provider list changes frequently; therefore, it is recommended that a Participant verify with the Provider that the Provider is still a Physician Provider before receiving services. Please refer to the Participant identification card for the website address.

**CLAIMS AUDIT**

In addition to the Plan's Medical Record Review process, the Plan Administrator may use its discretionary authority to utilize an independent bill review and/or claim audit program or service for a complete claim. While every claim may not be subject to a bill review or audit, the Plan Administrator has the sole discretionary authority for selection of claims subject to review or audit.

The analysis will be employed to identify charges billed in error and/or charges that exceed the Maximum Allowable Charge or services that are not Medically Necessary, and may include a patient medical billing records review and/or audit of the patient's medical charts and records.

Upon completion of an analysis, a report will be submitted to the Plan Administrator or its agent to identify the charges deemed in excess of the Maximum Allowable Charge or other applicable provisions, as outlined in this Plan Document.

Despite the existence of any agreement to the contrary, the Plan Administrator has the discretionary authority to reduce any charge to the Maximum Allowable Charge, in accord with the terms of this Plan Document.

**CALENDAR YEAR MAXIMUM BENEFIT**

The following Calendar Year maximums apply to each Participant:

**SUMMARY OF BENEFITS: MEDICAL**

The following benefits are per Participant per Plan/Calendar Year. All benefits are subject to the Maximum Allowable Charge.

**CHOICE OF PROVIDERS**

The Plan is not intended to disturb the Physician-patient relationship. Each Participant has a free choice of any Physician or surgeon, and the Physician-patient relationship shall be maintained. Physicians and other health care Providers are not agents or delegates of the Plan Sponsor, Company, Plan Administrator, Employer or Third Party Administrator. The delivery of medical and other health care services on behalf of any Participant remains the sole prerogative and responsibility of the attending Physician or other health care Provider. The Participant, together with his or her Physician, is ultimately responsible for determining the appropriate course of medical treatment, regardless of whether the Plan will pay for all or a portion of the cost of such care.

**CLAIMS AUDIT**

In addition to the Plan's Medical Record Review process, the Plan Administrator may use its discretionary authority to utilize an independent bill review and/or claim audit program or service for a complete claim. While every claim may not be subject to a bill review or audit, the Plan Administrator has the sole discretionary authority for selection of claims subject to review or audit.

The analysis will be employed to identify charges billed in error and/or charges that exceed the Maximum Allowable Charge or services that are not Medically Necessary, and may include a patient medical billing records review and/or audit of the patient's medical charts and records.

Upon completion of an analysis, a report will be submitted to the Plan Administrator or its agent to identify the charges deemed in excess of the Maximum Allowable Charge or other applicable provisions, as outlined in this Plan Document.

Despite the existence of any agreement to the contrary, the Plan Administrator has the discretionary authority to reduce any charge to the Maximum Allowable Charge, in accord with the terms of this Plan Document.

**CALENDAR YEAR MAXIMUM BENEFIT**

The following Calendar Year maximums apply to each Participant.

**SUMMARY OF BENEFITS: MEDICAL**

The following benefits are per Participant per Plan/Calendar Year. All benefits are subject to the Maximum Allowable Charge.

The following Schedule of Benefits is designed as a quick reference. For complete provisions of the Plan's benefits, refer to the following sections: Utilization Review, Medical Expense Benefit, Prescription Drug Program, Plan Exclusions and Provider Organization.

| CALENDAR YEAR DEDUCTIBLE | BENEFIT |
|---|---|
| **Individual (per person)** | $2,500 |
| **Family** | $5,000 |
| **CALENDAR YEAR OUT-OF-POCKET EXPENSE LIMIT*** | **BENEFIT** |
| **Single Coverage** | $4,000 |
| **Family Coverage** | $8,000 |

*Includes deductible and co-payments

Refer to Medical Expense Benefit, Calendar Year Out-of-Pocket Expense Limit for a listing of charges not applicable to the out-of-pocket expense limit.

**Coinsurance**

The Plan pays the percentage listed on the following page for covered expenses incurred by a covered person during a calendar year after the single or family coverage deductible has been satisfied and until the single or family out-of-pocket expense limit has been reached. Thereafter, the Plan pays one hundred percent (100%) of incurred covered expenses for the remainder of the calendar year or until the maximum benefit has been reached. Refer to Medical Expense Benefit, Out-of-Pocket Expense Limit, for a listing of charges not applicable to the one hundred percent (100%) coinsurance.

*Schedule of Benefits begins on next page.*



**SCHEDULE OF BENEFITS** (All services are subject to deductible unless otherwise indicated.)

| BENEFIT DESCRIPTION | Benefit | | |
|---|---|---|---|
| **Inpatient Hospital** | | 70% | |
| **Outpatient Surgery** | | 70% | |
| **Emergency Room Services** | | | |
| Emergency Situation Only | $250 then | 70% | |
| Non-Emergency Situation | | Not Covered | |
| **Physicians' Services** | | | |
| MyMD Select *(deductible waived)* | | 100% | |
| Office Visit *(deductible waived; simple Labs & X-rays performed in the Physicians Office are covered under the Office Visit Copay)* | | 100% after $40 copay | |
| Specialist Office Visit *(deductible waived; simple Labs & X-rays performed in the Physicians Office are covered under the Office Visit Copay)* | | 100% after $60 copay | |
| Mental and Nervous Disorders/Chemical Dependency Outpatient Physician Services *(deductible waived)* | | 100% after $60 copay | |
| Mental and Nervous Disorders/Chemical Dependency Inpatient Physician Services | | 70% | |
| Home and Inpatient Visits | | 70% | |
| Surgery – Physician's Office | | 70% | |
| Surgery – Other | | 70% | |
| Pathology | | 70% | |
| Anesthesiology | | 70% | |
| Radiology | | 70% | |
| **Diagnostic X-rays and Lab Exams** | | | |
| Inpatient | | 70% | |
| Outpatient | | 70% | |
| **Independent Lab Exams** | | | |
| Outpatient *(deductible waived if ordered by PCP, applies to simple lab exams)* | | 70% | |
| **Imaging** | | | |
| Complex Imaging *(CT/PET scans, MRI, MRA)* | | 70% | |
| **Second Surgical Opinion** | | 70% | |
| **Extended Care Facility** | | 70% | |
| **Home Health Care** | | 70% | |
| **Hospice Care** | | 70% | |
| **Durable Medical Equipment** | | 70% | |
| **Preventive Care** *(deductible waived)* | | 100% | |
| **Immunizations** *(deductible waived)* | | 100% | |
| **Mental and Nervous Disorders/Chemical Dependency Facilities** | | | |
| Inpatient Services | | 70% | |
| Outpatient Services | | 100% after $60 copay | |
| **Therapy Physician Services** | | 70% | |
| **Chiropractic Care** *(deductible waived)* | | 100% after $60 copay | |
| **Urgent Care Clinic** *(deductible waived; simple Labs & X-rays performed in the Physicians Office are covered under the Office Visit Copay)* | | 100% after $75 copay | |
| **All Other Covered Expenses** | | 70% | |

# MEDICAL BENEFITS

## MEDICAL BENEFITS

These medical benefits will be payable as shown in the Summary of Benefits or as otherwise outlined in this Plan. Subject to the Plan's provisions, limitations and Exclusions, the following are covered major medical benefits:

**Air Ambulance (Emergency Only).** Covered Expenses will be payable at the lesser of the following:

1. Two hundred fifty percent (250%) of the allowable charge established by application of the Medicare Ambulance Fee Schedule.
2. The billed charge is less than 1 or 2 above.

Benefits are provided for air ambulance transportation only if the Plan Administrator determines that the Participant's condition, the type of service required for the treatment of the Participant's condition, and the type of facility required to treat the Participant's condition justify the use of air ambulance instead of another means of transport. This Plan will only cover air ambulance transportation when no other method of transportation is appropriate (including emergency ground transport).

This Plan will cover aircraft for air ambulance services.

Only charges incurred for the first trip to and from a Hospital shall be included.

The determination of whether air ambulance transport for a service, supply or treatment is or is not Medically Necessary may include findings of the American Medical Association and the Plan Administrator's own medical advisors. The Plan Administrator has the discretionary authority to decide whether care or treatment is Medically Necessary.

**Allergy Services.** Charges related to the treatment of allergies.

**Ambulance.** Transportation by professional ambulance, including approved available air and train transportation (excluding chartered air flights), to a local Hospital or transfer to the nearest facility having the capability to treat the condition, if the transportation is connected with an Inpatient confinement.

**Ambulatory Surgical Center.** Services of an Ambulatory Surgical Center for Medically Necessary care provided.

**Anesthesia.** Anesthesia, anesthesia supplies, and administration of anesthesia by facility staff.

**Birthing Center.** Services of a birthing center for Medically Necessary care provided within the scope of its license.

**Blood and Plasma.** Blood transfusions, plasma and blood derivatives and charges for whole blood not donated or replaced by a blood bank.

**Cataracts.** Cataract surgery and one set of lenses (contacts or frame-type).

**Chemotherapy.** Charges for chemotherapy.

**Chiropractic Care.** Spinal adjustment and manipulation X-rays for manipulation and adjustment and other modalities performed by a Physician or other licensed practitioner, as limited in the Summary of Benefits.

**Contraceptives.** The charges for all Food and Drug Administration (FDA) approved contraceptives methods, except oral contraceptives, in accordance with Health Resources and Services Administration (HRSA) guidelines. NOTE: Oral contraceptives are covered under the Prescription Drug Benefits section.

**Diagnostic Tests; Examinations.** Charges for X-rays, microscopic tests, laboratory tests, esophagoscopy, gastroscopy, proctosigmoidoscopy, colonoscopy and other diagnostic tests and procedures.

**Dialysis.** Charges for dialysis.

**Durable Medical Equipment.** Charges for rental, up to the purchase price, of Durable Medical Equipment, including glucose home monitors for insulin dependent diabetics. At its option, and with its advance written approval, the Plan may cover the purchase of such items when it is less costly and more practical than rental. The Plan does not pay for any of the following:

1.   Any purchases without its advance written approval.
2.   The rental or purchase of items which do not fully meet the definition of "Durable Medical Equipment."

**Genetic Counseling or Testing.** Benefits are available for prenatal genetic testing for inherited susceptibility to a medical condition and counseling related to family history or test results to determine the physical characteristics of an unborn child. (For non-grandfathered plans, this benefit is in addition to coverage specified under Preventive Care.)

**Glaucoma.** Treatment of glaucoma.

**Habilitative Services.** These services include:

1.   **Occupational Therapy.** Treatment or services rendered by a registered occupational therapist, under the direct supervision of a Physician, in a home setting or at a facility or Institution whose primary purpose is to provide medical care for an Illness or Injury, or at a free standing outpatient facility.
2.   **Physical Therapy.** Treatment or services rendered by a physical therapist, under direct supervision of a Physician, in a home setting or a facility or Institution whose primary purpose is to provide medical care for an Illness or Injury, or at a free standing duly licensed outpatient therapy facility.
3.   **Speech-Language Pathology.** Treatment for speech delays and disorders.

See the Summary of Benefits for treatment and/or frequency limitations.

**Home Health Care.** Charges by a Home Health Care Agency for any of the following:

1.   Registered Nurses or Licensed Practical Nurses.
2.   Certified home health aides under the direct supervision of a Registered Nurse.
3.   Registered therapist performing physical, occupational or speech therapy.
4.   Physician calls in the office, home, clinic or outpatient department.
5.   Services, Drugs and medical supplies which are Medically Necessary for the treatment of the Participant that would have been provided in the Hospital, but not including Custodial Care.
6.   Rental of Durable Medical Equipment or the purchase of this equipment if economically justified, whichever is less.

*NOTE: Transportation services are not covered under this benefit.*

**Hospice Care.** Charges relating to Hospice Care, provided the Participant has a life expectancy of six months or less, subject to the maximums, if any, stated in the Summary of Benefits. Covered Hospice expenses are limited to:

1.   Room and Board for confinement in a Hospice.
2.   Ancillary charges furnished by the Hospice while the patient is confined therein, including rental of Durable Medical Equipment which is used solely for treating an Injury or Sickness.
3.   Medical supplies, Drugs and medicines prescribed by the attending Physician, but only to the extent such items are necessary for pain control and management of the terminal condition.
4.   Physician services and nursing care by a Registered Nurse, Licensed Practical Nurse or a Licensed Vocational Nurse (L.V.N.).
5.   Home health aide services.
6.   Home care furnished by a Hospital or Home Health Care Agency, under the direction of a Hospice, including Custodial Care if it is provided during a regular visit by a Registered Nurse, a Licensed Practical Nurse or a home health aide.
7.   Medical social services by licensed or trained social workers, Psychologists or counselors.
8.   Nutrition services provided by a licensed dietitian.
9.   Respite care.

The Hospice Care program must be renewed in writing by the attending Physician every 30 days.  Hospice Care ceases if the terminal Illness enters remission.

**Hospital.** Charges made by a Hospital for:

1.   Inpatient Treatment
     a.   Daily semi private Room and Board charges.
     b.   Intensive Care Unit (ICU) and Cardiac Care Unit (CCU) Room and Board charges.
     c.   General nursing services.
     d.   Medically Necessary services and supplies furnished by the Hospital, other than Room and Board.

2.   Outpatient Treatment
   a.   Emergency room.
   b.   Treatment for chronic conditions.
   c.   Physical therapy treatments.
   d.   Hemodialysis.
   e.   X ray, laboratory and linear therapy.

**Mastectomy.** The Federal Women's Health and Cancer Rights Act, signed into law on October 21, 1998, contains coverage requirements for breast cancer patients who elect reconstruction in connection with a Mastectomy. The Federal law requires group health plans that provide Mastectomy coverage to also cover breast reconstruction Surgery and prostheses following Mastectomy.

As required by law, the Participant is being provided this notice to inform him or her about these provisions. The law mandates that individuals receiving benefits for a Medically Necessary Mastectomy will also receive coverage for:

1.   Reconstruction of the breast on which the Mastectomy has been performed.
2.   Surgery and reconstruction of the other breast to produce a symmetrical appearance.
3.   Prostheses and physical complications from all stages of Mastectomy, including lymphedemas.
The coverage will be received in a manner determined in consultation with the attending Physician and the patient.

This coverage will be subject to the same annual Deductible and Coinsurance provisions that currently apply to Mastectomy coverage, and will be provided in consultation with the Participant and his or her attending Physician.

**Medical Supplies.** Dressings, casts, splints, trusses, braces and other Medically Necessary medical supplies, with the exception of dental braces or corrective shoes, but including syringes for diabetic and allergy Diagnosis, and lancets and chemstrips for diabetics.

**Mental Health and Substance Abuse Benefits.** Benefits are available for Inpatient or outpatient care for mental health and Substance Abuse conditions, including individual and group psychotherapy, psychiatric tests, and expenses related to the Diagnosis when rendered by any of the following:

1.   Doctor of Medicine (MD).
2.   Licensed Clinical Psychologist (PhD).
3.   Licensed Clinical Psychiatric Social Worker (LCSW).
4.   Licensed Professional Counselor (LPC).
5.   Registered Nurse Clinical Specialist (RNCS).

Benefits are available for Residential Treatment Facility, Partial Hospitalization, and Intensive Outpatient Services.

**Newborn Care.** Hospital and Physician nursery care for newborns who are natural Children of the Employee or spouse and properly enrolled in the Plan, as set forth below. Benefits will be provided under the Child's coverage, and the Child's own Deductible and Coinsurance provisions will apply:

1.   Hospital routine care for a newborn during the Child's initial Hospital confinement at birth.
2.   The following Physician services for well-baby care during the newborn's initial Hospital confinement at birth:
   a.   The initial newborn examination and a second examination performed prior to discharge from the Hospital.
   b.   Circumcision.

*NOTE: The Plan will cover Hospital and Physician nursery care for an ill newborn as any other medical condition, provided the newborn is properly enrolled in the Plan. These benefits are provided under the baby's coverage.*

**Nursing Services.** Services of a Registered Nurse or Licensed Practical Nurse.

**Oral Surgery.** Oral surgery in relation to the bone, including tumors, cysts and growths, not related to the teeth and extraction of soft tissue impacted teeth by a Physician or Dentist.

**Pathology Services.** Charges for pathology services.

**Physician Services.** Services of a Physician for Medically Necessary care, including office visits, home visits, Hospital Inpatient care, Hospital outpatient visits and exams, clinic care and surgical opinion consultations.

**Podiatry Services.** The presence of a systemic condition, such as metabolic, neurologic, or peripheral vascular disease, may require specialized foot care by a professional that, in the absence of such condition(s), would be considered routine (and, therefore, excluded from coverage). Accordingly, routine foot care may be covered when systemic condition(s) result in severe circulatory embarrassment or areas of diminished sensation in the patient's

legs or feet. In these instances, certain foot care procedures that are otherwise considered routine (for example, cutting or removing corns and calluses, or trimming, cutting, clipping, or debriding nails) may pose a hazard when performed by a non-professional on patients with such systemic conditions.

The following metabolic, neurologic, and peripheral vascular diseases (with synonyms in parentheses) most commonly represent the underlying conditions that may justify coverage for routine foot care. Note: This list is not comprehensive and serves would be based on medical necessity: Diabetes mellitus, Arteriosclerosis obliterans (A.S.O., arteriosclerosis of the extremities, occlusive peripheral arteriosclerosis), Buerger's disease (thromboangiitis obliterans), Chronic thrombophlebitis.

**Pregnancy Expenses.** Expenses attributable to a Pregnancy. Pregnancy expenses of Dependent Children are covered.

Under the Newborns' and Mothers' Health Protection Act of 1996, group health plans and health insurance issuers generally may not restrict benefits for any Hospital length of stay in connection with childbirth for the mother or newborn Child to less than 48 hours following a vaginal delivery, or less than 96 hours following a cesarean section. However, Federal law generally does not prohibit the mother's or newborn's attending Provider, after consulting with the mother, from discharging the mother or her newborn earlier than 48 hours (or 96 hours as applicable). In any case, plans and issuers may not, under Federal law, require that a Provider obtain authorization from the Plan or the issuer for prescribing a length of stay not in excess of 48 hours (or 96 hours). In no event will an "attending Provider" include a plan, Hospital, managed care organization, or other issuer.

In accordance with the "Summary of Benefits" and this section, benefits for the care and treatment of Pregnancy that are covered will be subject to all applicable Plan limitations and maximums, and are payable in the same manner as medical or surgical care of an Illness.

**Preventive Care.** Charges for Preventive Care services. This Plan intends to comply with the Affordable Care Act's (ACA) requirement to offer coverage for certain preventive services without cost-sharing.

Benefits mandated through the ACA legislation include Preventive Care such as immunizations, screenings, and other services that are listed as recommended by the United States Preventive Services Task Force (USPSTF), the Health Resources Services Administration (HRSA), and the Federal Centers for Disease Control (CDC).

See http://www.uspreventiveservicestaskforce.org or https://www.healthcare.gov/coverage/preventive-care-benefits/ for more details. *NOTE: The Preventive Care services identified through the above links are recommended services. It is up to the Provider and/or Physician of care to determine which services to provide; the Plan Administrator has the authority to determine which services will be covered.*

***Preventive and Wellness Services for Adults and Children.*** In compliance with section (2713) of the Affordable Care Act, benefits are available for evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force (USPSTF).

Immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices (ACIP) of the Centers for Disease Control and Prevention (CDC) with respect to the individual involved. With respect to infants, Children, and adolescents, evidence-informed Preventive Care and screenings as provided for in the comprehensive guidelines supported by the Health Resources and Services Administration (HRSA).

A description of Preventive and Wellness Services can be found at: https://www.healthcare.gov/coverage/preventive-care-benefits/

***Women's Preventive Services.*** With respect to women, such additional Preventive Care and screenings as provided for in comprehensive guidelines supported by the Health Resources and Services Administration (HRSA) not otherwise addressed by the recommendations of the United States Preventive Service Task Force (USPSTF), which will be commonly known as HRSA's Women's Preventive Services Required Health Plan Coverage Guidelines. The HRSA has added the following eight categories of women's services to the list of mandatory preventive services:

1. Well-woman visits.
2. Gestational diabetes screening.
3. Human papillomavirus (HPV) Deoxyribonucleic Acid (DNA) testing.
4. Sexually transmitted infection counseling.
5. Human Immunodeficiency Virus (HIV) screening and counseling.
6. Food and Drug Administration (FDA)-approved contraception methods and contraceptive counseling.
7. Breastfeeding support, supplies and counseling.
8. Domestic violence screening and counseling.

A description of Women's Preventive Services can be found at: http://www.hrsa.gov/womensguidelines/ or at https://www.healthcare.gov/coverage/preventive-care-benefits/

**Prosthetics, Orthotics, Supplies and Surgical Dressings.** Prosthetic devices (other than dental) to replace all or part of an absent body organ or part, including replacement due to natural growth or pathological change, but not including charges for repair or maintenance. Orthotic devices, but excluding orthopedic shoes and other supportive devices for the feet.

**Radiation Therapy.** Charges for radiation therapy and treatment.

**Routine Patient Costs for Participation in an Approved Clinical Trial.** Charges for any Medically Necessary services, for which benefits are provided by the Plan, when a Participant is participating in a phase I, II, III or IV clinical trial, conducted in relation to the prevention, detection or treatment of a life-threatening Disease or condition, as defined under the ACA, provided:

1. The clinical trial is approved by any of the following:
   a. The Centers for Disease Control and Prevention of the U.S. Department of Health and Human Services.
   b. The National Institute of Health.
   c. The U.S. Food and Drug Administration.
   d. The U.S. Department of Defense.
   e. The U.S. Department of Veterans Affairs.
   f. An institutional review board of an institution that has an agreement with the Office for Human Research Protections of the U.S. Department of Health and Human Services.
2. The research Institution conducting the Approved Clinical Trial and each health professional providing routine patient care through the Institution, agree to accept reimbursement at the applicable Allowable Expense, as payment in full for routine patient care provided in connection with the Approved Clinical Trial.

Coverage will not be provided for:

1. The cost of an Investigational new drug or device that is not approved for any indication by the U.S. Food and Drug Administration, including a drug or device that is the subject of the Approved Clinical Trial.
2. The cost of a service that is not a health care service, regardless of whether the service is required in connection with participation in an Approved Clinical Trial.
3. The cost of a service that is clearly inconsistent with widely accepted and established standards of care for a particular Diagnosis.
4. A cost associated with managing an Approved Clinical Trial.
5. The cost of a health care service that is specifically excluded by the Plan.
6. Services that are part of the subject matter of the Approved Clinical Trial and that are customarily paid for by the research Institution conducting the Approved Clinical Trial.

**Second Surgical Opinions.** Charges for second surgical opinions.

**Skilled Nursing Facility.** Charges made by a Skilled Nursing Facility or a convalescent care facility, up to the limits set forth in the Summary of Benefits, in connection with convalescence from an Illness or Injury (excluding drug addiction, chronic brain syndrome, alcoholism, senility, intellectual disability or other Mental or Nervous Disorders) for which the Participant is confined.

**Sterilization for Men.** Charges for male sterilization procedures. Benefits for all Food and Drug Administration (FDA) approved charges related to sterilization procedures for women are covered under Preventive Care, to the extent required by the Affordable Care Act (ACA).

**Surgery.** Surgical operations and procedures, unless otherwise specifically excluded under the Plan, and limited as follows:

1. Multiple procedures adding significant time or complexity will be allowed at:
   a. One hundred percent (100%) of the full Maximum Allowable Charge for the first or major procedure.
   b. Fifty percent (50%) of the Maximum Allowable Charge for the secondary and subsequent procedures.
   c. Bilateral procedures which add significant time or complexity, which are provided at the same operative session, will be allowed at one hundred percent (100%) of Maximum Allowable Charge for the major procedure, and fifty percent (50%) of the Maximum Eligible Charge for the secondary or lesser procedure.
2. Charges made for services rendered by an assistant surgeon will be allowed at twenty percent (20%) of the Maximum Allowable Charge for the type of Surgery performed.
3. No benefit will be payable for incidental procedures, such as appendectomy during an abdominal Surgery, performed during a single operative session.

**Surgical Treatment of Jaw.** Surgical treatment of Diseases, Injuries, fractures and dislocations of the jaw by a Physician or Dentist.

**Therapy Services.** Services for individual therapy are covered on an Inpatient or outpatient basis. They are services or supplies used for the treatment of an Illness or Injury and include:

1. Autism Spectrum Disorder Treatment. Charges for treatment of Autism Spectrum Disorder (ASD).
2. Cardiac Therapy. Charges for cardiac therapy.

3. Occupational Therapy. Rehabilitation treatment or services rendered by a registered occupational therapist, under the direct supervision of a Physician, in a home setting or at a facility or Institution whose primary purpose is to provide medical care for an Illness or Injury, or at a free standing outpatient facility.

4. Physical Therapy. Rehabilitation treatment or services rendered by a physical therapist, under direct supervision of a Physician, in a home setting or a facility or Institution whose primary purpose is to provide medical care for an Illness or Injury, or at a free standing duly licensed outpatient therapy facility.

5. Respiration Therapy. Respiration therapy services, when rendered in accordance with a Physician's written treatment plan.

6. Speech Therapy. Speech therapy, for Rehabilitation purposes, by a Physician or qualified speech therapist, when needed due to a Sickness or Injury (other than a functional Nervous Disorder) or due to Surgery performed as the result of a Sickness or Injury, excluding speech therapy services that are educational in any part or due to articulation disorders, tongue thrust, stuttering, lisping, abnormal speech development, changing an accent, dyslexia, hearing loss which is not medically documented or similar disorders.

See the Summary of Benefits for treatment and/or frequency limitations.

**Transplants.** Organ or tissue transplants are covered for the following human to human organ or tissue transplant procedures:

1. Bone marrow
2. Heart
3. Lung
4. Heart and lung
5. Liver
6. Pancreas
7. Kidney
8. Cornea

In addition, the Plan will cover any other transplant that is not Experimental.

**Recipient Benefits.** Covered Expenses will be considered the same as any other Sickness for Employees or Dependents as a recipient of an organ or tissue transplant. Covered Expenses include:

1. Organ or tissue procurement from a cadaver consisting of removing, preserving and transporting the donated part.
2. Services and supplies furnished by a Provider.
3. Drug therapy treatment to prevent rejection of the transplanted organ or tissue.

Surgical, storage and transportation costs directly related to the procurement of an organ or tissue used in a transplant described herein will be covered. If an organ or tissue is sold rather than donated, no benefits will be available for the purchase price of such organ or tissue.

When both the person donating the organ and the person receiving the organ are Participants, each will receive benefits under the Plan.

**Donor Benefits.** The Plan does not cover donor costs and organ acquisition for transplants. If only the donor is on this Plan, payment by this Plan will be secondary to coverage offered by the health plan of the recipient.

**Wigs.** Charges associated with the initial purchase of a wig after chemotherapy.

## EXCLUSIONS

Some health care services are not covered by the Plan. In addition to the General Exclusions set forth in the General Limitations and Exclusion section, these include, but are not limited to, any charge for care, supplies, or services, which are:

**Abortion.** Incurred directly or indirectly as the result of an abortion except when the life of the mother is endangered by the continued Pregnancy;

**Acupuncture.** Relating directly or indirectly to acupuncture.

**Biofeedback.** For biofeedback.

**Cochlear Implants.** For cochlear implants.

**Consultations.** For consultations.

**Education or Training Program.** Performed by a Physician or other Provider enrolled in an education or training program when such services are related to the education or training program, except as specifically provided herein.

**Eye Refractions.** For eye refractions, eyeglasses, contact lenses, or the vision examination for prescribing or fitting eyeglasses or contact lenses (except for aphakic patients, and soft lenses or sclera shells intended for use in the treatment of Disease or Injury).

**Foot Disorders.** Treatment of Flat Foot, cutting of corns or calluses, trimming, cutting, clipping or debriding of nail. Other hygienic and preventive maintenance care, such as cleaning and soaking the feet, the use of skin creams to maintain skin tone of either ambulatory or bedfast patients, and any other service performed in the absence of localized illness, injury, or symptoms involving the foot. (See Podiatry Services under covered expense section for what may be considered covered expenses for foot care).

**Genetic Counseling or Testing.** Care and treatment that is either for genetic counseling or testing. NOTE: For non-grandfathered plans, this Exclusion does not apply to genetic counseling or testing covered under the Preventive Care benefit.

**Hair Pieces.** For wigs, artificial hair pieces, human or artificial hair transplants, or any Drug, prescription or otherwise, used to eliminate baldness. NOTE: This Exclusion does not apply to hair pieces and wigs that are covered under the Plan for patients who are undergoing chemotherapy.

**Hearing Aids.** For hearing aids or examinations for the prescription, fitting, and/or repair of hearing aids.

**Hypnosis.** Related to the use of hypnosis.

**Impregnation and Infertility Treatment.** Following charges related to Impregnation and Infertility Treatment: artificial insemination, fertility Drugs, G.I.F.T. (Gamete Intrafallopian Transfer), impotency Drugs such as Viagra™, in-vitro fertilization, surrogate mother (unless the surrogate is a Participant, in which case the Preventive Care (if the plan is a non-grandfathered plan) and/or Pregnancy expenses will be covered in accordance with the Plan provisions), donor eggs, collection or purchase of donor semen (sperm) or oocytes (eggs), and freezing of sperm, oocytes, or embryos, or any type of artificial impregnation procedure, whether or not such procedure is successful.

**Nicotine Addiction.** For nicotine withdrawal programs, facilities, Drugs or supplies, except as specified under Preventive Care.

**Nutritional Supplements.** For nutritional supplements, except as specified under Preventive Care.

**Obesity.** Related to the care and treatment of obesity, weight loss or dietary control, unless related to morbid obesity (which is the lesser of 100 pounds over normal weight or twice normal weight). Specifically excluded, even if related to morbid obesity, are charges for bariatric surgery, including but not limited to, gastric bypass, stapling and intestinal bypass, and lap band surgery, including reversals. This Exclusion does not apply to obesity screening and counseling that are covered under the Preventive Care benefit.

**Organ Transplants.** Related to donation of a human organ or tissue, except as specifically provided.

**Orthopedic Shoes.** For orthopedic shoes, unless they are an integral part of a leg brace and the cost is included in the orthotist's charge, and other supportive devices for the feet.
Osseous Surgery. For osseous surgery.

**Personal Convenience Items.** For equipment that does not meet the definition of Durable Medical Equipment, including air conditioners, humidifiers and exercise equipment, whether or not recommended by a Physician.

**Private Duty Nursing.** Private duty nursing.

**Radial Keratotomy.** For radial keratotomy or other plastic surgeries on the cornea in lieu of eyeglasses.

**Routine Physical Examinations.** For routine or periodic physical examinations, related X-ray and laboratory expenses, and nutritional supplements, except as provided in the Summary of Benefits.

**Sex Assignment/Reassignment.** Related to a sex change operation.

**Sexual Dysfunction Therapy or Surgery.** For sexual dysfunctions or inadequacies that do not have psychological or organic basis.

**Sterilization Reversal.** For sterilization procedure reversal.

**Temporomandibular Joint Disorder.** For the Diagnosis and treatment of, or in connection with, temporomandibular joint disorders, myofascial pain dysfunction or orthognathic treatment.

**Travel.** For travel, whether or not recommended by a Physician, except as specifically provided herein.

**Vitamins.** For vitamins.

# UTILIZATION MANAGEMENT

Failure to comply with Utilization Management will result in a higher cost to Participants. "Utilization Management" includes Hospital pre-admission certification, continued stay review, length of stay determination and discharge planning. These programs are designed to ensure that Medically Necessary, high quality patient care is provided and enables maximum benefits under the Plan.

## SERVICES THAT REQUIRE PRE-CERTIFICATION OR NOTIFICATION

The following services will require Pre-Certification or Notification (or reimbursement from the Plan may be reduced):

1. Inpatient hospitalization.
2. Transplant candidacy evaluation and transplant (organ and/or tissue).
3. Skilled Nursing Facility stays.
4. Sex assignment/reassignment surgery and treatment.
5. Some outpatient surgeries (other than office surgery).

Remember that although the Plan will automatically pre-authorize a maternity length of stay that is 48 hours or less for a vaginal delivery or 96 hours for a cesarean delivery, it is important that the Participant has his or her Physician call to obtain Pre-Certification in case there is a need to have a longer stay.

Pre-Certification does not verify eligibility for benefits nor guarantee benefit payments under the Plan. It is the Participant's responsibility to verify that the above services have been pre-certified as outlined below. Notification is requested for the following services:

1. Hospice services.
2. Infusion services.
3. Dialysis.

## PRE-CERTIFICATION OR NOTIFICATION PROCEDURES AND CONTACT INFORMATION

The Inpatient Utilization Management Service is simple and easy for Participants to use. Whenever a Participant is advised that Inpatient Hospital care is needed, it is the Participant's responsibility to call the pre-certification department number that is located in their identification insurance card. The review process will continue, as outlined below, until the Participant is discharged from the Hospital.

### Urgent Care or Emergency Admissions

If a Participant needs medical care for a condition which could seriously jeopardize his or her life, obtain such care without delay, and communicate with the Plan as soon as reasonably possible.

If a Participant must be admitted on an Emergency basis, the Participant should follow the Physician's instructions carefully and contact the pre-certification department as follows:

1. For Emergency admissions after business hours on Friday, on a weekend or over a holiday weekend, a call to the pre-certification department must be made within 72 hours after the admission date, but no later than the first business day following the Emergency admission, by or on behalf of the covered patient.
2. For Emergency admissions on a weekday, a call to the pre-certification department must be made within 24 hours after the admission date.

If a medical service is provided in response to an Emergency situation or urgent care scenario, prior approval from the Plan is not required. The Plan may require notice after the Participant's receipt of treatment, once the Participant is able to so provide notice and/or the treating Provider is able to provide notice. Such a claim shall then be deemed to be a Post-service Claim.

### Non-Emergency Admissions

For Inpatient Hospital stays that are scheduled in advance, a call to the pre-certification department should be completed as soon as possible before actual services are rendered. Once the pre-certification call is received, it will be routed to an appropriate review specialist who will create an on-line patient file. The review specialist will contact the Participant's attending Physician to obtain information and to discuss the specifics of the admission request. If appropriate, alternative care will be explored with the Physician.

If, after assessing procedure necessity, the need for an Inpatient confinement is confirmed, the review specialist will determine the intensity of management required and will remain in contact with the Physician or Hospital during the confinement.

If, at any time during the review process, Medical Necessity cannot be validated, the review specialist will refer the episode to a board certified Physician advisor who will immediately contact the attending Physician to negotiate an appropriate treatment plan. At the end of the Hospital confinement, the

review specialist is also available to assist with discharge planning and will work closely with the attending Physician and Hospital to ensure that medically appropriate arrangements are made.

On weekends and evenings, the Participant can call the number on their identification card, and leave a message.

## PRE-CERTIFICATION PENALTY

The program requires the support and cooperation of each Participant. If a Participant follows the instructions and procedures, he or she will receive the normal Plan benefits for the services. However, if a Participant fails to notify the pre-certification department of any services listed in the provision entitled "Pre-Certification or Notification Procedures and Contact Information," allowed charges will be reduced by $500. The Participant will be responsible for payment of the part of the charge that is not paid by the Plan.

## ALTERNATE COURSE OF TREATMENT

Certain types of conditions, such as spinal cord Injuries, cancer, AIDS or premature births, may require long term, or perhaps lifetime, care. The claims selected will be evaluated as to present course of treatment and alternate care possibilities.

If the Plan Administrator should determine that an alternate, less expensive, course of treatment is appropriate, and if the attending Physician agrees to the alternate course of treatment, all Medically Necessary expenses stated in the treatment plan will be eligible for payment under the Plan, subject to the applicable benefit maximum(s) set forth in this Plan, even if these expenses normally would not be eligible for payment under the Plan. A more expensive course of treatment, selected by the Participant or their attending Physician, may not be deemed to be Medically Necessary or within Maximum Allowable Charge limitations, as those terms are defined by the Plan. The Plan may provide coverage in such circumstances by providing benefits equivalent to those available had the Medically Necessary and otherwise covered course of treatment subject to the Maximum Allowable Charge been pursued.

## PRE-ADMISSION TESTING

If a Participant is to be admitted to a Hospital for non-Emergency Surgery or treatment, one set of laboratory tests and X-ray examinations performed on an outpatient basis within seven days prior to such Hospital admission will be paid, after the Deductible, at 100% of the Maximum Eligible Charge, provided that the following conditions are met:

1. The tests are related to the performance of the scheduled Surgery or treatment.
2. The tests have been ordered by a Physician after a condition requiring Surgery or treatment has been diagnosed and Hospital admission has been requested by the Physician and confirmed by the Hospital.
3. The Participant is subsequently admitted to the Hospital, or confinement is cancelled or postponed because a Hospital bed is unavailable or if, after the tests are reviewed, the Physician determines that the confinement is unnecessary.
4. The tests are performed in the Hospital where the confinement will take place and accepted in lieu of duplicate tests rendered during confinement.

## SECOND SURGICAL OPINION

If a Physician recommends Surgery for a Participant, the Participant may request a second opinion as to whether or not the Surgery is Medically Necessary. In addition, the Plan recommends that a second opinion be obtained prior to the following Surgeries:

1. Adenoidectomy.
2. Bunionectomy.
3. Cataract removal.
4. Coronary Bypass.
5. Cholecystectomy (removal of gallbladder).
6. Dilation and curettage.
7. Hammer Toe repair.
8. Hemorrhoidectomy.
9. Herniography.
10. Hysterectomy.
11. Laminectomy (removal of spinal disc).
12. Mastectomy.
13. Meniscectomy (removal of knee cartilage, including arthroscopic approach).
14. Nasal surgery (repair of deviated nasal septum, bone or cartilage).
15. Prostatectomy (removal of all or part of prostate).
16. Release for entrapment of medial nerve (Carpal Tunnel Syndrome).
17. Tonsillectomy.
18. Varicose veins (tying off and stripping).

When a second opinion is requested, the Plan will pay 100% of the Maximum Allowable Charge Incurred for that opinion along with laboratory, X-ray and other Medically Necessary services ordered by the second Physician after application of the Deductible. Second opinions for Cosmetic Surgery, normal

obstetrical delivery and Surgeries that require only local anesthesia are not covered. If the second opinion does not concur with the first, the Plan will pay for a third opinion as outlined above. The second or third opinion must be given within 90 days of the first.

In all cases where a second opinion is requested, the original recommendation for Surgery must have been obtained from a Physician licensed in the medical specialty under which the recommended Surgery falls. The Physician consulted for the second opinion must be licensed in the same medical specialty and may not be a partner of or in association with the original Physician.

## PRE-SURGICAL APPROVAL

The Plan recommends that a pre-determination of benefits be obtained prior to the following Surgical Procedures, since they are usually Cosmetic Surgery or not Medically Necessary. These procedures include, but are not limited to:

1. Abdominoplasty.
2. Blepharoplasty.
3. Breast reduction or enlargement.
4. Dermabrasion.
5. Facial or nasal reconstruction.
6. Gastric bypass.
7. Lipectomy.
8. Penile implant.
9. Scar revision.
10. Sex alteration.
11. Any Experimental or research procedures which are not generally accepted medical practice.

Because of the broad range of Surgical Procedures available and under development, if a Participant is scheduled to undergo any questionable procedure, he or she should contact the Third Party Administrator for further information. Pre-surgical approval is not a guarantee of coverage.

# PRESCRIPTION DRUG BENEFITS

| PRESCRIPTION DRUG PLAN | Out-of-Pocket Maximum, per Calendar Year | |
|---|---|---|
| Individual | $4,000 | |
| Family | $8,000 | |

The out-of-pocket maximum is the maximum dollar amount Participants are responsible for paying for covered services during a Calendar Year, including the Copayments. When the individual and/or family out-of-pocket expenses reach the out-of-pocket maximum, the Plan will pay 100% of the Allowable Expenses for the remainder of the Calendar Year. No family member will be charged more than the individual out-of-pocket maximum. A Copayment is the flat dollar amount specified in the Summary of Benefits that a Participant is required to pay for certain covered services. Copayments will not apply after the out-of-pocket maximum has been reached.

| PARTICIPATING PHARMACY (30-DAY SUPPLY) | Copayment (100% after copay) | |
|---|---|---|
| Generic | $20 | per prescription |
| Formulary Brand Name | $40 | per prescription |
| Non-Formulary Brand Name | $60 | per prescription |

| MAIL ORDER PRESCRIPTIONS (90-DAY SUPPLY) | Copayment (100% after copay) | |
|---|---|---|
| Generic | $60 | per prescription |
| Formulary Brand Name | $120 | per prescription |
| Non-Formulary Brand Name | $180 | per prescription |

| SPECIALTY DRUGS (30-DAY SUPPLY)* | Copayment (100% after copay) | |
|---|---|---|
| Generic | $60 | per prescription |
| Formulary Brand Name | $120 | per prescription |
| Non-Formulary Brand Name | $180 | per prescription |

*For specialty drugs, the first prescription may be filled at a participating pharmacy; subsequent fills must be through the plan drug vendor Specialty Pharmacy.

Participating pharmacies ("Participating Pharmacies") have contracted with the Plan to charge Participants reduced fees for covered Drugs. Participants will be issued an identification card to use at the pharmacy at time of purchase. Participants will be held fully responsible for the consequences of any pharmacy identification card after termination of coverage. No reimbursement will be made when a Drug is purchased from a non-Participating Pharmacy or when the identification card is not used.

The Mail Order Option is available for maintenance medications (those that are taken for long periods of time, such as Drugs sometimes prescribed for heart Disease, high blood pressure, asthma, etc.). Because of the volume buying, your plan's drug vendor mail order pharmacy, is able to offer Participants significant savings on their prescriptions.

The Copayment is applied to each charge and is shown on the Summary of Benefits, above. The Copayment amount applies toward the medical plan out-of-pocket maximum.

## COVERED EXPENSES

The following are covered under the Plan:

**Acne Control.** Drugs that help manage the severity and frequency of acne outbreaks that cannot be purchased over-the-counter.

**Bee Sting Kits.** Charges for EPI PEN and Ana Kit.

**Compounded Prescriptions.** All compounded prescriptions containing at least one prescription ingredient in a therapeutic quantity.



**Contraceptives.** All Food and Drug Administration (FDA)-approved contraceptives Drugs, in accordance with the Health Resources and Services Administration (HRSA) guidelines.

**Drug Efficacy Study Implementation (DESI) Drugs.** Charges for DESI Drugs.

**Diabetes.** Insulins, insulin syringes and needles, diabetic supplies – legend, diabetic supplies – over the counter, and glucose test strips, when prescribed by a Physician.

**Imitrex Injection.** Charges for Imitrex injections (migraine auto-injector).

**Immunizations.** Immunization agents or biological sera.

**Immunologicals.** Charges for immunologicals (vaccines).

**Legend Drugs.**

1.   Diabetic Supplies.
2.   Legend Drugs with over the counter equivalents.
3.   Pre natal vitamins.

**Required by Law.** All Drugs prescribed by a Physician that require a prescription either by Federal or State law, except injectables (other than insulin) and the Drugs excluded below.

## LIMITATIONS

The benefits set forth in this section will be limited to:

**Dosages.**

1.   With respect to the Pharmacy Option, any one prescription is limited to a 30 day supply.
2.   With respect to the Mail Order Option, any one prescription is limited to a 90 day supply.
3.   With respect to the Specialty Drug Option, any one prescription is limited to a 30 day supply.

**Refills.**

1.   Refills only up to the number of times specified by a Physician.
2.   Refills up to one year from the date of order by a Physician.

## EXCLUSIONS

In addition to the General Limitations and Exclusions section, the following are not covered by the Plan:

**Administration.** Any charge for the administration of a covered Drug.

**Allergy Sera.** Charges for allergy sera.

**Anorexiants.** Anorexiants (weight loss Drugs).

**Anti-Aging Products.** Drugs intended to affect the structure or function of the skin that cannot be purchased over-the-counter.

**Blood and Blood Plasma.** Charges for blood and blood plasma.

**Consumed Where Dispensed.** Any Drug or medicine that is consumed or administered at the place where it is dispensed.

**Devices.** Devices of any type, even though such devices may require a prescription, including, but not limited to, therapeutic devices, artificial appliances, braces, support garments or any similar device.

**Experimental Drugs.** Experimental Drugs and medicines, even though a charge is made to the Participant.



**Fertility Agents.** Charges for fertility agents.

**Growth Hormones.** Charges for growth hormones.

**Impotency.** A charge for impotency medication, including Viagra.

**Injectables.** A charge for injectables.

**Institutional Medication.** A Drug or medicine that is to be taken by a Participant, in whole or in part, while confined in an Institution, including any Institution that has a facility for dispensing Drugs and medicines on its premises.

**Investigational Use Drugs.** A Drug or medicine labeled "Caution – limited by Federal law to Investigational use."

**Medical Devices and Supplies.** Charges for legend and over the counter medical devices and supplies.

**No Charge.** A charge for drugs which may be properly received without charge under local, State or Federal programs.

**Non-Insulin Syringes/Needles.** Charges for non-insulin syringes and needles.

**Non-Prescription Drug or Medicine.** A drug or medicine that can legally be bought without a prescription, except for injectable insulin.

**Rogaine.** Charges for Rogaine (topical minoxidil).

**Smoking Deterrents.** A charge for Drugs or aids for smoking cessation, including, but not limited to, nicotine gum and smoking cessation patches except to the extent required by the Affordable Care Act.

**Steroids.** Anabolic steroids.

**Vitamins.** Vitamins, except pre-natal vitamins.

# HIPAA PRIVACY

The Plan provides each Participant with a separate Notice of Privacy Practices. This Notice describes how the Plan uses and discloses a Participant's personal health information. It also describes certain rights the Participant has regarding this information. Additional copies of the Plan's Notice of Privacy Practices are available by contact the plan's Human Resources department.

## DEFINITIONS

**Breach** means an unauthorized acquisition, access, use or disclosure of Protected Health Information ("PHI") or Electronic Protected Health Information ("ePHI") that violates the HIPAA Privacy Rule and that compromises the security or privacy of the information.

**Protected Health Information ("PHI")** means individually identifiable health information, as defined by HIPAA, that is created or received by the Plan and that relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and that identifies the individual or for which there is a reasonable basis to believe the information can be used to identify the individual. PHI includes information of persons living or deceased.

## COMMITMENT TO PROTECTING HEALTH INFORMATION

The Plan will comply with the Standards for Privacy of Individually Identifiable Health Information (i.e., the "Privacy Rule") set forth by the U.S. Department of Health and Human Services ("HHS") pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Such standards control the dissemination of "protected health information" ("PHI") of Participants. Privacy Standards will be implemented and enforced in the offices of the Employer and Plan Sponsor and any other entity that may assist in the operation of the Plan. The Plan is required by law to take reasonable steps to ensure the privacy of the Participant's PHI, and inform him/her about:

1.  The Plan's disclosures and uses of PHI.
2.  The Participant's privacy rights with respect to his or her PHI.
3.  The Plan's duties with respect to his or her PHI.
4.  The Participant's right to file a complaint with the Plan and with the Secretary of HHS.
5.  The person or office to contact for further information about the Plan's privacy practices.

Within this provision capitalized terms may be used, but not otherwise defined. These terms shall have the same meaning as those terms set forth in 45 CFR Sections 160.103 and 164.501. Any HIPAA regulation modifications altering a defined HIPAA term or regulatory citation shall be deemed incorporated into this provision.

## HOW HEALTH INFORMATION MAY BE USED AND DISCLOSED

In general, the Privacy Rules permit the Plan to use and disclose, the minimum necessary amount, an individual's PHI, without obtaining authorization, only if the use or disclosure is for any of the following:

1.  To carry out payment of benefits.
2.  For health care operations.
3.  For treatment purposes.
4.  If the use or disclosure falls within one of the limited circumstances described in the rules (e.g., the disclosure is required by law or for public health activities).

## DISCLOSURE OF PHI TO THE PLAN SPONSOR FOR PLAN ADMINISTRATION PURPOSES

In order that the Plan Sponsor may receive and use PHI for plan administration purposes, the Plan Sponsor agrees to:

1.  Not use or further disclose PHI other than as permitted or required by the Plan documents or as required by law (as defined in the Privacy Standards).
2.  Ensure that any agents, including a subcontractor, to whom the Plan Sponsor provides PHI received from the Plan, agree to the same restrictions and conditions that apply to the Plan Sponsor with respect to such PHI.
3.  Establish safeguards for information, including security systems for data processing and storage.
4.  Maintain the confidentiality of all PHI, unless an individual gives specific consent or authorization to disclose such data or unless the data is used for health care payment or Plan operations.
5.  Receive PHI, in the absence of an individual's express authorization, only to carry out Plan administration functions.
6.  Not use or disclose genetic information for underwriting purposes.
7.  Not use or disclose PHI for employment-related actions and decisions or in connection with any other benefit or Employee benefit plan of the Plan Sponsor, except pursuant to an authorization which meets the requirements of the Privacy Standards.

8.  Report to the Plan any PHI use or disclosure that is inconsistent with the uses or disclosures provided for of which the Plan Sponsor becomes aware.

9.  Make available PHI in accordance with section 164.524 of the Privacy Standards (45 CFR 164.524).

10. Make available PHI for amendment and incorporate any amendments to PHI in accordance with section 164.526 of the Privacy Standards (45 CFR 164.526).

11. Make available the information required to provide an accounting of disclosures in accordance with section 164.528 of the Privacy Standards (45 CFR 164.528).

12. Make its internal practices, books and records relating to the use and disclosure of PHI received from the Plan available to the Secretary of the U.S. Department of Health and Human Services ("HHS"), or any other officer or Employee of HHS to whom the authority involved has been delegated, for purposes of determining compliance by the Plan with part 164, subpart E, of the Privacy Standards (45 CFR 164.500 et seq).

13. Train Employees in privacy protection requirements and appoint a Privacy Officer responsible for such protections.

14. If feasible, return or destroy all PHI received from the Plan that the Plan Sponsor still maintains in any form and retain no copies of such PHI when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the PHI infeasible.

15. Ensure that adequate separation between the Plan and the Plan Sponsor, as required in section 164.504(f)(2)(iii) of the Privacy Standards (45 CFR 164.504(f)(2)(iii)), is established as follows:

    a.  The Privacy Officer shall be given access to the PHI to be disclosed.

    b.  The access to and use of PHI by the individuals identified above shall be restricted to the plan administration functions that the Plan Sponsor performs for the Plan.

    c.  In the event any of the individuals described above do not comply with the provisions of the Plan documents relating to use and disclosure of PHI, the Plan Administrator shall impose reasonable sanctions as necessary, in its discretion, to ensure that no further non-compliance occurs. The Plan Administrator will promptly report such violation or non-compliance to the Plan, and will cooperate with the Plan to correct violation or non-compliance and to impose appropriate disciplinary action or sanctions. Such sanctions shall be imposed progressively (for example, an oral warning, a written warning, time off without pay and termination), if appropriate, and shall be imposed so that they are commensurate with the severity of the violation.

**DISCLOSURE OF SUMMARY HEALTH INFORMATION TO THE PLAN SPONSOR**

The Plan may disclose PHI to the Plan Sponsor of the group health plan for purposes of plan administration or pursuant to an authorization request signed by the Participant. The Plan may use or disclose "summary health information" to the Plan Sponsor for obtaining premium bids or modifying, amending, or terminating the group health plan. "Summary health information" may be individually identifiable health information and it summarizes the claims history, claims expenses or the type of claims experienced by individuals in the plan, but it excludes all identifiers that must be removed for the information to be de-identified, except that it may contain geographic information to the extent that it is aggregated by five-digit zip code.

**DISCLOSURE OF CERTAIN ENROLLMENT INFORMATION TO THE PLAN SPONSOR**

Pursuant to section 164.504(f)(1)(iii) of the Privacy Standards (45 CFR 164.504(f)(1)(iii)), the Plan may disclose to the Plan Sponsor information on whether an individual is participating in the Plan or is enrolled in or has un-enrolled from a health insurance issuer or health maintenance organization offered by the Plan to the Plan Sponsor.

**DISCLOSURE OF PHI TO OBTAIN STOP-LOSS OR EXCESS LOSS COVERAGE**

The Plan Sponsor may hereby authorize and direct the Plan, through the Plan Administrator or the Third Party Administrator, to disclose PHI to stop-loss carriers, excess loss carriers or managing general underwriters ("MGUs") for underwriting and other purposes in order to obtain and maintain stop-loss or excess loss coverage related to benefit claims under the Plan. Such disclosures shall be made in accordance with the Privacy Standards.

**OTHER DISCLOSURES AND USES OF PHI**

**Primary Uses and Disclosures of PHI**

1.  Treatment, Payment and Health Care Operations: The Plan has the right to use and disclose a Participant's PHI for all activities as included within the definitions of Treatment, Payment, and Health Care Operations and pursuant to the HIPAA Privacy Rule.

2.  Business Associates: The Plan contracts with individuals and entities (Business Associates) to perform various functions on its behalf. In performance of these functions or to provide services, Business Associates will receive, create, maintain, use, or disclose PHI, but only after the Plan and the Business Associate agree in writing to contract terms requiring the Business Associate to appropriately safeguard the Participant's information.

3.  Other Covered Entities: The Plan may disclose PHI to assist health care Providers in connection with their treatment or payment activities or to assist other covered entities in connection with payment activities and certain health care operations. For example, the Plan may disclose PHI to a health care Provider when needed by the Provider to render treatment to a Participant, and the Plan may disclose PHI to another covered entity to conduct health care operations. The Plan may also disclose or share PHI with other insurance carriers (such as Medicare, etc.) in order to coordinate benefits, if a Participant has coverage through another carrier.

**Other Possible Uses and Disclosures of PHI**

1. Required by Law: The Plan may use or disclose PHI when required by law, provided the use or disclosure complies with and is limited to the relevant requirements of such law.

2. Public Health and Safety: The Plan may use or disclose PHI when permitted for purposes of public health activities, including disclosures to:
   a. A public health authority or other appropriate government authority authorized by law to receive reports of child abuse or neglect.
   b. Report reactions to medications or problems with products or devices regulated by the Federal Food and Drug Administration (FDA) or other activities related to quality, safety, or effectiveness of FDA-regulated products or activities.
   c. Locate and notify persons of recalls of products they may be using.
   d. A person who may have been exposed to a communicable Disease or may otherwise be at risk of contracting or spreading a Disease or condition, if authorized by law.

3. The Plan may disclose PHI to a government authority, except for reports of child abuse or neglect, when required or authorized by law, or with the Participant's agreement, if the Plan reasonably believes he or she to be a victim of abuse, neglect, or domestic violence. In such case, the Plan will promptly inform the Participant that such a disclosure has been or will be made unless the Plan believes that informing him/her would place him/her at risk of serious harm (but only to someone in a position to help prevent the threat). Disclosure generally may be made to a minor's parents or other representatives although there may be circumstances under Federal or State law when the parents or other representatives may not be given access to the minor's PHI.

4. Health Oversight Activities: The Plan may disclose PHI to a health oversight agency for oversight activities authorized by law. This includes civil, administrative or criminal investigations; inspections; claim audits; licensure or disciplinary actions; and other activities necessary for appropriate oversight of a health care system, government health care program, and compliance with certain laws.

5. Lawsuits and Disputes: The Plan may disclose PHI when required for judicial or administrative proceedings. For example, the Participant's PHI may be disclosed in response to a subpoena, discovery requests, or other required legal processes when the Plan is given satisfactory assurances that the requesting party has made a good faith attempt to advise the Participant of the request or to obtain an order protecting such information, and done in accordance with specified procedural safeguards.

6. Law Enforcement: The Plan may disclose PHI to a law enforcement official when required for law enforcement purposes concerning identifying or locating a suspect, fugitive, material witness or missing person. Under certain circumstances, the Plan may disclose the Participant's PHI in response to a law enforcement official's request if he or she is, or are suspected to be, a victim of a crime and if it believes in good faith that the PHI constitutes evidence of criminal conduct that occurred on the Sponsor's or Plan's premises.

7. Decedents: The Plan may disclose PHI to family members or others involved in decedent's care or payment for care, a coroner, funeral director or medical examiner for the purpose of identifying a deceased person, determining a cause of death or as necessary to carry out their duties as authorized by law. The decedent's health information ceases to be protected after the individual is deceased for 50 years.

8. Research: The Plan may use or disclose PHI for research, subject to certain limited conditions.

9. To Avert a Serious Threat to Health or Safety: The Plan may disclose PHI in accordance with applicable law and standards of ethical conduct, if the Plan, in good faith, believes the use or disclosure is necessary to prevent or lessen a threat to health or safety of a person or the public.

10. Workers' Compensation: The Plan may disclose PHI when authorized by and to the extent necessary to comply with workers' compensation or other similar programs established by law.

11. Military and National Security: The Plan may disclose PHI to military authorities or armed forces personnel under certain circumstances. As authorized by law, the Plan may disclose PHI required for intelligence, counter-intelligence, and other national security activities to authorized Federal officials.

## REQUIRED DISCLOSURES OF PHI

### Disclosures to Participants

The Plan is required to disclose to a Participant most of the PHI in a Designated Record Set when the Participant requests access to this information. The Plan will disclose a Participant's PHI to an individual who has been assigned as his or her representative and who has qualified for such designation in accordance with the relevant State law. Before disclosure to an individual qualified as a personal representative, the Plan must be given written supporting documentation establishing the basis of the personal representation.

The Plan may elect not to treat the person as the Participant's personal representative if it has a reasonable belief that the Participant has been, or may be, subjected to domestic violence, abuse, or neglect by such person, it is not in the Participant's best interest to treat the person as his or her personal representative, or treating such person as his or her personal representative could endanger the Participant.

### Disclosures to the Secretary of the U.S. Dept of Health and Human Services

The Plan is required to disclose the Participant's PHI to the Secretary of the U.S. Department of Health and Human Resources when the Secretary is investigating or determining the Plan's compliance with the HIPAA Privacy Rule.

## INSTANCES WHEN REQUIRED AUTHORIZATION IS NEEDED FROM PARTICIPANTS BEFORE DISCLOSING PHI

1. Most uses and disclosures of psychotherapy notes.
2. Uses and disclosures for marketing.

3. Sale of PHI.
4. Other uses and disclosures not described in this section can only be made with authorization from the Participant. The Participant may revoke this authorization at any time.

## PARTICIPANT'S RIGHTS

The Participant has the following rights regarding PHI about him/her:

1. Request Restrictions: The Participant has the right to request additional restrictions on the use or disclosure of PHI for treatment, payment, or health care operations. The Participant may request that the Plan restrict disclosures to family members, relatives, friends or other persons identified by him/her who are involved in his or her care or payment for his or her care. The Plan is not required to agree to these requested restrictions.

2. Right to Receive Confidential Communication: The Participant has the right to request that he or she receive communications regarding PHI in a certain manner or at a certain location. The request must be made in writing and how the Participant would like to be contacted. The Plan will accommodate all reasonable requests.

3. Right to Receive Notice of Privacy Practices: The Participant is entitled to receive a paper copy of the plan's Notice of Privacy Practices at any time. To obtain a paper copy, contact the Privacy Officer.

4. Accounting of Disclosures: The Participant has the right to request an accounting of disclosures the Plan has made of his or her PHI. The request must be made in writing and does not apply to disclosures for treatment, payment, health care operations, and certain other purposes. The Participant is entitled to such an accounting for the six years prior to his or her request. Except as provided below, for each disclosure, the accounting will include: (a) the date of the disclosure, (b) the name of the entity or person who received the PHI and, if known, the address of such entity or person; (c) a description of the PHI disclosed, (d) a statement of the purpose of the disclosure that reasonably informs the Participant of the basis of the disclosure, and certain other information. If the Participant wishes to make a request, please contact the Privacy Officer.

5. Access: The Participant has the right to request the opportunity to look at or get copies of PHI maintained by the Plan about him/her in certain records maintained by the Plan. If the Participant requests copies, he or she may be charged a fee to cover the costs of copying, mailing, and other supplies. If a Participant wants to inspect or copy PHI, or to have a copy of his or her PHI transmitted directly to another designated person, he or she should contact the Privacy Officer. A request to transmit PHI directly to another designated person must be in writing, signed by the Participant and the recipient must be clearly identified. The Plan must respond to the Participant's request within 30 days (in some cases, the Plan can request a 30 day extension). In very limited circumstances, the Plan may deny the Participant's request. If the Plan denies the request, the Participant may be entitled to a review of that denial.

6. Amendment: The Participant has the right to request that the Plan change or amend his or her PHI. The Plan reserves the right to require this request be in writing. Submit the request to the Privacy Officer. The Plan may deny the Participant's request in certain cases, including if it is not in writing or if he or she does not provide a reason for the request.

7. Fundraising contacts: The Participant has the right to opt out of fundraising contacts.

## QUESTIONS OR COMPLAINTS

If the Participant wants more information about the Plan's privacy practices, has questions or concerns, or believes that the Plan may have violated his or her privacy rights, please contact the Plan using the following information. The Participant may submit a written complaint to the U.S. Department of Health and Human Services or with the Plan. The Plan will provide the Participant with the address to file his or her complaint with the U.S. Department of Health and Human Services upon request.

The Plan will not retaliate against the Participant for filing a complaint with the Plan or the U.S. Department of Health and Human Services.

## CONTACT INFORMATION

Privacy Officer Contact Information:

Peak Fishing Services, LLC

1603 N Longview St., Kilgore, TX 75662

(713) 223-5751

# HIPAA SECURITY

**DISCLOSURE OF ELECTRONIC PROTECTED HEALTH INFORMATION ("ELECTRONIC PHI") TO THE PLAN SPONSOR FOR PLAN ADMINISTRATION FUNCTIONS**

### Standards for Security of Individually Identifiable Health Information ("Security Rule")

The Health Insurance Portability and Accountability Act (HIPAA) and other applicable law shall override the following wherever there is a conflict, or a term or terms is/are not hereby defined.

The Security Rule imposes regulations for maintaining the integrity, confidentiality and availability of protected health information that it creates, receives, maintains, or maintains electronically that is kept in electronic format (ePHI) as required under HIPAA.

### Definitions

*Electronic Protected Health Information (ePHI)*, as defined in Section 160.103 of the Security Standards (45 C.F.R. 160.103) and means individually identifiable health information transmitted or maintained in any electronic media.

*Security Incidents*, as defined within Section 164.304 of the Security Standards (45 C.F.R. 164.304) and means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with systems operation in an information system.

### PLAN SPONSOR OBLIGATIONS

To enable the Plan Sponsor to receive and use Electronic PHI for Plan Administration Functions (as defined in 45 CFR §164.504(a)), the Plan Sponsor agrees to:

Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the Electronic PHI that it creates, receives, maintains, or transmits on behalf of the Plan.

1. Ensure that adequate separation between the Plan and the Plan Sponsor, as required in 45 CFR § 164.504(f)(2)(iii), is supported by Maximum Eligible Charge Security Measures.
2. Ensure that any agent, including a subcontractor, to whom the Plan Sponsor provides Electronic PHI created, received, maintained, or transmitted on behalf of the Plan, agrees to implement Maximum Eligible Charge administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of the Electronic PHI and report to the Plan any security incident of which it becomes aware.
3. Report to the Plan any security incident of which it becomes aware.

### NOTIFICATION REQUIREMENTS IN THE EVENT OF A BREACH OF UNSECURED PHI

The required breach notifications are triggered upon the discovery of a breach of unsecured PHI. A breach is discovered as of the first day the breach is known, or reasonably should have been known.

When a breach of unsecured PHI is discovered, the Plan will:

Notify the Participant whose PHI has been, or is reasonably believed to have been, assessed, acquired, used, or disclosed as a result of the breach, in writing, without unreasonable delay and in no case later than 60 calendar days after discovery of the breach. Breach notification must be provided to the affected individual(s) by:

    a. Written notice by first-class mail to the Participant (or next of kin) at the last known address or, if specified by Participant, e-mail.

    b. If the Plan has insufficient or out-of-date contact information for the Participant, the Participant must be notified by a "substitute form".

    c. If an urgent notice is required, the Plan may contact the Participant by telephone.

    d. The breach notification will have the following content:

        i. Brief description of what happened, including date of breach and date discovered.

        ii. Types of unsecured PHI involved (e.g., name, Social Security number, date of birth, home address, account number).

        iii. Steps the Participant should take to protect from potential harm.

        iv. What the Plan is doing to investigate the breach, mitigate losses and protect against further breaches.

4. Notify the media if the breach affected more than 500 residents of a State or jurisdiction. Notice must be provided to prominent media outlets serving the State or jurisdiction without unreasonable delay and in no case later than 60 calendar days after the date the breach was discovered.
5. Notify the HHS Secretary if the breach involves 500 or more individuals, contemporaneously with the notice to the affected individual and in the manner specified by HHS. If the breach involves less than 500 individuals, an internal log or other documentation of such breaches must be maintained and annually submitted to HHS within 60 days after the end of each Calendar Year.
6. When a Business Associate, which provides services for the Plan and comes in contact with PHI in connection with those services discovers a breach has occurred, that Business Associate will notify the Plan without unreasonable delay and in no case later than 60 calendar days after discovery of a breach so that the affected Participants may be notified. To the extent possible, the Business Associate should identify each individual whose unsecured PHI has been, or is reasonably believed to have been, breached.

# PARTICIPANT'S RIGHTS

As a Participant in the Plan, the Participant is entitled to certain rights and protections under ERISA. ERISA provides that all Participants are entitled to:

### RECEIVE INFORMATION ABOUT THE PLAN AND BENEFITS

Examine, without charge, at the Plan Administrator's office and at other specified locations, such as worksites and union halls (if any), all documents governing the Plan, including insurance contracts, collective bargaining agreements (if any), and copies of the latest annual report (Form 5500 Series) filed by the Plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration.

Obtain, upon written request to the Plan Administrator, copies of documents governing the operation of the Plan, including insurance contracts and collective bargaining agreements (if any), and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The Administrator may make a reasonable charge for the copies.

Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each Participant with a copy of this summary annual report.

### CONTINUE GROUP HEALTH PLAN COVERAGE

Continue health care coverage for the Employee and eligible Dependents if there is a loss of coverage under the Plan as a result of a Qualifying Event. The Employee or eligible Dependents may have to pay for such coverage. Review this Plan Document and the documents governing the Plan on the rules governing the Participant's COBRA Continuation Coverage rights.

### PRUDENT ACTIONS BY PLAN FIDUCIARIES

In addition to creating rights for Participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate the Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of the Participants and beneficiaries. No one, including the Employer, the union (if any), or any other person, may fire the Employee or otherwise discriminate against the Employee in any way to prevent the Employee from obtaining a welfare benefit or exercising the Participant's rights under ERISA.

### ENFORCE THE PARTICIPANT'S RIGHTS

If a Participant's claim for a welfare benefit is denied or ignored, in whole or in part, the Participant has a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules. Under ERISA, there are steps the Participant can take to enforce the above rights. For instance, if the Participant requests a copy of Plan documents or the latest annual report from the Plan and do not receive them within 30 days, the Participant may file suit in a Federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay the Participant up to $1,10 a day until the Participant receives the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If the Participant has a claim for benefits which is denied or ignored, in whole or in part, the Participant may file suit in a State or Federal court. In addition, if the Participant disagrees with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a Medical Child Support Order, the Participant may file suit in Federal court. If it should happen that Plan fiduciaries misuse the Plan's money, or if the Participant is discriminated against for asserting his or her rights, the Participant may seek assistance from the U.S. Department of Labor, or the Participant may file suit in a Federal court. The court will decide who would pay court costs and legal fees. If the Participant is successful, the court may order the person the Participant sued to pay these costs and fees. If the Participant loses, the court may order the Participant to pay these costs and fees, for example, if it finds the Participant's claim is frivolous.

### ASSISTANCE WITH THE PARTICIPANT'S QUESTIONS

If the Participant has any questions about the Plan, the Participant should contact the Plan Administrator. If the Participant has any questions about this statement or about rights under ERISA, or needs assistance in obtaining documents from the Plan Administrator, the Participant should contact the nearest Office of the Employee Benefits Security Administration, U.S. Department of Labor, listed in the telephone directory or the Division of Technical Assistance and Inquiries, Employee Benefits Security Administration, U.S. Department of Labor, 200 Constitution Avenue, N.W., Washington, D.C., 20210. The Participant may also obtain certain publications about his or her rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.